IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY, | Civil Action No. 3:16-cv-147 |
| Plaintiff, | |
| vs. | Electronically Filed |
| DANIEL J. FELIX, | JURY TRIAL DEMANDED |
| Defendant. | |

**CONCISE STATEMENT OF MATERIAL FACTS
IN SUPPORT DEFENDANT/COUNTERCLAIM PLAINTIFF'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

AND NOW, defendant/counterclaim plaintiff Daniel J. Felix ("defendant"), by and through his attorneys, Bordas & Bordas, PLLC, files this Concise Statement of Material Facts in Support of Defendant/Counterclaim Plaintiff's Motion for Summary Judgment and states as follows:

1. On June 24, 2016, the plaintiff/counterclaim defendant, American National Property and Casualty Company ("plaintiff" or "ANPAC"), initiated this action by Complaint In Declaratory Judgment alleging fraud pursuant to 18 Pa.C.S.A. § 4117(a)(2), and seeking a declaration from the Court voiding the homeowner's insurance policy ("Policy") it issued to the defendant. (Doc 1.)

2. The Policy covered the defendant's house, located at 975 Frankstown Road, Sidman, Cambria County, Pennsylvania. (*Id*. at ¶¶ 6-8.)

3. Contained within the Policy is the following "Fraud" provision:

Section I and Section II – Conditions

…

>> 2. Concealment or Fraud. This entire policy shall be void if, whether before or after a loss, any insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of any insured therein, or in case of any fraud or false swearing by any insured relating thereto. (*Id*. at ¶ 16.)

4. On January 23, 2016, the defendant's house that he helped to build, was destroyed by fire. (*Id*. at ¶ 7; *see also* Affidavit of Daniel J. Felix, attached to Defendant/Counterclaim Plaintiff's Motion for Summary Judgment as Exhibit A, ¶¶ 1-4.)

5. Thereafter, the defendant made claims pursuant to the Policy for losses having an estimated value in excess of a million dollars ($1,000,000.00). (Doc.1 at ¶ 9; *see also* Sworn Statement in Proof of Loss, attached to Defendant/Counterclaim Plaintiff's Motion for Summary Judgment as Exhibit B, Bates No. CL0460.)

6. During the claims process, the plaintiff determined that there were several "red flags" concerning the defendant's claim; and therefore, because the plaintiff suspected arson, the defendant's claim was referred to the plaintiff's Special Investigation Unit. (*See* the deposition of Kip Mathena, attached to Defendant/Counterclaim Plaintiff's Motion for Summary Judgment as Exhibit C, Pp. 163-180.)

7. The cause of the fire was undetermined, and therefore, no basis existed to deny the defendant's claim on the basis of arson. (*See* Exhibit C, Pp. 116, 180-182.)

8. During the claims process, the defendant submitted a wealth of information to the plaintiff, including an inventory of over 350 personal items destroyed in the fire with an estimated value of $270,000.00, which included a Louis Vuitton purse having an estimated value of $1,358.00 and a set of diamond earrings having an estimated value of $1,906.94. (Doc 1. at ¶ 10, *see also* Exhibit A, ¶¶ 5, 10; and, Exhibit B, Bates No. CL0481 and CL0468, respectively.)

9.     During the claims process, the defendant did not submit a receipt for the Louis Vuitton purse; however, he did submit a receipt for the diamond earrings from Littman Jewelers. (*See* Littman Jewelers' receipt, attached to Defendant/Counterclaim Plaintiff's Motion for Summary Judgment as Exhibit D.)

10.    During the claims process, the defendant was aware of the "Fraud" provision in the Policy, and he advised the plaintiff that he was having difficulty preparing the proof of loss, but was reviewing pictures of the interior of his house, and bank and credit card statements in order to be as accurate as possible. (*See* Exhibit A, ¶¶ 7-9.)

11.    During the claims process, the defendant had extensive communications with the plaintiff, including two separate and distinct statements under oath, which consumed approximately six hours, and over 300 pages of testimony, wherein he affirmed his loss of a Louis Vuitton purse and a set of diamond earrings in the January 23, 2016 fire. (Doc. 1. at ¶ 12; *see also* Exhibit A, ¶ 6; and, Statements Under Oath, collectively attached to Defendant/Counterclaim Plaintiff's Motion for Summary Judgment as Exhibit E, Pp. 2, 189-198, 268, 273, 329.)

12.    At the time the defendant gave his first statement under oath, he was not represented by counsel; he had never given a deposition/examination under oath before, and he was never instructed not to guess in providing answers to the plaintiff's attorney's questions. (*See* Exhibit A, ¶ 23; and, Exhibit E, Pp. 4-6.)

13.    During the statement under oath, the defendant testified that the Louis Vuitton purse was purchased as a gift for his ex-fiancé (Ms. Kelly Madison) and was later returned to him when the relationship ended. (*See* Exhibit E, P. 198.)

14. The defendant made no such representation regarding the set of diamond earrings he claimed lost in the January 23, 2016 fire. (*Id*. at 189-198; *see also* Exhibit A, ¶ 39; and, Exhibit C, Pp. 125-129.)

15. During the claims process, Ms. Madison advised the plaintiff's claims investigator, Mr. Kip Mathena, and/or, plaintiff's attorney, Mr. Joe Hudock, that she was in possession of a Louis Vuitton purse and a set of diamond earrings, both of which were given to her by the defendant. (*See* Exhibit C, Pp. 18-19, 142-144; and*,* the deposition of Kelly Madison, attached to Defendant/Counterclaim Plaintiff's Motion for Summary Judgment as Exhibit F, Pp. 32-34, 68, 71-75.)

16. Ms. Madison did not meet with plaintiff's representatives in person, and she did not provide a sworn statement during the claims process. (*See* Exhibit C, Pp. 141-144, 149; and, Exhibit F, Pp. 32-34, 74-76, 84-85, 146-147.)

17. During the claims process, either Ms. Madison or her father, Mr. Ron Madison, provided the plaintiff with photographs of a *brown* Louis Vuitton purse and a set of diamond *stud* earrings. (*See* Exhibit C, Pp. 144, 192-194; Exhibit F, Pp. 32-37, 74, 81-83; and, photographs of the brown Louis Vuitton purse and set of diamond stud earrings, attached to Defendant/Counterclaim Plaintiff's Motion for Summary Judgment as Exhibits G and H, respectively.)

18. During the claims process, Ms. Madison also provided the plaintiff with copies of text messages between her and the defendant, wherein defendant made inquiries regarding Ms. Madison's use of a $1,700.00 purse he purchased for her. (*See* Exhibit C, at Pp. 135-139, 147-148; Exhibit F, Pp. 64-67, 83-84; and, text messages between Kelly Madison and the defendant, attached to Defendant/Counterclaim Plaintiff's Motion for Summary Judgment as Exhibit I.)

19. During the claims process, plaintiff retained the services of Attorney Joseph Hudock, who provided the following coverage opinion:

> It is difficult to see how the insured could have been mistaken about whether he took back the purse from his former fiancé and whether it was in his home at that time of the fire. Consequently, it is my opinion that his statements to the effect that the purse was destroyed in the fire were made with an intent to deceive and are material, thus entitling ANPAC to void the entire policy. Although the insured did not testify that he took back the earrings, it is clear that they were not destroyed or lost in the fire as he claims. Based upon Pennsylvania law (which follows the majority view that a single fraudulent material misrepresentation can void the entire policy), I believe ANPAC is within its rights to deny the entire claim.

(*See* June 14, 2016 letter from Attorney Joseph Hudock to plaintiff, attached to Defendant/Counterclaim Plaintiff's Motion for Summary Judgment as Exhibit J.)

20. On June 23, 2016 plaintiff completed its investigation, and issued a coverage letter denying the defendant's claims. (*See* Exhibit C, P. 166; and, the June 23, 2016 letter from Kip Mathena to defendant, attached to Defendant/Counterclaim Plaintiff's Motion for Summary Judgment as Exhibit K.)

21. The *only* information that was materially significant to plaintiff in its decision to deny defendant's claims was provided to plaintiff by either Kelly Madison or her father, Ron Madison. In other words, the defendant's prior house fire, prior insurance claims, subject house fire, and/or any insurance claim "red flags" did *not* factor in the plaintiff's denial of defendant's claims. (*See* Exhibit C, Pp. 116, 166-180, 205-206.)

22. At all times during the claims process the defendant was compliant and cooperative; he provided the plaintiff with access to every piece of information the plaintiff deemed necessary to formulate its coverage opinion; and, he never refused to answer any questions during his examinations under oath. (*Id*. at P. 132; *see also* Exhibit A, ¶ 44.)

23. At no time during the claims process did the plaintiff ask the defendant if he had purchased two Louis Vuitton purses and/or two sets of diamond earrings for Kelly Madison. (*See* Exhibit A, ¶ 37; Exhibit C, Pp. 130-131, 133-134; and, Exhibit E, generally.)

24. At no time during the claims process did the plaintiff ask the defendant the color of the purses he purchased for Kelly Madison. (*See* Exhibit A, ¶¶ 19, 38.)

25. At no time during the claims process did the plaintiff ask the defendant the types of diamond earrings he purchased for Kelly Madison. (*See* Exhibit A, ¶¶ 20, 38.)

26. At no time did the defendant claim the loss of a brown Louis Vuitton purse and/or a set of diamond stud earrings. (*See* Exhibit A, ¶¶ 13-14.)

27. The color of the purse that the defendant claimed lost in the fire was white. (*See* Exhibit A, ¶ 11.)

28. The type of diamond earrings that the defendant lost in the fire were hoops. (*See* Exhibit A, ¶ 12.)

29. At no time during the claims process did the plaintiff question the amount paid or the method of payment concerning the Louis Vuitton purse the defendant claimed lost in the fire. (*See* Exhibit A, ¶ 40.)

30. At no time during the claims process did the plaintiff question the amount paid or the method of payment concerning the set of diamond earrings the defendant claimed lost in the fire. (*See* Exhibit A, ¶ 41.)

31. At no time during the claims process did the plaintiff provide the defendant with an opportunity to reconcile the discrepancies between the information the defendant submitted to the plaintiff concerning the lost Louis Vuitton purse and/or the lost set of diamond earrings with the information the plaintiff received from Kelly Madison and Ron Madison. (*See* Exhibit A, ¶ 42.)

32. At no time during the claims process did the plaintiff contact the individuals the defendant identified as having information about the house and/or its contents, including Jessica Bloom, who testified during the litigation that in the months leading up to the fire, she observed a white Louis Vuitton purse and a set of diamond hoop earrings in the defendant's home. (*See* Exhibit A, ¶ 43.)

33. On June 24, 2016, the plaintiff filed its Complaint In Declaratory Judgment, alleging fraud pursuant to 18 Pa.C.S.A. § 4117(a)(2), and seeking a declaration from the Court voiding the Policy and extinguishing the defendant's right to recover for the losses sustained in the January 23, 2016 fire based on the defendant's willful material misrepresentation concerning the defendant's loss of the Louis Vuitton purse and set diamond earrings in the January 23, 2016 fire. (Doc.1 at ¶¶ 12-16, ¶ 20.)

34. On August 22, 2016, defendant filed his Answer, Defenses and Counterclaims against plaintiff denying that he willfully made any false statements, and alleging the plaintiff's breach of contract and bad faith in denying his claims. (Doc.6 at ¶¶ 15-29, 30-36.)

35. The plaintiff referred this matter to the Pennsylvania Attorney General's office for investigation, but nothing ever came of that referral. (*See* Exhibit C, Pp. 146-147.)

36. During the litigation, the defendant explained that over the course of the three and a half year relationship with Ms. Madison, he spent no less than $36,000.00 on gifts and trips for her. Consequently, he cannot recall all of the items he purchased for her and/or the amounts he paid for each item and/or the method of payment for each item. (*See* deposition of defendant, Daniel J. Felix, attached to Defendant/Counterclaim Plaintiff's Motion for Summary Judgment as Exhibit L, Pp. 187-188; *see also* Exhibit A, ¶¶ 15-18, 33-34.)

37. During the litigation, the defendant also stated that over the course of their relationship, the defendant and Ms. Madison frequently argued. (*Id*. at Pp. 196-197; and, Exhibit A, ¶¶ 15-18, 22.)

38. During the litigation, the defendant clarified his previous sworn statement under oath concerning the Louis Vuitton purse he claimed lost in the fire:

> [Q.] And then, also, if you look at December 20, a little further down that list, you've got a $1,500 Louis purse. That's the Louis Vuitton purse. Is that correct?
> [A.] **Yes, sir.**
> [Q.] Okay. And you only ever gave Kelly Madison one Louis Vuitton purse. Correct?
> [A.] **No, sir.**
> [Q.] Can you explain your answer?
> [A.] **Yes, sir. In my statement under oath, I do say that she returned the purse. That – that statement *may* have been incorrect or not completely true in that it's my belief that I presented the purse to her. She may have never taken it or left with it from the house that we got into one of the many arguments that we had gotten into – and both of us drinking, under the influence of alcohol. So whether she left that night in a crying rage and never left with the purse – and I believe there's a – from February – oh, 15th, 2 – well, year 2015, February 2014. As the relationship ended, it's – you know, the best of my memory is that's what I had gotten her for that – as a present for that year. And that, as there's – as Kelly can tell you, there's a lengthy email substantially after that holiday, that event, where we had a major, major fight, and again, when the relationship ended. So the – the purse – it was my intent or thought that I had presented it with her. Whether I did, I could have. Or I could've been intoxicated and forgot that I ever told her about it, or I'm not sure if Ms. Madison was ever asked if there was a possibility that I had given her another purse, or she remembers if there was another purse presented to her, so –.**

(*See* Exhibit L, Pp. 193-195; *see also* Exhibit A, ¶¶ 23-24.)

> …
> [Q.] Did you give Kelly Madison more than one Louis Vuitton purse?
> [A.] **I purchased more than one Louis Vuitton purse.**
> [Q.] How many Louis Vuitton purses did you purchase?
> [A.] **Two.**
> [Q.] For whom did you purchase the two Louis Vuitton purses?
> [A.] **For Kelly.**

(*Id.* at P. 198; *see also* Exhibit A, ¶ 19.)

39.     During the litigation, the defendant explained that he believed that he purchased the Louis Vuitton purse in Ms. Madison's possession from a Louis Vuitton store by way of credit card at an approximate cost of $1,700.00 in or around December 2014, and that he purchased the other Louis Vuitton purse he claimed lost in the fire from a private individual by way of cash at an approximate cost of $1,358.00 in February 2015, but he could not be certain. In explaining why he noted a credit card payment of $1,358.00 in his proof of loss for the Louis Vuitton purse, the defendant testified that when he was preparing his proof of loss, "I looked through a credit card statement. I was unsure of which one it was there, and I did not recall which one she had or did not have, which one I paid credit for. It was my mistake, if – if that's as such. But I was unsure. So I just knew there was a purse, to the best of my knowledge, in the house. And I couldn't remember, and I knew I paid that for the one. The other one was obviously more expensive." (*Id*. at Pp. 204-226; *see also* Exhibit A, ¶¶ 7-8, 30, 32; and, Exhibit G.)

40.     From 2012 through January 2016, the defendant spent approximately $900,000.00, $300,000.00 of which involved cash and cash withdrawals. (*See* Exhibit A, ¶ 35.)

41.     From 2012 through January 2016, the defendant made many cash purchases from private individuals identified through internet websites such as Craigslist, Pennswood and Traders Guide, including but not limited to multiple firearms having an estimated value in excess of $20,000.00, multiple pieces of jewelry having an estimated value in excess of $10,000.00, a mountain bike having an estimated value of $10,000.00 and other high-end purchases, including the white Louis Vuitton purse. (*See* Exhibit A, ¶ 36.)

42.     The defendant admits to having some lapses in memory due, in part, to his history of alcohol consumption. (*See* Exhibit A, ¶¶ 21, 27.)

43. At the time the defendant prepared his proof of loss, he did not recall the loss of many personal items actually lost in the fire, and he did not recall having possession of a few items he claimed lost in the fire. The defendant later corrected his proof of loss based upon the items subsequently discovered. (*See* Exhibit A, ¶¶ 28-29.)

44. During the litigation, Ms. Kelly Madison offered the following testimony: confirming the defendant's history of alcohol intake; admitting that she had passed out at the defendant's home on one occasion in February 2015 during a disagreement over a prenuptial agreement; and, admitting that she did not know if the defendant had purchased a second Louis Vuitton purse for her:

> [Q.] Now, what about Mr. Felix, how would you describe his alcoholic intake?
> [A.] **At one point in our relationship he said he would quit drinking. He thought that that would help our relationship. So, to categorize his drinking, I would say, you know, very heavy at times and – but he could control his alcohol. I mean, if he had five drinks, he was fine. If he had ten drinks, you know, he could consume a lot more than I could, but it was definitely a problem in our relationship.**

(*See* Exhibit F, P. 137.)

> …
> [Q.] You don't--okay. When your engagement was broken off in February of 2015, do you know if Mr. Felix had intended to give you a Louis Vuitton purse at that time?
> [A.] **No.**
> [Q.] You don't know?
> [A.] **No, he – I don't think he could have cared less, but like he kind of just said I called him, and there were many talks leading up to whether it was going to be canceled or not, and I said Dan, I really don't think I am going to be able to do this and he said, cancel it, and I think at that time he was at a bar and I was at home crying, so – .**

(*Id.* at Pp. 52-53.)

> …
> [Q.] From – the date of the wedding was –
> [A.] **August 29, 2015.**
> [Q.] I believe you indicated that it was canceled in February of 2015?
> [A.] **Correct.**

10

(*Id.* at Pp. 26-27.)

…
> [Q.] When the wedding date was canceled, it had to do with the pre-nup, so we won't go through that.
> [A.] **Yeah.**
> [Q.] How did you decide; where was Mr. Felix; where were you?
> [A.] **We had had a lot of talks leading up until like I made the call. So, I mean, one time I even** *passed out* **in his house talking about it. Like we had talked about it for so long and then I had called one night and said like I can't continue to keep making these plans. I have to cancel these vendors and things. And I think he was out somewhere – I don't know his exact location, but it was just a phone call. And I said like I am going to call to cancel and he said cancel it. Like if you are not going to sign it, cancel it. That is all he said.**

(*Id.* at Pp. 177-178.)

45. Kelly Madison's father, Mr. Ron Madison, also testified and confirmed that in or around February 2015, when the issue of the "pre-nup" arose, there was occasion when his daughter was with the defendant at his home and had passed out and hit her head:

> [Q.] What was the problem about a pre-nuptial? That actually was a big issue. What was Ron Madison's view of the proposal of the pre-nup?
> [A.] **The pre-nup was almost like he – he was – almost it sounded like he was planning a divorce before the wedding. He already sent her an e-mail – the pre-nup he brought up six months before the wedding. She had the hall money down. I think 2000 down on the hall. She had the flowers bought. She had the photographer. She had the lighting. She had the band all paid for. And so, the pre-nup she was up at his house, and he mentioned the pre-nup. She was so upset she** *passed out***. She hit her head. Okay…**

(*See* deposition of Ron Madison, attached to Defendant/Counterclaim Plaintiff's Motion for Summary Judgment as Exhibit M, Pp. 61-62.)

46. During the litigation, the defendant also clarified his representation concerning the set of diamond earrings he claimed lost in the fire:

> [Q.] So just so I'm clear, does this receipt from Littman Jewelers for $1,906.94, does that relate to this page 200 or rather 201 that we're talking about, the statement under oath?
> [A.] **It does. And I'm unsure if this is the exact receipt for the earrings I claimed or not.**
> [Q.] As opposed to a replacement or as to – ?

11

> [A.] **As far as another set of earrings I had bought.**
> [Q.] Okay. And I just want to get the – I just want to get the – would you get Exhibit 3 in front of you, which is the inventory list?
> [A.] **Yes, sir.**
> [Q.] And if you would take a look at, we were looking at page 0468.
> [A.] **Yes, sir.**
> [Q.] All right. And so the testimony we just saw at page 200, and the receipt that we just saw of the earrings that pertain to this line, line two here on page 468 of your inventory, the 14 carat, 1.5 total weight earrings?
> [A.] **It was to the best of my knowledge that the earrings that I claimed in the fire that this was a receipt for, or could have been a receipt for. I'm unsure specifically if I made a mistake or not in the receipt I provided. I didn't make a mistake in providing that I had lost a set of earrings.**

(*See* Exhibit L, Pp. 151-152; *see also* Exhibit A, ¶¶ 31-32; Exhibit B, Bates No. CL4068; Exhibit D; and, Exhibit E, P. 200.)

> [Q.] Did you give earrings to Kelly Madison that were 14 carat gold, 1.5 total weight earrings that cost approximately $1906?
> [A.] **Yes, sir.**
> [Q.] So I think what you're telling me is that the earrings that you lost in the fire, you believe, are different than the earrings that you gave Kelly Madison.
> [A.] **I don't believe so. I know they were different.**
> [Q.] Can you explain what makes you say that?
> [A.] **Kelly Madison had lost a set of earrings that I had bought her for a time period. And there was discussion about them. And I bought another pair to replace them. In the meantime, she had found those earrings. So I never presented those earrings to Ms. Madison.**
> [Q.] And so the receipt that you submitted in discovery here, which is Exhibit 7, is that the receipt for the earrings that you believe are the replacement earrings? We'll call them that.
> [A.] **No, sir. I'm not certain if that is the exact receipt for the earrings that I had lost in the fire or not. I'm not positive. It was one of the receipts I had and did submit, yes. But I'm not positive it goes along with those.**
> [Q.] So is it possible that the receipt, Exhibit 7, actually is the earrings that you gave Kelly Madison?
> [A.] **That is possible, yes.**
> [Q.] Was the price of – strike that. And you got these earrings that Littman Jeweler. Correct?
> [A.] **That's correct.**
> [Q.] And if I understand you correctly, you actually might have gotten Ms. Madison two pairs of earrings from the same store, Littman Jewelers?
> [A.] **No. The second pair was not purchased at Littman Jewelers.**
> [Q.] Where did you get it?
> [A.] **They were bought at a goldsmith shop of Scalp Avenue in Johnstown.**

12

> [Q.] That just went real fast.
> [A.] **I'm sorry. A goldsmith shop. I don't recall the name of the shop. It was at Scalp Avenue, Johnstown, PA.**
> [Q.] And was the price of those earrings exactly the price of the Littman Jeweler earrings that you had gotten Ms. Madison sometime before?
> [A.] **No, sir. They were around $2,000 as well though. But I don't know the exact cost because I lost the receipt in the fire.**
> [Q.] How did you get a copy of the Littman's receipt? Was it after the fire? Did you have to go get it?
> [A.] **Yeah, I believe I got it from Littman's.**
> [Q.] And I apologize if I'm a little confused here, but bear with me.
> [A.] **No problem.**
> [Q.] The earrings that you did give to Kelly Madison that she thought she lost, but she found, were they purchased at Littman Jewelers?
> [A.] **I believe so. I was unsure of which receipt went with which earrings that I had with the amount of jewelry that I had purchased for Kelly in the past. So I was unsure of which receipt was to go with which ones.**

(*See* Exhibit L, Pp. 156-159; and, Exhibit A, ¶¶ 20, 31.)

> …
> [Q.] And would it be accurate to say that you believe that the replacement earrings that you bought were pretty close to the earrings that you had given Ms. Madison, and were close to costing the same amount. So you made the decision that it really wouldn't make much difference which receipt you gave. Correct?
> [A.] **No. Incorrect, sir. I was unsure. I may have made a mistake in my proof of loss and was never asked to correct it or subject to it, if that was actually correct. It's possible it was a mistake that I just made under the assumption here's a receipt. Okay. That was it. I don't recall. I don't remember. As you would refer to my file three of, I don't know how many pages you want to say that is, 150. Maybe not that, 100 pages of items, it is quite possible I made a mistake and supplied the wrong receipt.**
> [Q.] And you believe that the right receipt that should have been provided, if you could have gotten it, would have been from the goldsmith at Johnstown?
> [A.] **That's correct.**

(*See* Exhibit L, Pp. 161-162.)

47. During the litigation, Ms. Madison confirmed that she had temporarily lost the diamond earrings that the defendant had purchased for her. (*See* Exhibit F, Pp. 54-56.)

48. During the litigation, Ms. Madison testified that she had no knowledge whether the defendant ever purchased a second Louis Vuitton purse or a set of diamond earrings for her. (*Id.* at Pp. 44-47, 59-60.)

49. During the litigation, Ms. Madison testified that she did not know whether the defendant lost a Louis Vuitton purse and/or a set of diamond earrings in the fire of January 23, 2016. (*Id.* at Pp. 38-44, 54-62.)

50. During the litigation, the defendant's friend, Jessica Bloom, and the defendant's sister, Becky Shirk, testified that they observed a white Louis Vuitton purse in the defendant's home in the months leading up to the January 23, 2016 fire. (*See* the deposition of Jessica Bloom, attached to Defendant/Counterclaim Plaintiff's Motion for Summary Judgment as Exhibit N, Pp. 21, 76-82; and, the deposition of Becky Shirk, attached to Defendant/Counterclaim Plaintiff's Motion for Summary Judgment as Exhibit O, Pp. 23-24, 53-59.)

51. Ms. Bloom and Ms. Shirk also testified that they observed a set of diamond hoop earrings in the defendant's home in the months leading up to the January 23, 2016 fire. (*See* Exhibit N, Pp. 89-92; and, Exhibit O, Pp. 65-67.)

52. During the litigation, Ms. Madison produced e-mails and text messages exchanged with the defendant, which supplemented the text messages she initially produced to plaintiff during the claims process (Exhibit I). (*See* e-mails and text messages, attached to Defendant/Counterclaim Plaintiff's Motion for Summary Judgment as Exhibit P.)

53. During the litigation, the defendant offered information concerning the text messages Kelly Madison provided to the plaintiff:

    a. He was certain that Ms. Madison failed to produce all of the texts exchanged between them. (*See* Exhibit L, Pp. 112-114.)

    b. He was often under the influence of alcohol and/or intoxicated when he exchanged the subject texts with Kelly Madison. (*Id.* at Pp. 251-252.)

    c. He explained when he texted requesting a picture of the purse on or about May 22, 2016, prior to the denial of the claim, he was referring to the brown Louis Vuitton purse, which he wanted returned to him because he and Ms. Madison had broken

off their relationship altogether the day before. (*See* Exhibit L, Pp. 234-237; Exhibit P, Bates No. 46; and, Exhibit G.)

d. He further explained that he requested a picture of the purse because he thought Ms. Madison had sold it or gave it to her aunt or that her father did something with it, and was more interested in whether she god rid of the purse as opposed to getting it back, particularly because she deceived him in the past, so the picture would have been evidence of her truthfulness that she still had the purse. (*See* Exhibit L, Pp. 239-249; and, Exhibit P, Bates Nos. 59, 63, 70-71, 92.)

e. The defendant was concerned about Ms. Madison's truthfulness because she had lied to him on many occasions during their relationship, and even lied about the level of her involvement in his insurance claim. (See Exhibit L, Pp. 242, 278; and, Exhibit P, Bates Nos. 186 and 187.)

f. He confirmed that during the times he requested a picture of the purse it had nothing to do with the insurance claim. (*See* Exhibit L, Pp. 257-259.)[1]

g. He explained that when he texted, "Just so u know how ugly this will get in court for u and ur family. Everything will come out…," he suspected that Ms. Madison had lied to plaintiff about his loss of a Louis Vuitton purse and a set of diamond earrings, and was merely telling Ms. Madison the truth, i.e. that she would be involved in the court process, which is something that she wanted to avoid entirely, and the fact that her family (parents) would have to deal with the fallout from their daughter's stress. (*See* Exhibit L, Pp. 70-72, 80-82, 102-105; Exhibit P, Bates No.155; and, Exhibit A, ¶ 26.)

        Respectfully submitted,
        DANIEL J. FELIX,
        Defendant/Counterclaim Plaintiff,

        *s/ Tyler J. Smith, Esq.*
        CHRISTOPHER J. REGAN (PA ID #88771)
        TYLER J. SMITH PA (ID #70492)
        BORDAS & BORDAS, PLLC
        One Gateway Center, 18th Floor
        420 Fort Duquesne Blvd.
        Pittsburgh, PA 15222
        T: 412-502-5000
        F: 412-709-6343
        tsmith@bordaslaw.com

---

[1] During the time that the defendant had been asking Ms. Madison for a picture of the Louis Vuitton purse he gifted to her, the defendant's claim had not been denied, so he had no knowledge that his claim was being denied, in part, over a Louis Vuitton purse.

*Counsel for Defendant/*
*Counterclaim Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on February 14, 2018, I served a true and correct copy of the foregoing upon all counsel of record via CM/ECF.

>  */s Tyler J. Smith*_____
> Tyler J. Smith, Esquire