**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY,** | ) ) ) | |
| **Plaintiff/Counterclaim-Defendant** | ) ) | **CIVIL ACTION** |
| **v.** | ) ) | **NO. 16-147-KRG** |
| **DANIEL J. FELIX,** | ) ) | |
| **Defendant/Counterclaim-Plaintiff** | ) | |

**BRIEF IN SUPPORT OF PLAINTIFF/COUNTERCLAIM DEFENDANT AMERICAN
NATIONAL PROPERTY AND CASUALTY COMPANY'S MOTION PURSUANT TO
FED. R. CIV. PRO. 50 AND 59 SEEKING JUDGMENT AS A MATTER OF LAW
AND/OR TO ALTER OR AMEND JUDGMENT,
AND/OR FOR A NEW TRIAL**

**POST & SCHELL, P.C.**

BY: _____

**Richard L. McMonigle, Jr., Esq.**
 (PA ID: 33565)
**Karyn D. Rienzi, Esq.**
 (PA ID: 92034)
**Bryan M. Shay, Esq.**
 (PA ID: 205953)
Four Penn Center, 13th Fl.
1600 John F Kennedy Blvd.
Philadelphia, PA  19103
215-587-1019  (phone)
215-587-1444 (fax)
*Attorneys for Plaintiff/Counterclaim
Defendant AMERICAN NATIONAL
PROPERTY AND CASUALTY COMPANY*

**Dated: 1/2/2019**

**Table of Contents**

Page

I.    SYNOPSIS OF AMERICAN NATIONAL'S RULE 50 AND 59 MOTIONS...............1

II.   PROCEDURAL HISTORY ................................................................................3

    A.    RELEVANT CLAIMS ................................................................................3

    B.    RELEVANT PRE-TRIAL RULINGS.........................................................4

    C.    TRIAL .........................................................................................................5

    D.    TRIAL VERDICT .......................................................................................7

III.  SUMMARY OF KEY FACTUAL EVIDENCE AT TRIAL ...........................7

    A.    THE POLICY'S RELEVANT TERMS AND CONDITIONS .............7

    B.    FELIX'S BREACH OF CONTRACT CLAIM AND HIS CLAIM
        FOR CONTRACTUAL DAMAGES ......................................................14

        1.    Loss of Use Claim (Additional Living Expenses). ....................15

        2.    Personal Property Claim. .............................................................16

        3.    Dwelling Claim ............................................................................18

    C.    AMERICAN NATIONAL'S DENIAL OF FELIX'S CLAIM
        BASED      UPON      FELIX'S      INTENTIONAL
        MISREPRESENTATION, FRAUD, AND FALSE SWEARING .......20

        1.    The Louis Vuitton Purse and Diamond Earrings. .....................20

        2.    Other Misrepresentations by Felix..............................................24

IV.   APPLICABLE LEGAL STANDARDS ..........................................................27

    A.    RULE 50 MOTION FOR JUDGMENT AS A MATTER OF LAW ..................27

    B.    RULE 59 MOTION TO ALTER OR AMEND JUDGMENT .............................29

    C.    RULE 59 MOTION FOR A NEW TRIAL.............................................29

    D.    STANDARDS APPLICABLE TO THE INTERPRETATION OF
        AN INSURANCE POLICY ....................................................................30

V.    LEGAL ARGUMENT.......................................................................................31

A.      RULE 50 AND 59 MOTION WITH RESPECT TO THE JURY AWARD ON FELIX'S CLAIM FOR LOSS OF USE/ADDITIONAL LIVING EXPENSE DAMAGES .........................................31

B.      RULE 50 AND 59 MOTION WITH RESPECT TO THE JURY AWARD ON FELIX'S CLAIM FOR LOSS OF CONTENTS DAMAGES ...............................................................................................34

C.      RULE 50 AND 59 MOTION WITH RESPECT TO THE JURY AWARD ON FELIX'S CLAIM FOR LOSS OF DWELLING DAMAGES ..............................................................................................40

        1.    American National Is Entitled to Judgment in its Favor as a Matter of Law Regarding the Jury Award on Felix's Loss of Dwelling Claim Stating "Plus 25% Endorsement." .........................................40

        2.    Based Upon the Applicable Policy Language and the Evidence Produced at Trial, The Most the Jury Could Reasonably Have Awarded Felix on the Loss of Dwelling Claim Was $588,453.18 for Replacement Cost Value. 43

D.      RULE 50 AND 59 MOTION WITH RESPECT TO JURY AWARD ON FELIX'S CLAIM FOR "SERVICES FROM ROBERT L. FELIX" ..........................................................................46

E.      RULE 59 MOTION SEEKING A NEW TRIAL BASED UPON THE JURY'S PLAIN DISREGARD OF THE EVIDENCE AND INSTRUCTIONS FROM THE COURT ..................................................47

F.      RULE 59 MOTION SEEKING A NEW TRIAL BASED UPON THE COURT'S REFUSAL TO ALLOW EVIDENCE CONCERNING FELIX'S FIRST FIRE LOSS AND RELATED CLAIM SUBMITTED TO AMERICAN NATIONAL .......................................49

G.      RULE 59 MOTION SEEKING A NEW TRIAL BASED UPON THE COURT'S REFUSAL TO ALLOW EVIDENCE OF THE EXTENT AND RESULT OF THE CAUSE AND ORIGIN INVESTIGATION INTO THE SUBJECT FIRE ...................................................54

H.      RULE 59 MOTION SEEKING A NEW TRIAL BASED UPON THE COURT'S PERMITTING FELIX TO QUESTION WITNESSES CONCERNING THE "PLUS 25% ENDORSEMENT" WITHOUT OFFERING SAME INTO EVIDENCE ...............................................................................................58

I.      RULE 59 MOTION SEEKING A NEW TRIAL BASED UPON THE COURT'S IMPROPER JURY INSTRUCTION AS TO THE STANDARD APPLICABLE TO THE DECLARATORY JUDGMENT CLAIM ON FRAUD ....................................................................61

J.   RULE 59 MOTION SEEKING A NEW TRIAL BASED UPON THE COURT'S REFUSAL TO ALLOW VOIR DIRE QUESTIONING AND A JURY CHARGE REFLECTING THE LAW THAT IF FELIX WILLFULLY CONCEALED OR MISREPRESENTED A SINGLE MATERIAL FACT OR CIRCUMSTANCE CONCERNING HIS INSURANCE CLAIM, THE SUBJECT INSURANCE POLICY WOULD BE VOID............................64

**VI.   CONCLUSION** ...............................................................................................**68**

Plaintiff/Counterclaim Defendant American National Property and Casualty Company ("American National"), by and through its undersigned counsel, hereby files this Brief in Support of its Motion Pursuant to Fed. R. Civ. Pro. 50 and 59 Seeking to Alter or Amend Judgment, and/or for a New Trial, and/or For Judgment as a Matter of Law.

## I.    <u>SYNOPSIS OF AMERICAN NATIONAL'S RULE 50 AND 59 MOTIONS</u>

As the party which filed the initial pleading in this case, Plaintiff American National proceeded first with its evidence at trial.  Because the focus of American National's case was on Felix's violation of the Concealment or Fraud condition of the Policy, the bulk of American National's evidence focused upon the misrepresentations made by Felix in the presentation of his claim and proof as to his intent in making those misrepresentations and committing insurance fraud.  Felix's evidence to counter American National's case and in support of his alleged breach of contract claim was based primarily upon the testimony obtained from American National's witnesses on cross-examination.  Felix opted not to personally testify, either in the presentation of his defense to American National's claims, or in support of his breach of contract claim. While this decision may have had a favorable effect on his defense to the misrepresentation, false swearing, and fraud claims, should those parts of the verdict be permitted to stand, Felix's failure to personally testify significantly undermined the jury's verdict that was returned in his favor on each and every aspect of his breach of contract claim against American National.  ***In fact, each damage award was marred by serious legal error that mandates post-verdict relief***.   These errors, and the required relief to cure same, are as follows:

- As to Felix's claim for Loss of Use/Additional Living Expense ("ALE"), American National is entitled to judgment in its favor as a matter of law under Rule 50(b) based upon the applicable Policy language and the fact that Felix failed to prove that he ***actually incurred*** a "necessary increase in living expenses … so that your household can maintain its normal standard of living." Alternately, under Rule 59, the jury award as to Felix's claim for Loss of Use/ALE must be molded to zero.

- As to Felix's claim for Loss of Contents, the jury award is excessive, and, indeed, ***twice the amount Felix was claiming.*** Under Rules 50(b) and 59, based upon the applicable Policy language and the only evidence-supported estimates as to the value of his Contents claim offered into evidence—which estimates were prepared by American National's vendor, Enservio—the jury award must at minimum be reduced to the sum of $257,390.43.

- As to Felix's claim for Loss of Dwelling, American National is entitled to judgment in its favor as a matter of law under Rule 50(b) regarding the jury award stating "plus 25% endorsement," thus negating the Court's addition of $181,756.08 to the Loss of Dwelling claim based upon the jury's finding. Alternately, under Rule 59, the amount relating to the jury statement "plus 25% endorsement" must be molded to zero. The jury's and Court's reference to the endorsement was in error first because ***the endorsement at issue was never offered into evidence at trial***. Moreover, even were the Court to consider the endorsement, ***the "plus 25%" terms of the endorsement would not apply***, because the jury award of $727,024.33, was based upon an estimate that represented the full replacement cost (less only the Policy deductible) of Felix's dwelling—which was the most Felix would be entitled to recover.

- Further as to Felix's claim for Loss of Dwelling, he never submitted his contractor's rebuild estimate, or presented expert testimony as to the appropriate replacement cost of his dwelling, nor did he take the stand and testify on his own behalf as to the valuation of his dwelling. ***Instead, Felix elected to rely upon the trial testimony of American National's Cory Campbell and the estimates prepared by American National's independent adjustment firm, Summit Claim Services, as reviewed by its Property Quality Unit***. Under Rules 50(b) and 59, based upon the applicable Policy language and the testimonial evidence produced by Mr. Campbell at trial, the Loss of Dwelling award must be molded by the Court to $588,453.18—the only amount testified to by Mr. Campbell as being supported by the evidence supplied by Felix.

- As to Felix's claim for "Services from Robert L. Felix," American National is entitled to judgment in its favor as a matter of law under Rule 50(b) for several reasons: ***the pleadings make no mention of such claim; the evidence did not establish that Felix suffered damage as a result of the non-payment of such claim; Felix lacked standing to bring such claim on behalf of Robert Felix; and the applicable Policy language does not cover such claim.*** Alternately, under Rule 59, the jury award as to Felix's claim for Services from Robert L. Felix must be molded to zero.

Furthermore, pursuant to Rule 59, based upon the foregoing errors and additional legal errors at trial, American National is entitled to a new trial as to all issues raised in American National's Complaint and Felix's Counterclaim, for the following reasons:

- The jury's verdict is contrary the law, against the weight of the evidence, and wholly unsupported by the evidence presented.  As shown above, with respect to Felix's claim for breach of contract damages, the jury recklessly disregarded the testimonial and documentary evidence, the Policy language, and the instructions from the Court.  The jury simply awarded nearly the full Policy limits, irrespective of Felix's proof of his actual damages, and threw in an extra 25% for the Dwelling claim without proof it was warranted.  The verdict suggests that the jury award was motivated by undue sympathy for Felix or unfair animus toward American National, or both, contrary to the Court's instructions.

- The Court erred and abused its discretion in refusing to allow evidence concerning Felix's first fire loss in March 2013 and the related claim submitted to American National.

- The Court erred and abused its discretion in refusing to allow evidence of the extent and result of the cause and origin investigation conducted by American National into the fire of January 23, 2016.

- The Court erred and abused its discretion in permitting Felix's counsel to question witnesses concerning the "plus 25% endorsement" to the Policy without offering the terms of same into evidence.

- The Court erred and abused its discretion by improperly instructing the jury as to the standard applicable to the declaratory judgment claim on fraud.

- The Court erred and abused its discretion by refusing to allow voir dire questioning and requested jury charges reflecting the law that if Felix willfully concealed or misrepresented a single material fact or circumstance concerning his insurance claim, the subject insurance Policy would be void.

## II.   PROCEDURAL HISTORY

### A.   RELEVANT CLAIMS

This action arises from the January 23, 2016 fire loss to the Sidman, PA property owned by Defendant/Counterclaim Plaintiff Daniel Felix ("Felix"), and from Felix's subsequent claim for insurance coverage in connection with same under a policy of homeowners' insurance issued to him by American National ("the Policy").  American National denied Felix's fire loss claim based on his violation of the Concealment or Fraud condition in the Policy, and it subsequently filed the instant declaratory judgment and fraud action.  In response to American National's claims, Felix asserted counterclaims for breach of contract and bad faith.  In its April 11, 2018

Order, the Court dismissed Plaintiff's bad faith counterclaim.  *See* ECF Doc. No. 72.  American National's claims, and Felix's counterclaim for breach of contract, went to trial on November 26, 2018.

### B.      RELEVANT PRE-TRIAL RULINGS

Prior to the trial of this matter, both parties filed several Motions *in Limine* in accordance with the Court's Pre-Trial Scheduling Order.  Relevant to the instant Motions, Felix filed pre-trial motions seeking to preclude evidence of (1) the March, 2013 fire loss and subsequent insurance claim suffered by Felix at the same property as the subject fire loss, *see* Def. Motion *in Limine* #1, ECF Doc. No. 83; and (2) American National's investigation of the subject fire as arson, *see* Def. Motion *in Limine* #2, ECF Doc. No. 86.

On November 21, 2018, the Court issued its decisions on the parties' various pre-trial motions.  With respect to the motion relating to the March, 2013 fire loss (Def. Motion *in Limine* #1), the Court held that "any evidence related to the 2013 fire is inadmissible under Rules 401, 403, and 404 of the Federal Rules of Evidence."  *See* ECF Doc. No. 187, at 3.  According to the Court, "[t]he 2013 fire is wholly unrelated to the content of Felix's insurance claim after the 2016 fire.  ANPAC does not allege any connection between the purse or earrings and the 2013 fire."  *Id*.  The Court further held that the evidence regarding this first fire had the potential to unfairly prejudice the jury, in that it "could prejudice Felix if it leads the jury to conclude that, because ANPAC paid Felix's insurance claim after the 2013 fire, Felix was trying to take advantage of ANPAC by making a second claim after the 2016 fire."  *Id*. at 4.  The Court rejected American National's argument that the 2013 fire and subsequent insurance claim supported its contention that Felix had the knowledge and motive to commit insurance fraud after this fire loss.  *Id*. at 5.

With regard to Felix's Motion pertaining to the scope of American National's investigation into the subject fire (Def. Motion *in Limine* #1), the Court granted Felix's Motion, and held that "ANPAC will not be permitted to introduce evidence of investigations into the cause of the 2016 fire." *See* ECF Doc. No. 194. On November 25, 2018—the day before trial—American National filed a motion seeking clarification of the Court's holding with respect to its investigation of the subject fire loss. *See* Motion for Clarification, ECF Doc. No. 198. On November 26, 2018, the Court granted American National's Motion seeking clarification of the Court's Order regarding Felix's Motion *in Limine* #2, and it vacated its previous Order. *See* ECF Doc. No. 200. By way of clarification, the Court held that American National would "not be permitted to introduce evidence of arson or suspicion of arson as the cause of the 2016 fire at Mr. Felix's home."

Importantly, the parties agreed on the record at the outset of the trial that the Motions *in Limine* and related briefs would be sufficient to preserve all issues for post-verdict and appellate review, and would be deemed sufficient offers of proof as to any evidence precluded by Court order. The Court concurred with the position that all such issues were properly preserved for appellate review.[1]

## C.   TRIAL

A jury trial commenced before the Honorable Kim R. Gibson on November 26, 2018. Jury selection was concluded in the afternoon of that date. The swearing of the jury was followed by the Court's pre-charge, and opening statements by counsel for American National and Felix. American National's SIU Claims Examiner, Kip Mathena, testified for about an hour. Mathena resumed the stand the following day, November 27. His testimony did not conclude

---

[1] The transcript of this colloquy is presently being transcribed.

until the morning of November 28, whereupon the following witnesses testified over the next three days:

- Kelly Madison

- Ron Madison (Kelly Madison's father)

- Joseph Hudock, Esquire (former counsel for American National)

- Cory Campbell (American National Property Claims Adjuster)

- Douglas King (forensic CPA)

- Angela Merrill

Ms. Merrill concluded her testimony Friday afternoon, November 30.  On the following Monday, December 3, after reading in a statement of admission from Felix concerning the facts of the break-in to Ms. Merrill's residence, American National rested.  Defendant Felix called only one live witness in his case: his friend, Jess Bloom.  Ms. Bloom testified for about 30 minutes.  Felix's counsel also played, over American National's objection, brief excerpts from the depositions of American National's Keith Heuring (Cory Campbell's supervisor) and John Jennings (the company's corporate representative).  The defense then rested.

Notably, the defense elected not to call Felix as a trial witness.  Thus, there was no trial testimony from Felix to rebut the allegations of intentional misrepresentation (such as, for example, by testifying that he had made a mistake with respect to certain inventory items).  Likewise, there was no trial testimony from Felix in support of his damages claim for breach of contract against American National.

A lengthy charging conference was had the afternoon of Monday, December 3.  Rule 50 motions were argued and denied.  On Tuesday, December 4, the parties' counsel delivered their closing statements, followed by the jury charge given by Judge Gibson.  The jury returned its verdict at approximately 3:00 p.m. that afternoon.

### D.      TRIAL VERDICT

After deliberating only a little more than an hour, the jury of twelve returned its unanimous verdict.  The jury rejected American National's position under the Fraud and Concealment provision and Pennsylvania's Civil Insurance Fraud statute.  The jury held that American National breached the policy by failing to pay Felix in connection with his claim.  On the Jury Verdict Slip [ECF Doc. No. 218], the jury awarded:

| | |
|---|---|
| Loss of dwelling: | $727,024.33, "plus 25% endorsement" |
| Loss of contents: | $501,516 |
| Loss of use: | $146,620 |
| Services from Robert L. Felix | $3,800 |

As it turned out, in awarding damages, the jury awarded Felix substantially more than his counsel, in his opening statement, said that Felix was seeking,[2] and more than Felix's evidence would support.  After the jury returned its verdict, the Court *sua sponte* added 25% to the Dwelling damage award; this action added $181,756.08, bringing the total award for Loss of Dwelling to $908,780.41, and the total verdict amount to $1,560,716.41.  *See id.*

## III.   SUMMARY OF KEY FACTUAL EVIDENCE AT TRIAL

### A.      THE POLICY'S RELEVANT TERMS AND CONDITIONS

Felix's breach of contract claim is framed by the terms of the operative contract—his Policy with American National.  Entered into evidence as Trial Exhibit J-1[3] at trial was a copy of the Policy forwarded to Felix after his fire.  *See* Exhibit J-1; *see also* N.T. Mathena, 11/26/18, at 9.  There was also a significant amount of trial testimony about a supplemental policy

---

[2] In his opening statement to the jury, Attorney Olcott suggested that Felix's damages (based on American National's estimates) were $220,218 for the Contents Loss; $3,310 per month for the Loss of Use/ALE, which he calculated at $115,810; and $712,779 for the Dwelling Loss.  *See* N.T., 11/26/2018, Transcript of Defense Opening Statement, at 16-17.

[3] All references to Exhibits, unless otherwise indicated, are to the Exhibits used at trial.  By agreement of the parties, Joint Exhibits were marked, "J-__."   American National's Exhibits were marked, "P-__."  Felix's Exhibits were marked, "D-__."

endorsement, colloquially referred to as "the 25% endorsement," but more accurately referred to as Endorsement SH-31410, which entitled, "Special Protection Package – Silver Series."  In one of Felix's oversights that affects the instant post-verdict motions, Felix failed to offer into evidence the terms and conditions of Endorsement SH-31410, even though the parties did not dispute that it had been retroactively placed in effect.  A true and correct copy of Endorsement SH-31410 is attached to American National's Motion as Exhibit "A."

Felix's claim for contractual damages arises under SECTION I of the Policy, which deals with the Policy's property damage coverages, and about which there was considerable trial testimony.  The Declarations Page for the Policy delineates the following relevant policy limits:

| SECTION I | LIMITS |
|---|---|
| COVERAGE A – DWELLING | $733,100 |
| … | |
| COVERAGE C – PERSONAL PROPERTY | $504,000 |
| COVERAGE D – LOSS OF USE | $146,620 |
| SUBJECT TO MONTHLY MAXIMUM OF $14,662 | |

*See* Exhibit J-1 at CL 0988, 0992.    The Declarations Page further provides that there is an all-perils deductible of $7,331 (which is one percent of the Dwelling policy limits).  *Id.*  Importantly, by its terms and according to unrebutted trial testimony, the applicable Policy limits are not affected by Endorsement SH-31410.  *See* Exhibit "A," at 1 (referring in numerous places to "**the limit of liability** shown in the **Declarations"** of the policy[4]); N.T. Cory Campbell (November 28, 2018) at 77-79 (hereinafter "N.T. Campbell").

Turning to the three elements of property damage involved in this case, under "COVERAGE A – DWELLING," the Policy states in part:

---

[4] The only "limit of liability" for Dwelling Coverage on the Declarations Page is $733,100.

We cover:

a.   the dwelling on the **residence premises** shown in the **Declarations** used principally as a private residence, including structures attached to the dwelling; ….

This coverage does not apply to land, including land on which dwelling is located.

*See* Exhibit J-1 at CL 0997.   As to the methodology of calculating the amount of Dwelling loss under Coverage A, the Policy—in SECTION I - CONDITIONS, under "Loss Settlement"—provides as follows:

b.   Buildings under Coverage A or B will be settled at replacement cost without deduction for depreciation, subject to the following:

(1)   We will pay the cost of repair or replacement without deduction for depreciation, but not exceeding the smaller of the following amounts:

(a)   the **limit of liability** under this policy applying to the building;

(b)   the replacement cost of that part of the building damaged for equivalent construction and use on the same premises; or

(c)   the amount actually and necessarily spent to repair or replace the damaged building.

(2)   We will pay the actual cash value of the damage, not to exceed the applicable **limit of liability**, until actual repair or replacement is completed.

(3)   For replacement cost loss settlement provisions to apply, you must first make claim under the policy for loss or damage on an actual cash value basis and then you must:

a.   complete repair or replacement of the damaged property; and

b.   make claim within 180 days from the date of payment of the actual cash value amount for any additional liability on a replacement cost basis.

9

*See* Ex. J-1 at CL 1005, as amended by Pennsylvania Amendatory Endorsement, CL 1014.

Under "COVERAGE C – PERSONAL PROPERTY," the Policy provides coverage for damaged or destroyed contents, stating in pertinent part, "We cover personal property owned or used by any **Insured** while it is anywhere in the world." *See* Exhibit J-1 at CL 0998.   As to the methodology of calculating a Personal Property loss under Coverage C, the Policy—in SECTION I - CONDITIONS, under "Loss Settlement"—provides that American National will pay no more than: "(1)  the cost to repair or replace the damaged property with material of like kind and quality; or (2) the applicable limit of liability of the policy." *See* Ex. J-1 at CL 1005. The "CONTENTS REPLACEMENT COST COVERAGE ENDORSEMENT," Policy Form SH91147, provides replacement cost coverage for a Personal Property claim as follows:

> In consideration of an additional premium, coverage of this policy is extended to include the full cost of repair or replacement without deduction for depreciation, subject to the conditions of this endorsement and applicable to [**Coverage C**] …
>
> Our liability for loss on any one item or items covered hereunder shall not exceed the smallest of the following amounts:
>
> 1.   replacement cost at the time of loss;
> 2.   the full cost of repair;
> 3.   the Coverage C Limit of Liability;
> 4.   any special **limits of liability** described in the policy;
> 5.   the interest of the **insured**; or
> 6.   the amount it would cost us to replace the item with a similar item of like kind and quality, using our replacement facilities, within a reasonable time after the loss.
>
> When the replacement cost for the entire loss under this endorsement is more than $500, we will pay no more than the **actual cash value** for the loss or damage until the actual repair or replacement is completed. …
>
> The following also apply under this loss settlement process:
>
> (a)   You shall promptly forward to us evidence of the arrangement with the party repairing or replacing the property

which shows the cost and approximate completion date of the repaired property or delivery date of the replaced property.

(b)      We will send to you the balance, if any, of the loss payment previously agreed upon when you notify us of the completion of the repairs or the expected delivery date of the replaced property.

(c)      We will pay no more than the **actual cash value** for the loss or damage and you agree to refund the amount greater than the **actual cash value** within 30 days of our notice to you if you do not comply with the terms listed above. …

You may make a claim for the **actual cash value** of the loss and then make a claim within 180 days from the date of payment of the **actual cash value** amount for any additional liability due to this policy condition.

All other terms and conditions of this policy not in conflict herewith remain unchanged.

*See* Exhibit J-1 at CL 1016.

Under "COVERAGE D – LOSS OF USE," the Policy provides coverage for Loss of Use,

including Additional Living Expenses ("ALE"), pursuant to the following language:

Subject to a monthly maximum of 2% of the Coverage A **limit of liability**, the **limit of liability** shown in the **Declarations** for Coverage D is the total limit for all the following coverages:

**1.      Additional Living Expense**. If a loss covered under this Section makes the residence premises uninhabitable, we cover any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living for up to [24 or 36] months. Payment shall be for the shortest time required to repair or replace the premises; or, if you permanently relocate, the shortest time required for your household to settle elsewhere. This period of time is not limited by expiration of this policy. …

*See* Ex. J-1 at CL 0999; Exhibit "A," at 1.[5]

---

[5] American National's standard Policy language allows for 24 months of Loss of Use Coverage. *See* Exhibit J-1 at CL 0999.  Endorsement SH-31410 increases that amount to 36 months.  *See* Exhibit "A," at 1.  As will be developed below, since Felix presented no evidence or testimony proving any necessary increase in living expenses *actually incurred by him* so that his household could maintain its normal standard of living, the difference in months' coverage is immaterial.

Endorsement SH-31410 (which, as noted above, was never offered into evidence) has no effect on the applicable limit of liability with respect to COVERAGE C – PERSONAL PROPERTY and COVERAGE D – LOSS OF USE; rather, it provides as follows:

> III.   Under Section I, the following limits of liability apply:
>
> Coverage C – Personal Property limit is at least 75% of Coverage A, *but no more than the amount shown on the Declarations for Coverage C.*
>
> Coverage D – Loss of Use limit is at least 25% of Coverage A, *but no more than the amount shown on the Declarations for Coverage D*.

*See* Exhibit "A," at 2 (emphasis added).

To the extent it is deemed applicable, Endorsement SH-31410 provides as follows with respect to calculating a loss under COVERAGE A – DWELLING:

> II.   **SECTION I – CONDITIONS**
>
> A. Under item 3. **Loss Settlement**, paragraph b. is deleted and replaced with the following:
>
> b. Buildings under Coverage A will be settled at replacement cost without deduction for depreciation, subject to the following:
>
> (1) We will pay the cost of repair or replacement without deduction for depreciation, but not exceeding the smallest of the following amounts:
>
> (a)   125% of the **limit of liability** shown in the **Declarations** for Coverage A.
>
> (b)   the replacement cost of that part of the damage for equivalent construction and use on the same premises;
>
> (c)   the amount actually and necessarily spent to repair or replace the damage; or
>
> (d)   the replacement cost of your home or any part as described in **Declarations** – Page 2, Description of Your House.

The extension provided in (a), above, does not apply unless and until replacement takes place on the same premises with a structure designed for the same use and occupancy. Compliance with any applicable Valued Policy Statute will be limited to the **limit of liability** shown in the **Declarations**.

(2) We will pay the **actual cash value** of the damage not to exceed the applicable **limit of liability**, until actual repair or replacement is completed.

(3) For replacement cost loss settlement provisions to apply, you must first make claim under the policy for loss or damage on an actual cash value basis and then you must:

> (a)    complete repair or replacement of the damaged property; and

> (b)    make claim within 180 days from the date of payment of the **actual cash value** amount for any additional liability on a replacement cost basis.

You agree to notify us within 90 days of the start of any new building or any additions or remodeling of the dwelling which will increase the value of your dwelling by $5,000 or more, and pay any resulting additional premium. If you fail to notify us within 90 days, our loss payment shall not exceed the **limit of liability** applying to the dwelling.

…

IV. Special Protection Package and Ordinance or Law Coverage shall not increase the total amount we will pay under Coverage A – Dwelling, for the cost of repair or replacement, beyond 125% of the Coverage A – Dwelling **limit of liability** shown on the **Declarations**.

All other provisions of the policy apply.

*See* Exhibit "A," at 1-2.

American National's case in chief primarily cited two sections of the Policy.  The first, found in SECTION I - CONDITIONS, was entitled **"Your Duties After Loss,"** and specified Felix's duties owed to American National in connection with the presentation of his fire claim, including:

- providing prompt notice of the claim;

13

- assisting in the investigation;

- preparing an inventory of damaged Personal Property, "showing in detail, the quantity, description, **actual cash value**, and amount of the loss";

- "Attach[ing] to the inventory all bills, receipts, and related documents that substantiate the figures in the inventory"; and

- submitting to a Statements Under Oath ("SUO") as often as reasonably required.

*See* Exhibit J-1 at CL 1005. The second, found in SECTION I & SECTION II – CONDITIONS, was entitled "**Concealment or Fraud,"** and provided:

> This entire policy shall be void if, whether before or after a loss, any **insured** has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of any **insured** therein, or in case of any fraud or false swearing by any **insured** relating thereto.

*See* Exhibit J-1 at CL 1011.

## B. FELIX'S BREACH OF CONTRACT CLAIM AND HIS CLAIM FOR CONTRACTUAL DAMAGES

Felix himself provided absolutely no testimony concerning his contract claim and his claim for contractual damages. Contrary to what a policyholder might typically do in a breach of contract case, he did not personally testify as to the value of the claimed property at issue. He did not submit contractor estimates or invoices as to the cost to rebuild his home. He did not submit invoices or receipts as to actual costs incurred in obtaining replacement personal property. He did not submit any proof as to his pre-fire living expenses. And he did not submit any proof as to costs he actually incurred post-fire to maintain his living expenses.

Most of the testimony on Felix's breach of contract claim came from American National's witnesses, primarily Kip Mathena of American National's SIU and Cory Campbell of its Claims Department. Of those two, Campbell testified as the only professionally-trained property claims adjuster. *See* N.T. Campbell, at 3-4. The testimony of other witnesses—Kelly

Madison, Ron Madison, Joseph Hudock, Angela Merrill and the only defense witness, Jess Bloom—while tangentially addressing certain parts of Felix's claim, was more focused on the fraud aspect of American National's claim.  Thus, in deciding these post-verdict motions as to Felix's damages claim, the Court is largely restricted to the testimony of Cory Campbell, given that Felix did not offer much else by way of trial evidence.

Campbell testified as to the Loss of Use, Personal Property, and Dwelling aspects of Felix's damage claim.  This testimony from American National's case-in-chief, which was unrebutted in Felix's case-in-chief, included the following:

### 1.   Loss of Use Claim (Additional Living Expenses).

Campbell testified at length about what is necessary to prove a claim for Loss of Use/ALE.  Coverage for ALE is designed to pay an insured for any sums incurred in addition to the insured's normal standard of living.  "So if you incur costs over and above, that's what the coverage is for."  N.T. Campbell at 54.

Campbell explained that an insured is entitled to coverage for ALE under the Loss of Use coverage only if the sums are actually incurred by the insured.  According to Campbell, "So one of the tenets to additional living expense coverage is that *it has to be incurred*.  *You have to spend the money in order to get reimbursed essentially*."  N.T. Campbell at 55 (emphasis added).  He explained, "Just because the fire occurred does not necessarily mean you automatically are going to spend more money than you were usually spending on your living arrangement."  N.T. Campbell at 56.

On cross-examination, Campbell further explained that the Loss of Use coverage pays for the insured's increase in living expenses, i.e. "what are your new expenses," and the cost must be actually incurred.  N.T. Campbell at 114.  He testified that any sum paid to an insured under the Loss of Use provision must be "fair and reasonable."  *See* N.T. Campbell at 113.

Although there was testimony and numerous trial exhibits pertaining to communications back and forth between Felix and American National on the subject of whether he had sustained an increase in his living expenses and what the sum might be, there was no evidence that established by a preponderance of evidence that Felix actually **incurred** ALE costs, and there was no written documentation establishing his **payment** of such costs for which he might seek reimbursement. According to Campbell, "I don't believe we ever got to a point where we knew actually what his plan was going to be, where he was going to stay." N.T. Campbell at 55. Felix's claim for ALE was "not totally nailed down from [American National's] perspective," nor, according to Campbell, was it firmly established from Felix's perspective. *See* N.T. Campbell at 57-58. Neither Felix nor any witness called by Felix offered any rebuttal to this testimony.

### 2. Personal Property Claim.

As to Felix's Personal Property claim, Campbell testified as to its evaluation by Enservio, a professional third-party inventory appraisal firm. Enservio was utilized given its expertise and the extent (42 pages) of Felix's initial contents inventory. *See* N.T. Campbell at 17-18. He explained that Enservio's appraisers would review an insured's inventory list and seek to find replacement items of "like kind and quality," which is the operative term from the insurance policy. N.T. Campbell at 17; *see* Exhibit J-1 at CL 1016 (Policy describing "the amount it would cost us to replace the item with a similar item *of like kind and quality*, using our replacement facilities, within a reasonable time after the loss").

Campbell's testimony established that Enservio reviewed Felix's initial inventory list (Exhibit J-10) as well as his supplemental inventory list (Exhibit J-26). N.T. Campbell at 13-15. He authenticated Enservio's two reports providing estimated valuations of Actual Cash Value and Replacement Cost for each and every item being claimed by Felix as having been destroyed

16

in the fire.  *See* Exhibit J-24 (Enservio's initial report dated 4/13/2016) and Exhibit J-28 (Enservio's supplemental report dated 4/27/2016).[6]  Enservio's reports covered even those items that were being disputed as to whether they were destroyed:  the Louis Vuitton purse,[7] the diamond stud earrings,[8] the golf clubs,[9] the GoPro camera,[10] the Nikon camera,[11] a Movado watch,[12] Kelly Madison's engagement ring,[13] and the items Angela Merrill said Felix had given her and her children for Christmas—prior to the fire.[14]  N.T. Campbell at 50-51.  As part of its evaluation, Enservio also provided a "professional opinion of value" which addressed items of unique characteristics, such as Felix's dining room set, the diamond ring, the claimed rare sports memorabilia, etc.  N.T. Campbell at 27-31.

According to Campbell, Enservio's valuation for numerous items was much less than Felix was claiming, particularly with respect to the allegedly destroyed sports memorabilia (e.g., rare basketball cards).  N.T. Campbell at 34.  Enservio's reports established a "bottom line number" as to the Actual Cash Value and Replacement Cost for all of the contents that were being claimed by Felix appearing on page CL-1928.  N.T. Campbell at 49.  The Actual Cash Value of all the items claimed by Felix, according to Enservio, totaled $220, 218.23, which was designated as the "covered loss."  *See* Exhibit J-28 at 1928.  The cost to repair or replace each item claimed by Felix, at like kind and quality, according to Enservio, totaled $257,390.43.  *Id.*;

---

[6] It should be noted that all of the items on Enservio's initial inventory (Exhibit J-24) are included in Enservio's supplemental inventory (Exhibit J-28).  Enservio listed 358 separate items on the initial inventory.  *See* Exhibit J-24 at CL1355-CL1368.  The later claimed items on Felix's supplemental Proof of Loss inventory were listed by Enservio in its supplemental report as items no. 359 to 377.  (*See* Exhibit J-28, at CL1942-CL1943).

[7] *See* Exhibit J-28, at CL 1934, item no. 146.
[8] *See* Exhibit J-28, at CL 1930, item no. 46.
[9] *See* Exhibit J-28, at CL 1933, item nos. 115-119.
[10] *See* Exhibit J-28, at CL 1932, item nos. 85 and 86.
[11] *See* Exhibit J-28, at CL 1932, item no. 87.
[12] *See* Exhibit J-28, at CL 1930, item no. 47.
[13] *See* Exhibit J-28, at CL 1930, item no. 45; *see also* Exhibit J-24, at CL 1351.
[14] *See* Exhibit J-28, at CL 1941, item nos. 315 and 316.

*see also* N.T. Campbell at 134.   Neither Felix nor any witness called by Felix offered any rebuttal to this testimony.

Finally, Campbell testified as to the advance payments that were made to Felix pursuant to the Policy language.   N.T. Campbell at 51-53.   Exhibit J-5 related to a $10,000 advance payment and Exhibit J-33 related to a $20,000 advance payment.   The parties stipulated to the $30,000 advance payments that were made.   *See* Exhibit J-56 (Stipulation of the Parties). Campbell explained that the advance of $30,000 would be deducted from any Personal Property final payment by American National.   *See* N.T. Campbell at 135.

### 3.   Dwelling Claim

 In testifying with respect to Felix's Dwelling claim (*see generally*, N.T. Campbell at 60-72), Campbell confirmed that the documentation submitted by Felix in support of that aspect of the claim was limited.   N.T. Campbell at 62.   Felix had submitted a general architect plan from when the house was finished, but there were no invoices or other documentation that showed the cost of materials put in the house.   N.T. Campbell at 62.   On May 5, 2016, Campbell had forwarded an e-mail to Felix specifically noting that the company was requesting original building plans; blueprints of the structure to document and verify sizes and materials used in the original construction; invoices from the original construction; and "a detailed and itemized estimate from the builder or contractor of your choice showing what they estimate the cost to rebuild your dwelling into its pre-loss condition."   *See* Exhibit P-37 at Hudock 1882-1883; N.T. Campbell at 172.   According to Campbell, apart from the generic architectural floor plan documentation, Felix did not provide the documents requested.   N.T. Campbell at 172-173.

Campbell testified that American National hired a qualified independent adjuster, Richard Kress, of Summit Claim Services, to prepare a rebuild estimate.   N.T. Campbell at 64-65.   Kress prepared a series of early estimates that were forwarded to American National, but,

according to Campbell, these were based on generic figures like square footage, number of bedrooms, number of bathrooms, etc., and lacked sufficient specificity.[15]  *See* N.T. Campbell at 67.  Summit's initial estimates would be reviewed by American National's Property Quality Unit, which makes sure there are no duplications, and attempts to confirm that everything lines up with what was at the house before the fire.  N.T. Campbell at 68.

Campbell testified that Exhibit J-29, dated May 2, 2016, was the most fully-supported dwelling replacement cost estimate prepared by Kress/Summit and American National.  N.T. Campbell at 67-69.  This estimate was reviewed and approved by American National's Property Quality Unit.  N.T. Campbell at 68.  According to Campbell, this estimate by Summit and American National as to the fair and reasonable replacement cost of Felix's property was $595,784.18.  *See* N.T. Campbell at 69-70; Exhibit J-29 at p. 11.  Less the deductible, according to Campbell, the recoverable sum under the Policy was $588,453.18.  N.T. Campbell at 70.  Campbell stated that that these figures were the appropriate numbers "based on the information we had at the time."  N.T. Campbell at 72.  Neither Felix nor any witness called by Felix offered any rebuttal to this testimony.

Campbell was questioned also about Endorsement SH-31410.[16]  He explained that it was an endorsement which "enhances coverage" for the insured, and it allows American National to

---

[15] One of the Kress/Summit early reports was dated March 22, 2016 (Exhibit D-15), and provided a replacement Dwelling estimate, after the deductible was imposed, of $727,024.33.  N.T. Campbell at 136-138.  This estimate (the highest of the Summit estimates) apparently was the basis for the jury's award on the Dwelling claim of $727,024.33.

[16] Actually, Campbell was questioned about "the 25% endorsement."  The documentary evidence makes it plain that "the 25% endorsement" refers to Endorsement SH-31410.  *See, e.g.*, Exhibit D-6 (not admitted) (Cory Campbell e-mail referencing "endorsement form SH-31410"); Exhibit D-8 (noting that Claim Committee agreed to add Endorsement SH-31410); Exhibit D-21, at CL1848 (referring to "Adding the SH-31410 Endorsement"); Exhibit J-2, at 12-13 (5/10/2016 Log Note confirming that Claim Committee agreed to add Endorsement SH-31410).

pay *up to* 125% of the Dwelling limit to replace damaged property.  N.T. Campbell at 77.  ***He stressed, however, that the endorsement it is "not an automatic payment" of the extra 25%.*** N.T. Campbell at 78.  He explained that it does not change the Dwelling coverage limit, but, under certain circumstances, would allow the company to go over that limit.  N.T. Campbell at 78.  He further explained that the endorsement had been included on Felix's earlier insurance policy (which insured him for his first fire in March 2013), and was not appropriate for the builder's risk policy applicable for the rebuild after the first fire, but then had been inadvertently left off by the agent for the subject Policy.  *See* N.T. Campbell at 81.  According to Campbell, the company's Claim Committee concluded that it was reasonable to allow the endorsement to be added back, retroactively, and this decision was communicated to Felix.  See id.; see also, Exhibit D-7 (Claim Committee Note referencing Endorsement SH-31410); Exhibit D-21, at CL1847-48 (confirming that Endorsement SH-31410 added, but premium actually was lowered); Exhibit J-2, at 12-13 (5/10/2016 Log Note confirming that Claim Committee agreed to add Endorsement SH-31410).  There was therefore no dispute that this endorsement was part of the Policy at the time of the January 23, 2016 fire loss.

### C.   AMERICAN NATIONAL'S DENIAL OF FELIX'S CLAIM BASED UPON FELIX'S INTENTIONAL MISREPRESENTATION, FRAUD, AND FALSE SWEARING

#### 1.   The Louis Vuitton Purse and Diamond Earrings.

American National's claims for a declaratory judgment and statutory insurance fraud were based on two specific items of Felix's personal property that he claimed to have lost in the subject fire: the Louis Vuitton purse and the pair of diamond stud earrings.  The evidence at the trial overwhelmingly established that these two items were, in fact, ***not*** destroyed in the fire.

For example, with regard to the Louis Vuitton purse, Felix's Proof of Loss indicated that the Louis Vuitton purse had a purchase price of $1,358; that it was purchased with a credit card

(though there was no receipt); and that it was approximately one year old.  *See* Ex. J-10 at CL0481.  The credit card statements provided to American National during the course of Felix's claim confirmed that Felix made a purchase at a Louis Vuitton store near Pittsburgh on December 19, 2014, and that the amount of the purchase was $1,358.90.  *See* Ex. J-11 at CL0463.  Felix stated in his SUO that the Louis Vuitton purse that he listed on his Proof of Loss had been given to Kelly Madison as a gift, but returned to him after they broke up.  *See* Ex. J-43 at CL1913.  During the trial, Kelly Madison testified that she had only ever received one Louis Vuitton purse from Felix—that is, the purse that was pictured in Exhibit J-37 and was in Ms. Madison's possession both at the time of the subject fire and the time of the trial.  *See* N.T. Kelly Madison at 6-9.  Ms. Madison further testified that Felix gave her the purse that was pictured in Exhibit J-37 as a Christmas gift in 2014, which is consistent with the records produced by Felix. *See id*. at 6.  Felix presented no testimony or other evidence at trial to indicate that he ever purchased any other Louis Vuitton purse, and Ms. Madison testified that she was never given a Louis Vuitton purse that looked like the purse in the stock photo produced by Felix during trial. *See id*. at 10-11.  Thus, the evidence adduced at trial does not support Felix's claim—which was made in a sworn statement under oath—that the claimed Louis Vuitton purse was destroyed in the fire.  To the contrary, the unrefuted evidence proves that the Louis Vuitton purse that Felix claimed was destroyed in the fire was the one that was in Ms. Madison's possession at the time of the subject fire.

With regard to the diamond earrings, the Proof of Loss submitted by Felix during the course of the claim averred that a pair of "14 kw 1.5 tw earings [*sic*]" was destroyed in the fire, and that the cost of these earrings was $1,906.94.  *See* Ex. J-10 at CL0468.  To support this claim, Felix provided both a receipt from Littman Jewelers documenting the purchase price of

$1,906.94 for a pair of earrings (*see* Ex. J-11 at CL0504), and a credit card receipt documenting a purchase at Littman Jewelers for that amount, identifying the transaction as having taken place on December 24, 2013 (*see* Ex. J-12 at CL1991). In addition, for the purposes of the trial, the parties stipulated that the item listed on the Littman Jewelers receipt provided to American National by Felix was a pair of 1½ carat total weight diamond stud earrings. *See* Ex. J-56 at ¶ 6. During her trial testimony, Ms. Madison confirmed that the diamond stud earrings pictured in Exhibit J-38 were the earrings that Felix gave her as a gift for Christmas in 2013, and that these earrings were in her possession at the time of the subject fire. *See* N.T. Kelly Madison at 7; *see also id*. at 9. Although Ms. Bloom testified that she saw a pair of diamond ***hoop*** earrings in Felix's house, *see* N.T. Bloom at 20, no one testified as to (1) whether Felix purchased these earrings; (2) where and when he purchased these earrings; (3) what the purchase price of the earrings was; and (4) whether he ever offered or gave these earrings to Ms. Madison. Accordingly, there can be no dispute that the evidence that was presented at trial by American National—and which was unrefuted by Felix—clearly proves that the earrings for which Felix submitted a sworn claim to American National were the earrings in Ms. Madison's possession at the time of the subject fire.

On May 31, 2016, Ms. Madison's parents provided photographs of the purse and earrings to American National, proving that they were not destroyed in the fire, contrary to Felix's claim. (Exhibits J-37 and J-38). *See* N.T. Kip Mathena (Nov. 27, 2018) at 71-74. American National's claims professionals, in a "Claim Committee" meeting, concluded that Felix was lying under oath when he claimed that the purse and earrings were destroyed in the subject fire. *Id*. at 77-78. American National referred the matter to Attorney Hudock, seeking his legal opinion as to how to proceed. *Id*., at 77-80.

On June 2, 2016, Ms. Madison spoke with American National representative Kip Mathena, and she informed him that she had copies of telephone text messages between her and Felix regarding the Louis Vuitton purse; she said she would send the text messages to American National.  *See* N.T. Kip Mathena (Nov. 27, 2018) at 81-83.  On or about June 8, 2016, Ms. Madison sent copies of these text messages to American National.  (Exhibit J-39).   These text messages included several unprompted requests by Felix—over the course of several days, from May 22, 2016 to June 16, 2016—wherein he was seeking information from Ms. Madison about the current whereabouts of the Louis Vuitton purse he had given to her as a gift in December 2014.

On June 10, 2016, American National received an opinion letter from Attorney Hudock (Exhibit J-40), which was supplemented by a corrected opinion letter dated June 14, 2016. (Exhibit J-43).  *See* N.T. Kip Mathena (Nov. 27, 2018), at 84-90.  Based on the results of its investigation (which included review of several of the foregoing text messages) and the legal opinion of its counsel, Joseph Hudock, Esq., American National determined that it would (1) deny Felix's claim because of the intentional material misrepresentations made by Felix, and (2) file a lawsuit against Felix seeking a declaratory judgment that it was not obligated to provide coverage for Felix in relation to the subject fire loss.  *Id*., at 90-92

On June 23, 2016, American National, under the signature of Mathena, sent a letter to Felix which, *inter alia*, quoted the Concealment or Fraud provision in the Policy and stated, "We respectfully deny coverage for your loss due to your material misrepresentations in the presentation of the claim."  Exhibit J-44, Denial Letter; N.T. Kip Mathena (Nov. 27, 2018) at 91. On June 24, 2016, American National filed the instant declaratory judgment action, seeking approval from the Court for its decision to void the policy and deny the claim, and claim

asserting Civil Insurance Fraud.   *See* Exhibit J-46, Complaint; N.T. Kip Mathena (Nov. 27, 2018) at 91-92.   On June 27, 2016, Mathena spoke with Ms. Madison and advised her that American National had made a decision as to Felix's claim; she said she understood. Once Felix learned that American National was denying his claim based on the Louis Vuitton purse and earrings, Felix began demanding that Ms. Madison speak over the phone or in person.   *See* Exhibit J-50 at MADISON 154, 156.   Thereafter, Felix resorted to threatening Ms. Madison and her family.   *See* Exhibit J-55 at MADISON 155-157.   American National's Claim Log note of June 29, 2016 indicates that Felix told Ms. Madison that:   "He [Felix] told her it would get very bad for her and her family if she didn't say the right thing. he [sic] also informed her that his attorney would be contacting her for a statement. …" *See* Exhibit J-2 at 5.

Ms. Madison testified at trial that after the loss—when he was asking her to meet in person—Felix had expressed concern that their phone calls were being recorded, and he insisted to her that he had bought more than a single purse and pair of earrings for her and that he had purchased several purses and several pairs of earrings for her.   *See* N.T. K. Madison at 135-36. Ms. Madison believed that Felix was attempting to convince her to lie for him, and Felix apparently got angry when she denied his assertions.   *Id*. at 137-38.

### 2.     Other Misrepresentations by Felix.

In addition to the purse and earrings that Felix falsely represented and swore were destroyed in the subject fire, discovery during the litigation and the testimony at trial from Angela Merrill proved that several other items claimed by Felix were not, in fact, destroyed in the fire.   For example, Ms. Merrill testified that she was familiar with Felix's Nikon camera—which was claimed on his Proof of Loss—prior to the date of the subject fire, as he had taken a picture of the two of them with it prior to the fire.   *See* N.T. Merrill 48-50.   Ms. Merrill further testified that Felix had offered her the use of his camera several months after the fire when she

was preparing for a trip to Italy.  *See id.* at 92-93.  Notably, neither Felix nor anyone else refuted this testimony, and no evidence was offered by Felix that he purchased a new camera between the time of the fire and his offer to Ms. Merrill.

Ms. Merrill further testified that she was in possession of one of Felix's Movado watches several months after the subject fire loss, thus calling into question whether Felix's claim that two Movado watches were destroyed in the fire was true.  *See* N.T. Merrill at 62-64; *id.* at 74-82; *see also* Ex. J-10 at CL0468.  Neither Felix nor any other witness called by Felix refuted Ms. Merrill's testimony regarding the existence of this Movado watch after the fire.

Ms. Merrill also testified that she and Felix had had several discussions about him purchasing an engagement ring for her.  *See* N.T. Merrill at 87-89.  In one of these exchanges, which took place *after* the subject fire, Felix told Ms. Merrill that "he had [Ms. Madison's engagement] ring but he couldn't trade it in until after this case was over."  *Id.* at 89.  It is undisputed that Felix claimed that Ms. Madison's engagement ring was in his house at the time of the subject fire, and his Proof of Loss lists that ring as having been destroyed in the fire.  *See* Ex. J-10 at CL0468.  Felix presented no evidence at trial to refute this testimony from Ms. Merrill, nor did he present testimony that the ring was, in fact, destroyed in the subject fire.

Ms. Merrill also testified that she was familiar with Felix's GoPro camera before the subject fire.  *See* N.T. Merrill at 89-91.  Ms. Merrill further testified that she was aware that Felix took the GoPro camera on a ski trip to Jackson Hole, Wyoming that took place *after* the subject fire.  *See id.* at 91-92.  Thus, Ms. Merrill's testimony proves that Felix was aware that the GoPro camera was not destroyed in the fire, and that he waited several months—until the eve of his deposition—to remove that item from his Proof of Loss.  Neither Felix nor any witness on his behalf refuted this testimony from Ms. Merrill.

Ms. Merrill testified that Felix's golf clubs were not destroyed in the fire, and that Felix was aware of this fact as early as the summer of 2016. *See* N.T. Merrill at 93-95. Although Felix did claim that he "found" the golf clubs shortly before his May, 2017 deposition, this testimony from Ms. Merrill—which was unrefuted by Felix or any witness offered by him at trial—proves that (1) Felix was aware that the golf clubs were not destroyed for nearly a year before he told American National that they should be removed from his Proof of Loss; and (2) Felix may well have lied during his deposition in this case when he claimed he only "found" them shortly before his deposition.

In his Proof of Loss, Felix also claimed that "kids toys" and "Buckle clothes" were destroyed in the subject fire. *See* Ex. J-10 at CL0499. During the course of his claim, Felix provided American National with receipts documenting the purchase of these items. *See* Ex. J-11 at CL 0511; *id.* at CL0521. Ms. Merrill testified that the items listed on the receipts provided to American National by Felix as support for his claim were Christmas gifts that Felix gave Ms. Merrill and her children around Christmas, 2015—that is, only a month before the subject fire occurred. *See* N.T. Merrill at 149-154. Ms. Merrill further testified that these items were still in the possession of her and her children, and that they therefore were not destroyed in the subject fire. *See id.* at 152; *id.* at 153-154. Neither Felix nor any witness on his behalf offered any testimony to refute this testimony from Ms. Merrill.

Based on the evidence obtained in discovery and all of the trial testimony, including that from Ms. Merrill, American National contended at trial that Felix violated the Concealment or Fraud condition in the Policy, and that it therefore had further evidence—in addition to the purse and the earrings upon which its affirmative declaratory judgment and statutory insurance fraud

claims had been initially based—in support of its affirmative defenses to Felix's breach of contract claim.

## IV.   APPLICABLE LEGAL STANDARDS

After the close of evidence on December 3, 2018, American National presented a motion under Fed. Civ. Pro. Rule 50(a) for judgment as a matter of law.  *See* N.T. Dec. 3, 2018 at 16-20, 42-51.  With respect to Felix's counterclaim for breach of contract, American National argued that Felix produced insufficient proof as to his claims under the American National Policy: that is, he had not met his burden of proving "that they breached this contract, that I have been damaged, here is the damage that I sustained, and here is my proof of the damages."  *Id.* at 43. American National contended that Felix pursued a tactical approach and, rather than testifying himself or putting much on in his case, instead said, "hey, I'm going to get it all out on cross-examination."  *Id.*  American National challenged whether, by presenting his breach of contract claim in that fashion, there existed a significant question of whether Felix "met those basic … rudimentary things that he would have had done had he [Felix's counsel] . . . represented just a Plaintiff in this case or had Mr. Felix been a Plaintiff."  *Id.*  American National requested judgment in its favor on all aspects of Felix's counterclaim under Rule 50.  *Id.*  American National's motion was denied by the Court.  *Id.*

### A.   RULE 50 MOTION FOR JUDGMENT AS A MATTER OF LAW

Federal Rule of Civil Procedure 50(b) provides in part as follows:

> **(b)    Renewing the Motion After Trial; Alternative Motion for a New Trial.**  If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.  No later than 28 days after the entry of judgment – or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged – the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint

request for a new trial under Rule 59.  In ruling on the renewed motion, the court may:

> (1)     allow judgment on the verdict, if the jury returned a verdict;
>
> (2)     order a new trial or
>
> (3)     direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b).

Federal Rule of Civil Procedure 50 permits a court to enter judgment as a matter of law where "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party on that issue." Fed. R. Civ. P. 50(a)(1). "[I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). All reasonable inferences must be drawn in favor of the nonmoving party, and the court is not permitted to make credibility determinations or weigh the evidence. *Id.*

Judgment as a matter of law should be granted if the record is deficient of that minimum quantity of evidence from which a jury might reasonably afford relief. *Raiczyk v. Ocean County Veterinary Hosp.*, 377 F.3d 266, 269 (3d Cir. 2004); *see also Davis v. Berks County Philadelphia*, 351 F. App'x 640, 643 (3d Cir. 2009) ("A district court should grant a motion for judgment as a matter of law only if, 'viewing the evidence in the light most favorable to the nonmovant and giving [him] the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.'") (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)) (alteration in the original).

### B.      RULE 59 MOTION TO ALTER OR AMEND JUDGMENT

Federal Rule of Civil Procedure 59 provides in part as follows:

> **(e)      Motion to Alter or Amend a Judgment.**  A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment.

Fed. R. Civ. P. 59(e). The Third Circuit has set forth the standard for Rule 59(e) motions as follows:

> A proper motion to alter or amend judgment must rely on one of three major grounds: (1) an intervening change in controlling law; (2) the availability of new evidence [not available previously]; or (3) the need to correct clear error [of law] or prevent manifest injustice.

*N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995) (quoting

*Natural Res. Def. Council v. U.S. Envtl. Prot. Agency*, 705 F. Supp. 698, 702 (D. D.C. 1989)).

*See also Wiest v. Lynch*, 710 F.3d 121, 128 (3d Cir. 2013).

### C.      RULE 59 MOTION FOR A NEW TRIAL

Federal Rule of Civil Procedure 59 provides in part as follows:

> **(a)      In General**
>
> > **(1)      *Grounds for New Trial.***  The court may, on motion, grant a new trial on all or some of the issues – and to any party – as follows:
> >
> > > (**A**)      After a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; ….

Fed. R. Civ. P. 59(a)(1)(A).  The decision to grant a new trial lies within the court's discretion.

*Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *American Bearing Co. v. Litton*

*Industries, Inc.*, 729 F.2d 943, 948 (3d Cir. 1983), *cert. denied*, 469 U.S. 854 (1984). A new trial

should be granted where "a miscarriage of justice would result if the verdict were to stand," the

verdict "cries out to be overturned," or where the verdict "shocks our conscience." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991).

Courts have granted motions for a new trial where, for example,: (1) there is a significant error of law, to the prejudice of the moving party; (2) the verdict is against the weight of the evidence; (3) the size of the verdict is against the weight of the evidence; or (4) counsel engaged in improper conduct that had a prejudicial effect on the jury. *See Maylie v. Nat'l R. R. Passenger Corp.*, 791 F. Supp. 477, 480 (E.D. Pa. 1992), *aff'd*, 983 F.2d 1051 (3d Cir. 1992). This standard for grant of a new trial is less rigorous than the standard for grant of judgment as a matter of law. Even where there exists that "minimum quantum of evidence" from which the jury might reasonably find in favor of the nonmoving party, *Dreyer v. ARCO Chem. Co.*, 801 F.2d 651, 654 (3d Cir. 1986), *cert denied*, 480 U.S. 906 (1987), a new trial may be granted. *Roebuck v. Drexel Univ.*, 852 F.2d 715, 735-36 (3d Cir. 1988).

###   D.   STANDARDS APPLICABLE TO THE INTERPRETATION OF AN INSURANCE POLICY

Felix's claims against American National are all contract-based. The relevant contract is the American National Policy. Hence, the Policy terms govern as to whether Felix has, or has not, proven his contractual claim, and as to what, if any, damages Felix may receive pursuant to the Policy. As with any contract claim, it is the Court that determines the meaning of the applicable contractual provisions.

"The general rules of contract interpretation apply to the interpretation of insurance policies." *Westport Ins. Corp. v. Hippo Fleming & Pertile Law Offices*, No. 3:15-cv-251, 2018 U.S. Dist. LEXIS 168756, at *11 (W.D. Pa. Oct. 1, 2018) (Gibson, J.) (*citing Frog, Switch & Mfg. Co. v. Travelers Ins.* Co., 193 F.3d 742, 746 (3d Cir. 1999)). Under Pennsylvania law, it is for the Court to interpret and apply unambiguous writings as a matter of law. *Westport Ins.*

*Corp. v. Hippo Fleming & Pertile Law Offices*, 2018 U.S. Dist. LEXIS 168756, at *11; *First Guard Ins. Co. v. Bloom Servs., Inc*., No. 3:15-59, 2018 U.S. Dist. LEXIS 25608, 2018 WL 949224, at *4 (W.D. Pa. Feb. 16, 2018) (Gibson, J.).

"When the language of an insurance policy is clear and unambiguous, courts must give effect to the policy's language." W*estport Ins. Corp. v. Hippo Fleming & Pertile Law Offices*, 2018 U.S. Dist. LEXIS 168756, at *11; *401 Fourth St., Inc. v. Inv'rs Ins. Grp*., 583 Pa. 445, 879 A.2d 166, 171 (Pa. 2005) (*citing Gene & Harvey Builders, Inc. v. Pa. Manufacturers' Ass'n Ins*. Co., 512 Pa. 420, 517 A.2d 910, 913 (Pa. 1986)); *Nationwide Mut. Ins. Co. v. CPB Int'l, Inc*., 562 F.3d 591, 595 (3d Cir. 2009) (*quoting Donegal Mut. Ins. Co. v. Baumhammers*, 595 Pa. 147, 938 A.2d 286, 290 (Pa. 2007)).

## V.   LEGAL ARGUMENT

### A.   RULE 50 AND 59 MOTION WITH RESPECT TO THE JURY AWARD ON FELIX'S CLAIM FOR LOSS OF USE/ADDITIONAL LIVING EXPENSE DAMAGES

Based upon the applicable Policy language and the evidence produced at trial, American National is entitled to judgment in its favor as a matter of law under Rule 50(b) regarding Felix's claim for Loss of Use/ALE.   Alternately, under Rule 59, based upon the applicable Policy language and the evidence produced at trial, the jury award as to Felix's claim for Loss of Use/ALE must be molded to zero.

As noted above, Felix himself provided absolutely no testimony concerning his contract claim and his claim for contractual damages.  Contrary to what a policyholder might typically do in a claim seeking ALE coverage, he did not personally testify as to his pre-fire living expenses, nor did he submit any proof as to costs he actually incurred post-fire to maintain his living expenses.  All of the relevant evidence on the Loss of Use/ALE claim came from Cory Campbell and the various pieces of correspondence exchanged between Felix and American National.

While the correspondence reflects that Felix had discussed various alternative living arrangements—including living with his mother; renting a property from his stepfather, Mr. McGough; and possibly getting a recreational vehicle to live in—there is no evidence of record reflecting the financial steps that Felix *actually took* or expenses he *actually incurred* with respect to his living arrangements.   This evidentiary deficiency strikes a fatal blow to Felix's Loss of Use/ALE claim.

Felix's ALE claim is governed by the Loss of Use coverage provided in Coverage D.[17] *See* Ex. J-1 at CL0999.   There is no dispute that after the fire, Felix's residence was uninhabitable.   The Policy provides in such case, "We cover any necessary increase in living expenses *incurred by you* so that your household can maintain its normal standard of living . . . ."   *See id*.; Exhibit "A" at 1 (emphasis added).   The Policy's specific reference to "necessary increase in living expenses incurred by you" plainly means that Felix was required to provide evidence as to what his usual living expenses were, what his increased (post-fire) living expenses were, and what actual ALE expense that he *incurred*.   Felix failed to do this during the trial.

The term "incurred" is not specifically defined by the Policy.   However, under Pennsylvania law, policy terms not specifically defined should be given their plain and ordinary meaning.   *See Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 435-36 (3d Cir. 2006); *Treesdale, Inc. v. TIG Ins. Co*., 2009 U.S. Dist. LEXIS 123970, at *9 (W.D. Pa. Dec. 22, 2009); *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Comm'l Union Ins. Co*., 908 A.2d 888, 897 (Pa. 2006).   The common meaning of the transitive verb "incur" is "to become liable or subject to: bring down upon oneself."   *See* Merriam-Webster Online Dictionary, www.merriam-webster.com/dictionary/incur.   Black's Law Dictionary defines the term to mean "[t]o suffer or

---

[17] Coverage D also provides coverage for Fair Rental Value.  *See* Ex. J-1 at CL0999.  This aspect of the Loss of Use coverage is inapplicable here as Felix was not renting his property to someone at the time of the fire.

bring on oneself (a liability or expense)." Black's Law Dictionary 836 (9th ed. 2009).  The evidence produced by Felix at trial is devoid of evidence that he actually become liable for or subject to a specific monthly expense over and above his ordinary pre-fire necessary living expenses.  Indeed, as has been noted, there was no specific testimony as to what his ordinary pre-fire living expenses were.

The requirement that Felix demonstrate at trial proof of ALE costs actually incurred was underscored by a sequence of questioning of Cory Campbell by Felix's counsel.  Although Campbell testified at several points that any Loss of Use expense must be incurred by the insured in order to be covered under the Policy, counsel for Felix at one point asked Campbell to "forget about incurred."  *See* N.T. Campbell at 115.  Counsel for American National objected to this comment, and the objection was sustained by the Court, which ruled, "I think saying forget about the incurred is—makes it a misleading question."  *See* N.T. Campbell at 115.  This ruling by the Court implicitly acknowledged that the ***incurring*** of ALE costs is the key determinant as to whether one may recover ALE reimbursement pursuant to the Policy, which is consistent with courts' interpreting the obligation of "incur" in other contexts.  *See Estate of Palumbo v. United States*, 675 F.3d 234, 239-40 (3d Cir. 2012) (citing Black's Law Dictionary and upholding the tax court's statement that "'fees are 'incurred' when there is a legal obligation to pay them.'");  *Bethenergy Mines v. Dept. of Envi. Prot.*, 676 A.2d 711, 714 (Commw. Ct. 1996) (upholding the Board's use of Webster's dictionary to find the plain meaning of the term "incur" to be "to become liable for or subject to").  By electing not to testify on this important issue, Felix set himself up for the failure of proof that has occurred.

E-mails from Felix to Campbell suggesting that Felix was staying with his mother, or thinking about entering into a lease with his father-in law, or considering getting an RV, is not

the equivalent of testimonial or documentary proof that Felix sustained an increase in living expense that he ***actually incurred*** over and above his normal standard of living.  Likewise, the fact that American National secured an estimate from another third-party vendor, Assured Relocation, as to what a comparable living expense for Felix might be is also not a substitute for proof that Felix actually incurred such costs.  *See* Exhibit J-16.  In his opening statement to the jury, Felix's counsel used Assured Relocation's estimated fair rental value of $3,310 per month as support for an ALE claim of $115,810, *see* N.T., 11/26/2018, Transcript of Defense Opening Statement, at 16-17, but then failed to prove that Felix actually incurred that cost, or some other cost.

The burden was on Felix to prove this aspect of his claim by the fair preponderance of evidence and, simply put, he failed to do so.  Therefore, under Rule 50, the Court should enforce the applicable Policy language; apply it to the evidence produced by Felix at trial; and grant judgment as a matter of law in favor of American National regarding Felix's claim for Loss of Use/ALE.  Alternately, under Rule 59, the jury award as to Felix's claim for Loss of Use/ALE must be molded to zero, as Felix has not met his burden of proving an entitlement to such damages.

### B.  RULE 50 AND 59 MOTION WITH RESPECT TO THE JURY AWARD ON FELIX'S CLAIM FOR LOSS OF CONTENTS DAMAGES

Based upon the applicable Policy language and the evidence at trial, American National is entitled, at minimum and as a matter of law, to a reduction of the jury's award regarding Felix's claim for Loss of Contents under the Policy's Coverage C.  Specifically, based upon the Policy language and the only evidence-supported estimates as to the value of his Personal Property, the jury award as to Felix's claim for Loss of Contents must be molded to the sum of $257,390.43.

Since Felix himself provided absolutely no testimony concerning his breach of contract claim and his claim for contractual damages, he did not personally testify as to his submitted inventory lists (Exhibit J-10 and J-26). Similarly, whether during the course of the claim or at trial, Felix did not submit any invoices or receipts as to actual costs incurred in obtaining replacement personal property. Instead, Felix opted to rely solely upon the testimony of Cory Campbell and the two reports prepared by the property appraisal vendor, Enservio. (Exhibits J-10 and J-26). In fact, Felix's counsel expressly incorporated these reports in statements to the jury. For example, in his opening statement, Felix's counsel suggested that Felix's Contents Loss damages—based on Enservio's estimates—were $220,218. *See* N.T., 11/26/2018, Transcript of Defense Opening Statement, at 16-17. In his closing argument, Felix's counsel suggested that the jury award should even be *less* than Enservio's figures on the Contents Loss claim, in that the jury should feel free to deduct any item they might conclude was mistakenly included by Felix on his inventory list.[18] *See* N.T., 12/4/2018, Transcript of Defense Closing Argument, at 44. ***Incredibly, the jury awarded Felix over double what his attorney was asking for on the Contents Loss claim.***

When the Court reviews this evidence, it should be readily apparent that the jury award of $501,516 should not be permitted to stand without, at minimum, a substantial reduction. It is clear that the verdict for Loss of Contents ($501,516) rendered by the jury represents the Personal Property Policy limit of $504,000 less the amount of the GoPro camera and accessories ($598)[19] and golf clubs and accessories ($1,886)[20] that Felix had conceded, by letter from his counsel prior to his deposition, were not actually destroyed in the fire. *See* Exhibit J-52 (5/12/17

---

[18] Notably, no witness offered testimony that Felix made a mistake in the presentation of his claim.

[19] *See* J-10 at CL0473. The GoPro ($399) + accessories ($199) = $598.

[20] *See* J-10 at CL0477. The golf club irons ($899) + driver ($399) + putter ($299) + bag ($289) = $1,886**.**

Letter from Tyler Smith, Esq.).  This exorbitant jury award as to the Loss of Contents is therefore deficient as a matter of law on numerous grounds.

Apart from the modest deduction for the GoPro camera and the golf equipment, the award essentially gives Felix the full Personal Property Coverage C limits.  The amount of the jury award was almost twice the amount claimed by Felix on his original Sworn Proof of Loss (Ex. J-9), where he claimed $270,000 as his Loss of Contents.  Even adding his supplemental inventory list (Ex. J-26), where Felix added another $65,434 of dubious cash purchases, the jury awarded a whopping $166,082 more than Felix's amended Loss of Contents claim of about $335,000.  No doubt in recognition of the extravagance of his client's claim, Felix's counsel, as noted above, requested that the jury limit itself to the Enservio estimates, deducting for the GoPro and the golf equipment, and "[i]f you think he included a couple pair of shirts or something for Angela Merrill or a couple toys, please feel free to deduct that.  We don't think we're entitled to anything more than we're entitled to."  *See* N.T., 12/4/2018, Transcript of Defense Closing Argument, at 44.  Nevertheless, the jury awarded more than Felix himself was seeking in his two Sworn Proof of Loss inventories, and over two times what Felix's counsel claimed would be reasonable as Contents Loss damages.

In addition, the jury's Contents Loss award was deficient in that it failed to account for the $30,000 advance that Felix had been paid by American National.  Even assuming that the jury rejected American National's evidence as to the Nikon camera, Movado watch, engagement ring, and gifts to Angela Merrill and her children, there is simply no basis for the jury's refusing to deduct for a $30,000 advance payment which Felix concedes that he received.  *See* Ex. J-56, Parties' Stipulations, at ¶ 8.

Another deficiency the jury's Contents Loss award is the fact that the jury did not deduct the amount of the Louis Vuitton purse and diamond stud earrings that, according to the unrefuted trial evidence, remained in the possession of Kelly Madison after the fire.  Although Felix's counsel attempted to create some obfuscation as to whether there had been possibly a different purse and a different pair of earrings that had burned in the fire, the fact is that because Felix did not testify, there was no evidence at trial that he was claiming a different purse and set of earrings on his inventory list.

Moreover, there can be ***absolutely no doubt whatsoever that the claim presented by Felix was for the actual Louis Vuitton purse and diamond stud earrings that remained in the possession of Kelly Madison after the fire***.  As for the claimed Louis Vuitton purse, the amount Felix claimed for the purse was very specific: $1358.  *See* Ex. J-10, at CL0481.  He provided a credit card statement indicating that he purchased the purse at the Louis Vuitton store in Pittsburgh on December 19, 2014 for $1358.90.  *See* Ex. J-11, at CL0643.  He told Attorney Hudock that the purse described had been given to Kelly Madison.  *See* Ex. J-43 (Hudock 6/14/16 Letter) at CL1913.  And it matched the testimony of Ms. Madison in terms of time, in that she testified that she received the purse as a gift for Christmas 2014.  *See* N.T. Kelly Madison, at 6.

As for the earrings, they were precisely those that were given to Ms. Madison. The amount claimed by Felix was again very specific: $1906.94.   *See* Ex. J-10, at CL0468.  It was supported both by a receipt from Littman's Jewelers (Ex. J-11, at CL0504) as well as a credit card receipt for a Littman's transaction dated December 24, 2013 (Ex. J-12, at CL1991).  The parties stipulated that they were diamond stud earrings. *See* Ex. J-56, Parties' Stipulations, at ¶ 6.  And, once again, the documentation matches Kelly Madison's testimony as to time, in that

she said she received the stud earrings as a gift for Christmas 2013.  *See* N.T. Kelly Madison at 7.

In short, no reasonable jury could conclude based on the evidence presented at trial that the purse and earrings being claimed by Felix were not those in possession of Kelly Madison. Felix never took the stand to dispute these facts or to support his lawyer's artfully presented fiction—asserted without any evidentiary proof in the trial record—that Felix really meant to claim another Louis Vuitton purse and another set of diamond earrings.  Therefore, the jury erred in not at least deducting from its award the amount of the purse and earrings ***as claimed***, as it had done with the GoPro camera and the golf club equipment.

In addition to being against the weight of the evidence, the jury's award for the Loss of Contents coverage violated the terms of the contract upon which Felix's claims were based. Specifically, the Policy provides that any Loss of Contents payment must be made pursuant to the Policy terms and conditions, which obligated Felix to prepare an inventory of damaged Personal Property, "showing in detail, the quantity, description, actual cash value, and amount of the loss," and "[a]ttach to the inventory all bills, receipts, and related documents that substantiate the figures in the inventory."  *See* Exhibit J-1 at CL 1005.  The "CONTENTS REPLACEMENT COST COVERAGE ENDORSEMENT," Policy Form SH91147, further provides that American National's:

> liability for loss on any one item or items covered hereunder shall not exceed the smallest of the following amounts:
>
> 1.      replacement cost at the time of loss;
>
> 2.      the full cost of repair;
>
> 3.      the Coverage C Limit of Liability; …
>
> 4.      any special **limits of liability** described in the policy;

5.      the interest of the **insured**; or

6.      the amount it would cost us to replace the item with a similar item of like kind and quality, using our replacement facilities, within a reasonable time after the loss.

*See* Exhibit J-1 at CL 1016.

When one considers the jury award for the Loss of Contents claim, it is clear that the award was ***not*** based upon Felix's "showing in detail, the quantity, description, actual cash value, and amount of the loss," and his attaching "to the inventory all bills, receipts, and related documents that substantiate the figures in the inventory." To the contrary, the amount awarded by the jury ***vastly exceeded*** what was claimed on Felix's inventory and his supporting bills, receipts, and related documents. Likewise, the jury award viewed as a total clearly was ***not*** based upon Policy requirements like the replacement cost at the time of loss of the claimed items, the interest of Felix in the items, or the amount it would cost American National to replace the items claimed "with a similar item of like kind and quality, using our replacement facilities…." *See* Exhibit J-1 at CL 1016. Because the total amount awarded by the jury ***vastly exceeded*** the sum total of Felix's Loss of Contents claim, the jury award is unsupported by the trial evidence and cannot be justified by the reasonable application of the Policy terms and conditions. Therefore, as a matter of law, American National is entitled— at minimum—to a reduction of the jury award.

Based upon the applicable Policy language and the only evidence-supported estimate as to the total value of his Personal Property—the Enservio report dated April 27, 2016 (Ex. J-28)—it is respectfully submitted that the jury award as to Felix's claim for Loss of Contents must be molded to the approximate sum of $221,642.43. This sum represents Enservio's Replacement Cost estimate of $257,390.43, less the golf equipment ($1,886); GoPro ($598); Louis Vuitton

purse ($1358); diamond stud earrings ($1906); and Advance Payments ($30,000.00).  Therefore, American National is entitled, at minimum and as a matter of law, to a reduction of the jury's award regarding Felix's claim for Loss of Contents to the sum of $221,642.43.

### C.   RULE 50 AND 59 MOTION WITH RESPECT TO THE JURY AWARD ON FELIX'S CLAIM FOR LOSS OF DWELLING DAMAGES

####   1.   American National Is Entitled to Judgment in its Favor as a Matter of Law Regarding the Jury Award on Felix's Loss of Dwelling Claim Stating "Plus 25% Endorsement."

The jury award with respect to the Loss of Dwelling claim (under the Policy's Coverage A) was "$727,024.33 plus 25% endorsement."  The "plus 25% endorsement" is a reference to Endorsement SH-31410 (attached Exhibit "A").  The Court added $181,756.08 to the jury award, apparently taking 25% of the $727,024.33 award, bringing the total award for Loss of Dwelling to $908,780.41.   As discussed below, the jury's consideration of the so called "25% endorsement," its adding a reference to that endorsement to its verdict, and the Court's adding the sum of $181,756.08 to the Loss of Dwelling claim, all constitute legal and factual error. Based upon the applicable Policy language and the evidence produced at trial, American National is entitled to judgment as a matter of law under Rule 50(b) as to that portion of the Dwelling Loss jury award stating "plus 25% endorsement," as Endorsement SH-31410 simply does not apply.  Alternatively, based upon the applicable Policy language and the evidence produced at trial, the amount allowed by the Court relating to the jury statement "plus 25% endorsement" must be molded to zero under Rule 59.

First and foremost, the jury's reference to the endorsement, and the court's addition to the Dwelling Loss award purportedly based upon the endorsement, is in error because Endorsement SH-31410 *was never offered into evidence* by either American National or Felix.  Felix's counsel first referenced the endorsement on cross-examination of Kip Mathena,  *See, e.g.*, N.T.

40

Mathena (Nov. 27, 2018) at 138-47.  American National had objected to any reference to the endorsement, but its objections were overruled.  *See, e.g., id.* at 147.  Despite his counsel's numerous references to the endorsement during trial, Felix never marked the endorsement as an exhibit, and never offered the terms of the endorsement into evidence.  Since this is a breach of contract case, Felix was obligated to prove what the terms of the contract were.  Felix failed to meet this burden.  Therefore, Felix is not entitled to an award of damages based upon the terms of an endorsement that were never offered into evidence.

Moreover, even were the Court to consider the terms of Endorsement SH-31410 (Exhibit "A"), it is manifest that Felix would not be entitled to an additional $181,756.08 under the terms of the endorsement.  Endorsement SH-31410 expressly states that the 125% extension to the Coverage A Dwelling Policy Limit "does not apply unless and until replacement takes place on the same premises with a structure designed for the same use and occupancy."  Exhibit "A" at 1. Moreover, under the endorsement, an insured cannot request replacement costs until the insured "complete[s] repair or replacement of the damaged property."  *Id.*  There was no evidence admitted at trial indicating that Felix had built a replacement structure on the same premises that caused him to incur costs of 125% of the applicable limit of liability.

More importantly, the terms of Endorsement SH-31410 with respect to the 125% Dwelling loss settlement extension would be inapplicable under the evidence presented at trial. Of course, Felix himself did not testify.  Likewise, Felix did not offer into evidence any invoices or contractor proposals that documented the replacement cost of his structure.  The only estimates of the replacement cost of his house were provided by Summit Claim Services and Mr. Kress.  The highest of these estimates (Exhibit D-15) totaled $727,024.33—the amount the jury referenced on the verdict slip. ***Importantly, this estimate amount was for the full replacement***

41

***cost (less only the Policy deductible) of Felix's dwelling, as it existed prior to the fire.***
Therefore, there would be no need to add an additional 25% to that estimate limit because, by the express terms of the estimate which the jury chose to award, $727,024.33 was enough to accomplish the complete replacement of Felix's dwelling with like kind and quality materials.

It is axiomatic that any jury award must be based upon the evidence ***admitted at trial***. This jury was not permitted to add a gratuitous $181,756.08 onto its Dwelling Loss award, which amount is justified by neither the Policy language nor the building repair estimate the jury apparently considered.  Likewise, the jury was not permitted to add a punitive amount to its award, particularly absent any claim seeking or jury charge explaining such extra-contractual damages.  In this breach of contract action, the jury was not permitted to award more than the contract provided, nor more than the trial evidence justified.

Felix was never entitled to receive any more than the actual, incurred replacement cost of his dwelling, under either the Policy as admitted into evidence, or under the express terms of Endorsement SH-31410 (Exhibit "A"), which was never admitted.  The Court is required to apply the terms of the Policy as they are written.  Should the Court elect to consider the terms of Endorsement SH-31410 (which the Court is urged not to do, as those terms are not in evidence), the Court is required to apply those terms as they are written as well.  And as they are written, neither the Policy nor the Endorsement's terms would permit a gratuitous addition to the full replacement cost of the building.  Therefore, it was inappropriate for the jury to add the "plus 25% endorsement" to its Loss of Dwelling award.  And it was also improper for the Court to add the $181,756.08 to the Loss of Dwelling award at the jury's behest.

In sum, American National is entitled to judgment in its favor as a matter of law under Rule 50(b) regarding the jury award of Felix's Loss of Dwelling under the so-called "plus 25%

endorsement."   Alternately, under Rule 59, based upon the applicable Policy language and the evidence produced by Felix at trial, the jury award saying "plus 25% endorsement" should be stricken from the verdict.   In both scenarios, the $181,756.08 added to the total Dwelling Loss claim must be deducted from the verdict entered upon the record.

>    **2.     Based Upon the Applicable Policy Language and the Evidence Produced at Trial, The Most the Jury Could Reasonably Have Awarded Felix on the Loss of Dwelling Claim Was $588,453.18 for Replacement Cost Value.**

In the previous section, American National demonstrated why it was inappropriate for the jury to add "plus 25% endorsement" to its award in favor of Felix on the Loss of Dwelling claim. It is American National's further position that even if the "plus 25% endorsement" language is stricken from the verdict slip, the amount awarded by the jury is still excessive in light of the unrebutted testimony presented at trial.

As Cory Campbell testified at trial, American National had requested—in writing—specific supporting documents from Felix in connection with his Dwelling Loss claim: the original building plans; blueprints of the structure to document and verify sizes and materials used in the original construction; invoices from the original construction; and "a detailed and itemized estimate from the builder or contractor of your choice showing what they estimate the cost to rebuild your dwelling into its pre-loss condition."   *See* N.T. Campbell at 172; Exhibit P-37 at Hudock 1882 (5/5/2016 E-mail Campbell to Felix).   Rather than provide this requested, specific documentation, all Felix ever submitted was a generic architectural blueprint that he had obtained online, and his personal, unverified statements about sizes and materials used.  *See* N.T. Campbell at 172-173; Exhibit P-37 at Hudock 1882-1883 (5/5/2016 E-mail Felix to Campbell). ***In other words, Felix never provided the specific information requested by Mr. Campbell in his May 5, 2016 e-mail.***  *See* N.T. Campbell at 172.  At any time during discovery, Felix could

have identified a contractor and presented an expert report as to the appropriate replacement cost of his property.  At any time during his case-in-chief, Felix could have added to the information contained in American National's claim file as to the structural components of his home at the time of the fire.  Felix also could have taken the stand on his own and provided testimony as to the valuation of his building.  ***He elected to take none of these steps.***

Instead, at trial Felix decided to rely solely on the documentation in American National's file, which included his unverified statements (*see, e.g.*, Ex. P-37); the Summit Claims Service reports; the final estimate approved by the Property Quality Unit dated May 2, 2016 (Exhibit J-29); and the testimony of Mr. Campbell.  "Whatsover a man soweth, that shall he also reap." Galatians 6:7-9 (King James Version).  Having limited himself to sowing the seeds provided by American National as to the valuation of his destroyed home, Felix was only entitled to reap that which those seeds would legitimately produce.  In this instance, that amount is $595,784.18—the full Replacement Cost valuation for his dwelling, as reflected in Exhibit J-29.

Felix naturally would prefer to rely upon the March 23, 2016 estimate that was prepared by Mr. Kress at Summit Claim Services (Exhibit D-15), which was the highest estimate.  It was this estimate upon which the jury chose to base its award.  However, the testimony of Mr. Campbell—which was unrebutted— demonstrated that the March 23, 2016 estimate by Mr. Kress was insufficient and improperly based upon generic assumptions.  *See* N.T. Campbell at 67-68.  Based upon the actual documentation presented by Felix over the course of the claim, Campbell testified that, as verified by American National's Property Quality Unit, Felix only established that he was entitled to $595,784.18 as a Replacement Cost valuation for his dwelling, which amount is reflected in the final Kress/Summit estimate dated May 2, 2016 (Exhibit J-29). *See* N.T. Campbell at 69-70.  Less the Policy deductible of $7,331, the net Replacement Cost

under this final estimate was $588,453,18.  *See* Ex. J-29, at p. 11 (ANPAC1589).  Given this evidence, and given the fact that Felix offered no evidence to contradict or rebut it, American National submits that the jury's award on the Dwelling Loss claim cannot reasonably be anything greater than $588,453,18, the verified sum testified to by the only witness who appeared at trial to testify on the subject.

On his Loss of Dwelling claim, Felix is not entitled to recover any more than is provided for by the terms of the Policy.  Under the "Loss Settlement" provisions relevant to COVERAGE A—DWELLING, both under the Policy and Endorsement SH-31410, American National would never be obligated to pay the cost of dwelling repair or replacement greater than the "replacement cost of that part of the building damaged for equivalent construction and use on the same premises."  *Compare* Ex. J-1 at CL 1005 *and* Exhibit "A," at 1.  Thus Felix was not entitled to recover any more than the actual, incurred replacement cost of his dwelling, under either the Policy as admitted into evidence, or under the express terms of Endorsement SH-31410 (Exhibit "A"), which was never admitted.  In awarding damages for Felix's Loss of Dwelling claim, the jury and the Court were required to apply the terms of the Policy as they are written.

It follows that if the jury decision in favor of Felix on the Dwelling Loss claim is to be allowed to stand (as opposed to the verdict being overturned in its entirety and a new trial granted), the only amount appropriately allowable under the evidence as testified to by Cory Campbell—the witness relied upon by Felix at trial—is $588,453.18.  Therefore, under Rule 50 and 59, the Loss of Dwelling award must, at the very least, be reduced to $588,453.18.

**D.   RULE 50 AND 59 MOTION WITH RESPECT TO JURY AWARD ON FELIX'S CLAIM FOR "SERVICES FROM ROBERT L. FELIX"**

The jury award of $3,800 to Felix for "Services from Robert L. Felix" was improper given the evidence as presented at trial.

The March 28, 2016 invoice in question (Exhibit J-17) was from Robert L. Felix, the father of Daniel Felix, and related to excavation work that Felix claimed American National asked him to perform as part of its cause and origin investigation. *See* Ex. J-18 (E-mail from Dan Felix to American National enclosing invoice). The invoice and testimony related to the it were entered into evidence by Felix, and despite American National's objection, the jury was permitted to consider this bill as an element of the damages that could be awarded to Felix. *See* N.T. Mathena (Nov. 27, 2018) at 127-33; N.T. Charge Conference at 16-19; N.T. Rule 50 Motions at 42-43.

Robert Felix did not file suit against American National. Robert Felix was not a party in this action. Daniel Felix did not testify in any way about the invoice or why it was being included as part of his contract damage claim. In addition, Felix's Counterclaim [ECF Doc. No. 6] asserts no claim to recover the amounts supposedly owed to Robert Felix. The invoice was not addressed from Robert Felix to Daniel Felix. Robert Felix did not assign his collection rights to Daniel Felix. There is nothing at all to suggest that Daniel Felix was responsible for payment of the invoice from Robert Felix.

Furthermore, trial testimony revealed that there was some dissatisfaction on the part of American National's SIU with the elder Felix's excavation, in that it disturbed the fire scene that was then still under investigation. *See* N.T. Mathena (Nov. 27, 2018) at 126-27. However, Cory Campbell of the Claims Department suggested that he would have paid it. *See* N.T. Campbell at 165-66. Regardless of whether the Robert Felix invoice should have been paid or not by

American National, it was not proper evidence at trial as to damages for which Daniel Felix could recover.  Daniel Felix lacked the standing to assert a breach of contract action against American National on behalf of his father, and he did not raise such claim in his Counterclaim. Therefore, the Robert Felix invoice was not a proper part of Daniel Felix's breach of contract claim against American National.

As was unsuccessfully argued at trial, the Robert Felix excavation invoice sent to American National was a piece of evidence that never should have been admitted into evidence. The only reason this invoice was offered into evidence at trial was in an attempt to portray American National in an unfavorable light.  There is simply no legal or factual basis to justify the $3,800 award against American National as part of Daniel Felix's breach of contract action, and therefore this aspect of the jury award must be stricken.

In sum, based upon the applicable Policy language, the pleadings, and the evidence produced at trial, American National is entitled to judgment in its favor as a matter of law regarding Felix's claim for "Services from Robert Felix."  Alternately, based upon the applicable policy language and the evidence produced at trial, the jury award as to Felix's claim for "Services from Robert Felix" must be molded to zero.

### E.     RULE 59 MOTION SEEKING A NEW TRIAL BASED UPON THE JURY'S PLAIN DISREGARD OF THE EVIDENCE AND INSTRUCTIONS FROM THE COURT

Pursuant to Rule 59, American National is entitled to a new trial as to all issues raised in American National's Complaint and Felix's Counterclaim, based upon the jury's plain disregard of the evidence and instructions from the Court.  The jury's verdict is against the law, the evidence, and the weight of the evidence, and is wholly unsupported by the evidence presented over the course of the trial.

As shown in sub-sections A, B, C, and D above, with respect to Felix's claim for breach of contract damages, the jury recklessly disregarded the testimonial and documentary evidence, the Policy language, and the instructions from the Court.  Regarding the Loss of Use/ALE claim, even though there was no evidence from Felix or anyone else that he actually incurred necessary living expenses over and above his usual living expenses, the jury awarded him the Loss of Use Policy limit. Although his Sworn Proof of Loss inventories, the Enservio documentation upon which his case relied, and his own attorney's statements as to what Felix was seeking with respect to his Loss of Contents—all of which showed him seeking damages in the vicinity of $250,000—the jury awarded Felix nearly twice that amount, awarding him nearly the full Policy limits for Contents. And although there was no evidence as to the actual terms of the so-called "plus 25% endorsement," the jury awarded Felix an additional 25% over and above the highest building estimate that was offered into evidence—even though that estimate was for the full replacement of his dwelling.

Clearly, this reckless conduct on the part of the jury reveals that it had no interest in applying the law as given to it by the Court, or in awarding damages that were supported by the evidence and the terms of the Policy of insurance. Rather, the jury simply awarded virtually the full Policy limits, irrespective of Felix's proof of his actual damages, and threw in an extra 25% for good measure. The jury verdict is therefore unsupported by the evidence presented at trial and the instructions on the law, including how to award damages, as issued by the Court.

It is beyond dispute that the jury awarded Felix more money that he was actually claiming.  Why did the jury do it?  Most likely, to punish the insurance company.  Thus the jury effectively rendered a punitive damage award, even though such claim was not before it.  This

verdict suggests that the jury award was motivated by undue sympathy for Felix or unfair animus toward American National, or both, contrary to the Courts instructions.

In the final analysis, the verdict is so egregiously defective that the only fair remedy is for the Court to grant American National a new trial under Rule 59 as to all issues raised in American National's Complaint and Felix's Counterclaim.

### F.   RULE 59 MOTION SEEKING A NEW TRIAL BASED UPON THE COURT'S REFUSAL TO ALLOW EVIDENCE CONCERNING FELIX'S FIRST FIRE LOSS AND RELATED CLAIM SUBMITTED TO AMERICAN NATIONAL

In its pre-trial motions, and again at various points during the trial, American National sought the approval of the Court to introduce evidence that Felix experienced a total fire loss at the same property in March 2013, and that he submitted a substantial insurance claim to American National as a result of this fire.  *See, e.g.,* ECF Doc. No. 165 and 166 (opposing Felix's Motion *in Limine* #1).  On multiple occasions during trial, American National renewed its request that the Court vacate its Order regarding evidence of the March 2013 fire loss.  As American National explained, evidence of the first fire and related claim was necessary and relevant in presenting to the jury a full picture as to all events related to the subject claim.  Moreover, certain testimony and evidence offered by Felix during the trial "opened the door" to this evidence.  *See, e.g.,* N.T. Kip Mathena, 11/27/2018, at 128-30.  However, the Court denied these renewed requests.  *See id*. at 130.  American National respectfully submits that he Court's decision to preclude all reference to this fire loss and subsequent insurance claim was error, and that a new trial is required.

As an initial matter, the preclusion of the evidence that Felix suffered this 2013 fire loss and made an insurance claim to American National deprived the jury of the full picture regarding the insurance claim that formed the basis of this lawsuit.  For example, the facts regarding the

first fire and first claim explain why American National referred the claims investigation regarding the second fire to Kip Mathena of its Special Investigative Unit ("SIU"), and why attorney Joseph Hudock was retained to take the examinations under oath ("EUOs") of Felix. American National's investigation into potential fraud regarding the second fire was triggered in large part by the coincidental, but obviously unusual, occurrence of the first fire, which a jury should have heard and would certainly understand.  The occurrence of the first fire and claim thus provided the necessary background and context for American National's heightened but perfectly reasonable scrutiny of the second fire via its SIU.  *See, e.g., United States v. Green*, 617 F.3d 233, 250 (3d Cir. 2010) (holding that evidence of prior acts was admissible under Rule 404(b) as "background information which completed the story of the crime"); *see also id*. at 238 ("[T]he Government certainly is entitled to give the background [and an] explanation [of] how this all came about.").  Although American National's counsel argued again during the trial that it was necessary to introduce this evidence to provide necessary background and present a complete picture to the jury, the Court declined to allow American National to get into this evidence.  *See* N.T. Mathena, 11/27/2018, at 46-54.

In addition, American National's witnesses would have testified that the company overpaid Felix on his claim arising from the March, 2013 fire.  With respect to the dwelling claim, for instance, it was undisputed that Felix initially paid $92,000 for a modest one-story frame house (which included the land) in July 2012; approximately one year later he received $225,000 for the same house as payment for the first claim. The evidence would have shown that he also received approximately $135,000 in contents, $40,000 in Additional Living Expense, and $26,000 in coverage for separately scheduled guns as a result of the first fire.  If permitted to testify, Kip Mathena would have explained that Felix's first fire claim was handled by a former

claims adjuster just prior to his retirement, and the claims payment were, in retrospect, excessive under the facts.  It is American National's position that this overpayment provided a windfall to Felix which, after the second fire occurred, gave him the idea that it might be easy for him inflate the claim arising out of the second fire, particularly with respect to his claim for allegedly destroyed contents.

Hence, the claim resulting from the March 2013 fire loss was essential to giving the jury a full understanding of Felix's financial motive to commit fraud with respect to the second fire. Because the first fire destroyed virtually all of Felix's belongings, from a budgetary perspective it provided a unique starting point for, and understanding of, everything Felix spent, both in building his new (and much larger and more extravagant) replacement home, and in replacing all his personal belongings that were allegedly destroyed in the first fire. This evidence was a significant part of the basis of the expert opinion of American National's forensic accountant, Douglas King.

There was important testimony during the trial from Mr. King about Felix's financial condition up to and including the time of the subject loss.  This evidence was relevant to establishing the financial motive to defraud American National in connection with the subject fire loss.  However, Mr. King was not permitted to testify about where Felix got the substantial sum of money to purchase all of the premium items he claimed were destroyed in the subject fire, or where he got the money to build the house that was burned on January 23, 2016.  This seed money came from the first insurance claim, about which Mr. King was precluded from testifying.  Thus, although it was clearly supported by the records and evidence, Mr. King's conclusion that Felix's financial condition at the time of the subject fire and submission of his claim to American National was significantly over-extended lacked a significant piece of the

picture.[21]   *See also* N.T. Campbell at 101-04 (sidebar discussion regarding the inability to identify the funding sources for Felix's construction of the house, because of the Court's ruling, and how the inability to do so rendered an almost false picture of Felix's financial condition).

In light of all of the foregoing, it is clear that the Court's preclusion of the evidence regarding the March 2013 fire and Felix's subsequent insurance claim deprived the jury of necessary and relevant information upon which it could form a conclusion that Felix knowingly made misrepresentations in connection with his second insurance claim.  In this regard, although the Court was concerned with the prejudice to Felix by the introduction of this evidence, it is clear that substantial prejudice inured to American National by the preclusion of this evidence. Indeed, the Court's preclusion of this evidence allowed Felix to do exactly what American National feared when it raised the issue with the Court: he "carve[d] up this investigation to make it almost sterile so that all they [the jury] hear about is a purse and earrings and whatever." *See* N.T. Mathena (Nov. 27, 2018) at 51.  As a result, and as predicted by American National's counsel, "the jury [didn't] understand how we got there."  *Id*.

In addition, to the extent that Felix argued or implied that he simply made a mistake on his Proof of Loss when he listed the Louis Vuitton purse and earrings, *see, e.g.,* N.T. 12/4/2018, Def. Closing Arguments at 16, his experience in preparing a Proof of Loss for this prior claim provides evidence that refutes any claim of mistake.  Put differently, his prior claim experience gave him knowledge as to how to prepare such a Proof of Loss statement, and insight into how the insurance claims process works.  American National intended to argue that Felix's familiarity with the claims process from the prior loss led him to believe that American National would not

---

[21] Indeed, counsel for Felix was somewhat misleading when—knowing full well that Mr. King could not testify about the first insurance claim—he suggested that perhaps Felix had other sources of income that contradicted Mr. King's conclusion that Felix was over-extended.  *See* N.T. King at 34-37; 54-56.

do much to investigate or question the items he listed on his Proof of Loss, as it had not done so during the prior claim.  One way that it would have done this was by comparing the Proofs of Loss from the first and second fires.  However, despite the relevance and probative value of this evidence on the subject of Felix's knowledge and motive to commit insurance fraud with respect to the subject loss, American National was precluded from offering any argument on this point by the Court's decision.

Similarly, Felix suggested during his deposition that he was not aware that he could amend his Proof of Loss once he found the golf clubs and GoPro camera.  Although American National had considered offering the excerpts of this deposition testimony at trial, the Court's preclusion of any reference to the prior insurance claim prevented American National from demonstrating the questionable veracity of Felix's comments in this regard.  Thus, evidence of the prior insurance claim would have been offered for the permissible purpose of showing an absence of a mistake on Felix's part.

In sum, the facts of the first fire and related insurance claim were directly linked with the present claim arising out of the second fire, and they were therefore highly relevant on the issue of Felix's motive and intent—subjects that American National was entitled—and indeed required—to prove at trial.  *See, e.g., Pence v. United States*, 316 U.S. 332, 338 (1942) (noting that intent or motive to defraud is a necessary element of a fraud claim); *see also Westport Ins. Corp. v. Hippo Fleming & Pertile Law Offices*, 2018 U.S. Dist. LEXIS 168756, at *30 (W.D. Pa. Oct. 1, 2018) (Gibson, J.) (holding that to rescind an insurance policy based on fraud, "the insurer must prove a fraudulent intent to deliberately deceive").  It is respectfully submitted that the Court's preclusion of this evidence prevented American National from presenting the jury with the complete picture of Felix's conduct and his financial motives to commit fraud.

American National respectfully submits that this decision constituted an abuse of discretion, as the jury would likely have accepted this evidence as proof of Felix's knowledge, intent, and motive to commit insurance fraud.  Therefore, a new trial—which would include this evidence— is necessary.

G.     RULE 59 MOTION SEEKING A NEW TRIAL BASED UPON THE COURT'S REFUSAL TO ALLOW EVIDENCE OF THE EXTENT AND RESULT OF THE CAUSE AND ORIGIN INVESTIGATION INTO THE SUBJECT FIRE

It was undisputed—and was offered into evidence—that American National conducted a cause and origin investigation into the January 23, 2016 fire.  However, as is the case with the evidence discussed in the preceding section, the Court's rulings precluding the admission of evidence regarding the conclusions reached as a result of this investigation erroneously limited the jury's ability to understand the full picture of the investigation conducted by American National.  For this reason, American National respectfully submits that the Court's preclusion of evidence that the investigation determined the cause of the subject fire was "undetermined" constitutes an abuse of the Court's discretion, such that a new trial is required.

As discussed above, Felix filed a Motion *in Limine* that sought to limit the evidence regarding American National's investigation into the cause and origin of the fire that damaged Felix's dwelling.  After initially appearing to rule that no evidence regarding this investigation was admissible, the Court clarified that American National could not introduce evidence that it suspected Felix of arson or that it conducted an arson investigation.  *See* ECF Doc. No. 200. Notably, however, the Court did ***not*** explicitly preclude evidence that an investigation occurred, nor did it explicitly hold that American National could not discuss the outcome of that investigation.  However, during the course of the trial, when American National believed that Felix's counsel's questions of American National's witnesses "opened the door" for American

National to elicit testimony on this subject, and it sought the permission of the Court to now discuss the fact that the investigation into the subject fire loss could not reach a conclusion as to the cause and origin of the subject fire loss—that is, that the cause and origin was "undetermined."  *See, e.g.,* N.T. Mathena (Nov. 27, 2018) at 129-31.  The Court held that American National could not pursue this line of questioning, and that the door had not been opened to such evidence; according to the Court, evidence regarding the outcome of the investigation was more prejudicial than probative, and would invite the jury to improperly speculate regarding the claims against Felix.  *See id.*; *see also id.* at 169-72.  The Court further held that American National could not even offer evidence that the cause and origin investigation was completed.  *See id.* at 169-72.

American National respectfully submits that the Court's preclusion of this evidence was error.  Specifically, the Court's refusal to admit testimony that American National completed its cause and origin investigation prevented the jury from getting a complete picture regarding the circumstances of the loss and American National's handling of the claim.  For example, on multiple occasions during the trial, Felix's counsel implied that American National's investigation was sloppy, incomplete, and/or that it simply stopped its investigation once it found evidence to support the denial of Felix's claim.  Precluding American National from explaining to the jury that it conducted a full cause and origin investigation; that it completed its investigation; and that it could not determine the cause of the fire allowed the jury to improperly conclude that Felix's argument was correct, and that American National acted in a sloppy manner in its handling of Felix's claim.  Indeed, the manner in which the evidence was presented made it seem as if American National never completed its investigation in the first place.  This

overly prejudicial inference could easily have led the jury to conclude that American National breached its contract with Felix in the handling of his contents claim.

In addition, precluding American National from offering evidence that its investigation was completed prevented it from providing the jury with the full picture of the process that led to American National's determination that Felix engaged in insurance fraud.  Indeed, as explained in its pre-trial motions, the course of this investigation and its conclusion explained the direction in which the handling of Felix's claim proceeded, as the evidence regarding its investigation explained:

    (a)    why Felix's claim was initially assigned to American National's SIU Department, and why the claim remained with the SIU through the conclusion of the claims-handling;

    (b)    why Attorney Hudock was retained;

    (c)    why two Examinations Under Oath ("EUO") were taken from Felix, and why these two EUOs were so lengthy;

    (d)    why, during the EUOs, American National's counsel inquired as to who Felix was with before the fire (Kelly Madison), and where he was headed during the fire (to be with Angela Merrill);

    (e)    why Kelly Madison and Angela Merrill were contacted as witnesses after the first EUO;

    (f)    why Ms. Madison's father, Ron Madison, contacted American National (he would have testified that he was aware that the authorities and the insurance company were investigation the cause and origin of the subject fire, and he did not want his daughter somehow implicated in any fraudulent scheme of Felix); and

    (g)    why Felix's claim was subject to heightened scrutiny by SIU, which ultimately revealed the post-loss fraudulent misrepresentations by Felix.

*See* ECF Doc. No. 198, at ¶ 12.  Thus, the preclusion of this evidence was an abuse of discretion that causes substantial and irreparable prejudice to American National.

Furthermore, the inability to explain the course of the investigation into the subject fire prejudiced American National's defense against Felix's claims for breach of contract damages.

Specifically, Felix sought to recover damages for the costs incurred by his father in excavating the loss site.  However, American National had concerns about the manner in which Robert Felix performed the work.  Specifically, Robert Felix removed debris from the loss site and discarded it, and pushed all of the contents of the basement to one side.  It was American National's intention to argue that this conduct—whether engaged in by Robert Felix alone or at the direction of Daniel Felix—raised suspicions within American National, and hindered its ability to fully investigate Daniel Felix's claim.  Indeed, American National submits that a reasonable jury, upon considering this evidence, could conclude that Felix used his father's work to hinder the cause and origin investigation.  As such, it was error for the Court to preclude all testimony on this subject, as the absence of this evidence hindered American National's defense.

Finally, as explained by American National to the Court, at several points during the trial Felix's counsel "opened the door" to the evidence regarding the cause and origin investigation. However, the Court still declined to allow American National to explore this subject.  *See* N.T. Mathena (Nov. 27, 2018) at 128-131.  Given the totality of the evidence and the jury's verdict, American National respectfully submits that the Court erred in declining to overturn its previous decision.

Simply put, the subject fire loss was suspicious, and American National conducted a full and proper investigation into the cause and origin of the loss; indeed, there is nothing prejudicial in the mere fact that an investigation occurred.  The evidence giving rise to this investigation and the fact that it found that the cause and origin of the subject fire was "undetermined" spurred American National into conducting a further investigation into Felix's claim.  These additional investigatory steps led, in turn, to the almost serendipitous discovery of Felix's fraud regarding the purse and earrings.  Thus, evidence regarding the nature and scope of the cause and origin

investigation; the fact that it was completed; and the fact that it concluded that the cause of loss was "undetermined" is highly relevant and necessary for the jury to get a complete picture of American National's claims-handling and its eventual discovery of Felix's fraud.  The absence of this evidence allowed Felix to focus on *de minimis* issues that diverted the jury's attention, and to improperly "carve up" the investigation so as to render it "sterile." *See id*. at 51.  For these reasons, American National respectfully submits that the Court erred in precluding this evidence at trial, and that this error warrants a new trial.

### H.   RULE 59 MOTION SEEKING A NEW TRIAL BASED UPON THE COURT'S PERMITTING FELIX TO QUESTION WITNESSES CONCERNING THE "PLUS 25% ENDORSEMENT" WITHOUT OFFERING SAME INTO EVIDENCE

It is clear from the jury verdict sheet that the "plus 25% Endorsement" played a significant role in the jury's determination regarding Felix's claim for breach of contract.  As noted above, American National objected to Felix's questions concerning this endorsement— Endorsement SH-31410, entitled, "Special Protection Package – Silver Series" (Exhibit "A")— during the trial; however, the Court overruled this objection.  *See* N.T. Mathena (Nov. 27, 2018) at 138-147.  When viewing the jury's verdict in light of the full evidence offered at trial, it is clear that the jury was improperly swayed by the substantially prejudicial nature of the existence of this minimally-probative endorsement that they never ended up seeing.

As discussed above, there was substantial trial testimony regarding this "25% Endorsement," but Felix never actually offered the terms of the endorsement into evidence.  Thus, the jury's inclusion of an additional 25% onto the award for the dwelling claim is based on an improper foundation, as Felix did not meet his burden of proving the elements of the contract.  For this reason alone, the Court's molding of the dwelling award to include the additional "Plus 25% Endorsement" is against the weight of the evidence.

Moreover, the fact that Felix never offered the terms of Endorsement SH-31410 into evidence allowed him to both misconstrue the terms and function of the Endorsement; and to argue an improper inference about that endorsement.  For example, at multiple points in the trial, counsel for Felix argued that the Claims Committee's references to the Policy limits as being $733,100 was a misrepresentation, and that the limits should instead be 125% of that figure.  *See, e.g.,* N.T. Mathena (Nov. 27, 2018) at 138-47.  However, as is eminently clear from the actual terms of the endorsement, the "25% Endorsement" only applies if the actual cost of replacing the damaged dwelling is *more than the Policy limits*.  *See* Ex. A at 1.[22]  The inclusion of this endorsement clearly does *not* simply increase the limits of the dwelling coverage; rather, it provides *conditional* coverage.  *See id.*  However, by referring to Endorsement SH-31410 without actually showing it to a witness or the jury, Felix was able to improperly misconstrue the effect of the endorsement.  The prejudicial effect of Felix's failure to prove the terms of the endorsement is evident in the jury's award for the dwelling claim, as the jury apparently awarded an additional 25% for the dwelling coverage *despite the fact that its assessment of the replacement cost of the dwelling was <u>below</u> the Policy limits*.  Thus, the jury's award contradicts itself, in that its award of compensatory damages for the dwelling does not implicate the "25% Endorsement."[23]  It is therefore clear that the jury's deliberations were prejudiced by Felix's misconstruction of Endorsement SH-31410.

---

[22]  Indeed, even counsel for Felix admitted that the endorsement did not apply unless the replacement cost of the dwelling exceeded the Policy limits.  In questioning Mr. Campbell about the "25% Endorsement," Felix's counsel stated, "[A]gain, *I understand that, you know, he has to meet the limits*, but you guys weren't even telling him he was entitled to it if he met that limit initially, right?" N.T. Campbell at 106 (emphasis added).

[23]  For this additional reason, American National respectfully submits that the Court's molding of the award for the dwelling loss to include an additional 25% above the compensatory award was incorrect under the terms of the Policy.

In addition to misconstruing what Endorsement SH-31410 actually provided, Felix offered evidence—over American National's objection, *see* N.T. Mathena (Nov. 27, 2018) at 138-47—of American National's initial oversight in including this endorsement on his Policy for an improper purpose. Specifically, in responding to American National's objection to the inclusion of this evidence despite the fact that there was no dispute that Endorsement SH-31410 was included on the Policy, Felix's counsel stated that he wanted to argue that because American National was permitted to make a mistake, it was acceptable for Felix to have made a mistake in presenting his claim. *See* N.T. Mathena (Nov. 27, 2018) at 138-47. In other words, Felix wanted to offer evidence of an Endorsement that no party disputed was included with the Policy, and which Felix had not offered to the jury, solely to defend Felix's conduct by comparison. In his closing statement, counsel for Felix argued that Felix should not be held liable because he made a mistake:

> Please don't lose perspective here. This guy lost everything and he's trying to recreate what he had. Think about what a daunting task that would be to lose everything in your life and try and recreate it and then, because maybe you submit a wrong receipt and a credit card when you're trying your best to tell them something, they come back and say: A-ha! That wrong receipt, that matches this pair of earrings because she told us it does.

N.T. Closing Arguments, at 16. Indeed, the use of this evidence for a plainly and purely prejudicial purpose was made all the more obvious by the fact that ***Felix himself never testified that he made a mistake***.

It is clear from the questions asked, and statements made, by Felix's counsel that the use and reference to the "25% Endorsement" was highly prejudicial to American National. The jury's award of an additional 25% for the dwelling loss despite the fact that the replacement cost—as determined by the jury—was below the Policy limits reflects the substantial impact that the misrepresentations regarding this Endorsement had on the jury. Given that there was no

dispute that Endorsement SH-31410 was part of the Policy, American National respectfully submits that the references to the endorsement and the process of including it on Felix's Policy should have been precluded by the Court; and that the use of this evidence by Felix was so prejudicial as to warrant a new trial.

I.      **RULE 59 MOTION SEEKING A NEW TRIAL BASED UPON THE COURT'S IMPROPER JURY INSTRUCTION AS TO THE STANDARD APPLICABLE TO THE DECLARATORY JUDGMENT CLAIM ON FRAUD**

In its Proposed Jury Instruction No. 7 ("Fraud"), American National requested the following jury charge:

> Under the Concealment or Fraud provision of the policy of insurance issued to Mr. Felix, American National is entitled to void the policy and deny Mr. Felix's claim if it proves by the preponderance of the evidence that Mr. Felix engaged in fraud in connection with any material fact or circumstance concerning his insurance claim.

> Under the law, an insured commits insurance fraud when he knowingly makes a false, incomplete, or misleading statement regarding a material fact relating to his insurance claim, and where he does so with the intent to defraud his insurer.

> If you find by a preponderance of the evidence that Mr. Felix willfully engaged in fraud concerning his insurance claim, I charge you as a matter of law that your verdict must be in favor of American National.

Plaintiff Proposed Jury Instruction No. 7.  American National's position was that its declaratory judgment action seeking to void the Policy based upon the violation of a Policy provision should be determined under the preponderance of evidence standard.  *Reese v. Allstate Vehicle & Prop. Ins*., 2015 U.S. Dist. LEXIS 164772, at **37-39 (E.D. Pa., Dec. 9, 2015); *Barnes v. Allstate Prop. & Cas. Ins. Co*., 2013 U.S. Dist. LEXIS 20661, at *2 (E.D. Pa. Feb. 15, 2013).  Thus American National believed that it was entitled to prove intentional misrepresentation, false swearing, ***and*** fraud by the preponderance of evidence standard on its declaratory judgment claim and in connection with its affirmative defenses to Felix's breach of contract claim.

The Court, however, disagreed with American National, and denied its request for Proposed Jury Instruction No. 7.  *See* N.T. Charge Conference, at 5-11.  Instead the Court elected to treat fraud under the Policy differently from misrepresentation and false swearing.  The Court charged the jury that in the declaratory judgment action, the company was entitled to prove intentional misrepresentation and false swearing by the preponderance of evidence standard, but that it was required to prove fraud by the more stringent clear and convincing evidence standard.  *See* Final Jury Instructions at 13-15.

American National submits that applying the clear and convincing evidentiary standard to the insurer's reliance on a contractual provision in the Policy was incorrect as a matter of law, and injected conflicting and confusing legal concepts into the jury's deliberations. Specifically, the Pennsylvania state and federal courts have been clear that where an insurer relies on the insured's misrepresentation, concealment, or ***fraud*** in the *presentation of a claim for benefits* under an insurance policy, the insurer need only show the insured's violation of this policy term or any other exclusion by a ***preponderance of the evidence*** in order to justify the denial of the insured's claim.  *See, e.g., Henriquez-Disla v. Allstate Prop. & Cas. Ins. Co.*, 2015 U.S. Dist. LEXIS 32768, at \*\*4-7 (E.D. Pa. Mar. 16, 2015); *see also Ratay v. Lincoln Nat'l Life Ins. Co.*, 405 F.2d 286, 289 (3d Cir. 1968) (noting that "in Pennsylvania … the party having the burden of proof in a civil case need carry it only by a fair preponderance of the evidence even though the conduct at issue is criminal in nature and on a criminal trial could have been established only by proof beyond a reasonable doubt," and holding that this principle applied "to a defense of fraud on an insurance claim.").  In *Henriquez-Disla*, the court rejected the plaintiffs' argument that the burden of proof that applies to claims of fraud in the procurement of the policy should apply to a defense based on a misrepresentation in the presentation of the claim:

In the additional briefing, Plaintiff continues to maintain that Allstate has to prove material misrepresentations by clear and convincing evidence, and Allstate maintains that the proper standard is a preponderance.  Specifically, Plaintiff argues that "[t]here is no distinction to be drawn between fraud in an insurance application (such as in *Tudor* [*Ins. Co. v. Twp. of Stowe*, 697 A.2d 1010, 1015 (Pa. Super. 1997)]) and fraud in a claim for insurance benefits (as in the case instantly)."  Doc. 85 at 7.

*The problem with Plaintiffs' argument is that the courts, both federal and state, have drawn such a distinction.* In *Tudor*, an insurer brought suit to declare a policy void based on material misrepresentations in the insurance application, and the Superior Court of Pennsylvania found that the insurance carrier had to prove such fraud by clear and convincing evidence. 697 A.2d 1010, 1016. The court compared the elements of common law fraud with fraud in an insurance application and concluded "we cannot agree that fraud in an insurance application is so intrinsically different from common law fraud that it warrants a lesser burden of proof: fraud is fraud." *Id*. at 1015. *Plaintiff equates an insurance company's attempt to void a policy ab initio for fraud with the denial of coverage based on material misrepresentations made in the submission of the claim. However, both the federal and state courts require proof of the latter by a preponderance of the evidence.*

*Henriquez-Disla*, 2015 U.S. Dist. LEXIS 32768, at **3-5 (italics added).

Moreover, in in *Greenberg v. Aetna Insurance Company*, 235 A.2d 582 (Pa. 1967), the Pennsylvania Supreme Court ordered a new trial based on the trial court's instruction that the insurer's defense of fraud based on arson needed to be proven "by evidence that is clear, precise and indubitable." *Id*. at 583.  Similarly, in *Ratay v. Lincoln National Life Insurance Company*, 405 F.2d 286 (3d Cir. 1968), the Third Circuit held that the *Greenberg* decision did not announce a new rule of law, but rather confirmed long-standing Pennsylvania law regarding the burdens of proof with respect to fraud in the presentation of the claim (as opposed to fraud in the application for the policy):

[*Greenberg*] merely reiterated the long established principle in Pennsylvania that the party having the burden of proof in a civil case need carry it only by a fair preponderance of the evidence even though the conduct at issue is criminal in nature and on a criminal trial could have been established only by proof beyond a reasonable doubt. … *It applied that principle to a defense of fraud on an insurance claim and declared that the defendant's burden of proof in such a case was not increased beyond proof by a preponderance of the evidence. Greenberg*

> *specifically recognized the distinction between fraud in the making of a contract*
> *and a fraudulent claim of loss under the contract.*

*Rattay*, 405 F.2d at 289-90 (italics added).  Indeed, the Court here appeared to agree that proof

that Felix breached the Concealment or Fraud condition in the Policy—including doing so by

engaging in fraud—need only be proven by a preponderance of the evidence.  *See Am. Nat'l*

*Prop. & Cas. Co. v. Felix*, 2018 U.S. Dist. LEXIS 61020, at **24-25 (W.D. Pa. Apr. 11, 2018)

("Therefore, to prevail on its claim for declaratory judgment and defeat Felix's breach of contract

claim based on its defense that Felix submitted a fraudulent claim, American National must

prove by a preponderance of the evidence that Felix intentionally made material

misrepresentations on his claim.").

Given all of the foregoing, American National respectfully submits that the Court's

decision to charge the jury that it needed to find fraud by clear and convincing evidence in order

to find in American National's favor on the declaratory judgment claim was error, and it injected

confusion into the jury's deliberations.  For these reasons, American National respectfully

submits that a new trial is necessary.

**J.      RULE 59 MOTION SEEKING A NEW TRIAL BASED UPON THE COURT'S REFUSAL TO ALLOW VOIR DIRE QUESTIONING AND A JURY CHARGE REFLECTING THE LAW THAT IF FELIX WILLFULLY CONCEALED OR MISREPRESENTED A SINGLE MATERIAL FACT OR CIRCUMSTANCE CONCERNING HIS INSURANCE CLAIM, THE SUBJECT INSURANCE POLICY WOULD BE VOID**

In its Proposed Supplemental Voir Dire, American National requested that the following

question be asked of the jury venirepersons:

15.     At the conclusion of the trial, the Court will instruct you that under
Pennsylvania law, *if Mr. Felix willfully concealed or misrepresented a single*
*material fact or circumstance concerning his insurance claim, the policy is*
*voided and he would not be entitled to recover anything under the insurance*
*policy*.  If you would have difficulty following this law as explained to you by the

Court, please raise your hand.  Please explain why (outside presence of other
venirepersons).

American National Proposed Supplemental Voir Dire [ECF Doc. No. 180], ¶ 15 (emphasis

added).  The Court refused American National's request.[24]

In its Proposed Jury Instruction No. 4 ("Concealment or Fraud Provision in Policy"),

American National requested the following jury charge:

> Pennsylvania law holds that it is such a fundamental proposition "that one cannot
> benefit from attempted or effected fraud" that "[w]here any such fraud is shown,
> the forfeiture provisions of an insurance policy are … strictly enforced." …
>
> ***Under Pennsylvania law, a violation of the Concealment or Fraud provision of
> an insurance policy serves as a complete bar to an insured's recovery under the
> policy***. …
>
> ***The Concealment or Fraud provision "does not differentiate between big and
> small lies."***  Under the provision, "the entire policy is void if the insured conceals
> or misrepresents material facts or circumstances, engages in fraudulent conduct or
> makes false statements relating to either the insurance or to a loss to which the
> insurance applies."

Plaintiff Proposed Jury Instruction No. 4.  In addition, in its Proposed Jury Instruction No. 8

("False In One, False In All"), American National requested the following jury charge:

> American National has claimed that Mr. Felix made at least one false statement in
> his sworn Statement in Proof of Loss and/or in his Statement Under Oath given to
> American National.  Under the law, if you believe that Mr. Felix knowingly made
> a false statement to American National concerning any matter that was important
> to his claim, you may distrust Mr. Felix's statements and representations
> concerning other matters.  You may reject all of Mr. Felix's statements or you
> may accept such parts of his statements that you believe are true and give them
> such weight as you think it deserves.

Plaintiff Proposed Jury Instructions No. 8.

The intent of both the proposed voir dire question and the proposed jury charges was to

underscore a very important aspect of the law relevant to American National's case:  that the

Concealment or Fraud provision "does not differentiate between big and small lies," so that even

---

[24] The transcript of jury selection is still in the process of being transcribed.

a single intentional material misrepresentation about a relatively small part of an insurance claim—such as a lie about a purse and earrings in a million dollar claim—could serve to void the applicable policy  *Martin v. Farm Bureau Gen. Ins. Co.*, 2008 Mich. App. LEXIS 819, at \*16 (Mich. Ct. App. Apr. 22, 2008); *see also Rizk v. State Farm Fire & Cas. Co.*, 2015 U.S. Dist. LEXIS 108988 (M.D. Pa. Aug. 18, 2015).  Relatedly, if the jury believed that Felix knowingly made a false statement to American National concerning the purse and earrings, the law recognized that the jury was entitled to distrust Felix's statements and representations concerning all other aspects of his claim.  *See Third Circuit Model Criminal Jury Instruction No. 4.26 ("False in One, False in All")*; *Lambert v. Blackwell*, 387 F.3d 210, 256 (3d Cir. 2004); *United States v. Rockwell*, 781 F.2d 985 (3d. Cir. 1986).

The specific request for that voir dire question and those jury charges was based upon American National's belief that these concepts were essential to the jury's understanding of the instant case.  Just like Attorney Hudock's senior partner—who, Mr. Hudock testified, initially did not believe that a small lie could void a policy and result in a valid denial of a substantial insurance claim—American National expected to face skepticism from the jury on this point. Thus, it was crucial for American National's case that the subject be proactively addressed at the outset in jury selection.  And it was equally important to American National's case that the Court's jury charge fully explained these concepts to the jury.  American National respectfully submits that the Court erred and abused its discretion by refusing to allow this requested voir dire question and the requested jury charges.

This legal concept would turn out to be a crucial issue at trial.  In his closing argument, Felix's counsel spent a significant amount of time painting a picture that American National's misrepresentation and false swearing case was *de minimis* at most.  He argued that he had his

66

high school son calculate Felix's "rate of error" in getting just one item (the set of earrings) out of 377 wrong, and he concluded that this "mistake" translated into only a .26 rate of error. *See* N.T. 12/4/2018, Day 7, Defense Closing Argument, at 17.  Defense counsel continued:

> So they come before you telling you that my client has committed insurance fraud because he submits one mistaken receipt and credit card statement out of 377. And I would submit to you, ladies and gentlemen, common sense will tell you -- and the Judge is going to tell you don't forget that, use that, it's probably your greatest asset when you come in here. And say: Boy, if somebody has to recreate their entire world to submit to these people, and the best they can come up with is one wrong receipt out of 377 items, maybe that's not a material misrepresentation. Maybe that's not false swearing. Maybe that's what we call human error.

*Id*. at 17-18.

Much of Felix's defense was based on this "what's the big deal?" approach to Felix getting an item or two wrong on his inventory.  The response, of course, is that the law in Pennsylvania strictly enforces the state-approved language in the Concealment or Fraud provision, so that even a single willful violation of the Concealment or Fraud provision concerning an item material to the claim—even just one item out of 377 items—would justify the denial of the entire claim.  Pennsylvania, like many jurisdictions in this country, has taken what might appear to some to be a harsh approach, recognizing that the insured's veracity is a paramount consideration when it comes to providing insurance coverage.

American National's counsel, in his opening and closing statements to the jury, pointed out that "truth matters" in most every aspect of life, including the submission of an insurance claim.  However, American National's presentation was weakened without the legal imprimatur of a jury charge corroborating its position that small lies matter under the law just as much as big lies in voiding an insurance Policy, and if the jury believed that Felix knowingly made a false statement to American National, even if it was about a relatively small material matter, the law allowed the jury to distrust Felix's statements and representations concerning all other aspects of

his claim.  The Court's failure to allow the requested voir dire question and related jury charges undercut the strength of American National's argument at trial, and constituted an abuse of discretion warranting the grant of a new trial.

## VI.    **CONCLUSION**

For all of the foregoing reasons, American National respectfully requests that this Court enter an Order granting judgment as a matter of law in American National's favor; and/or altering or amending the jury's verdict; and/or granting a complete new trial.

Respectfully submitted,

**POST & SCHELL, P.C.**

BY:

**Richard L. McMonigle, Jr., Esq.**
   (PA ID: 33565)
**Karyn D. Rienzi, Esq.**
    (PA ID:      )
**Bryan M. Shay, Esq.**
   (PA ID: 205953)
Four Penn Center, 13th Fl.
1600 John F Kennedy Blvd.
Philadelphia, PA  19103
215-587-1019  (phone)
215-587-1444 (fax)
*Attorneys for Plaintiff/Counterclaim*
*Defendant AMERICAN NATIONAL*
*PROPERTY AND CASUALTY COMPANY*

**Dated: January 2, 2019**

## <u>CERTIFICATE OF SERVICE</u>

I, Richard L. McMonigle, Esquire, hereby certify that I caused a true and correct copy of the foregoing Brief in Support of Plaintiff/Counterclaim Defendant American National Property And Casualty Company's Motion Pursuant to Fed. R. Civ. Pro. 50 and 59 Seeking to Alter or Amend Judgment, and/or For a New Trial, and/or For Judgment as a Matter Of Law to be filed with the Court via its ECF service.  Service of the foregoing Motion was made on all counsel of record via the Court's ECF system

**POST & SCHELL, P.C.**

BY: _____

**Richard L. McMonigle, Jr., Esq.**
  (PA ID: 33565)
**Karyn D. Rienzi, Esq.**
  (PA ID: 92034)
**Bryan M. Shay, Esq.**
  (PA ID: 205953)
Four Penn Center, 13th Fl.
1600 John F Kennedy Blvd.
Philadelphia, PA  19103
215-587-1019  (phone)
215-587-1444 (fax)
*Attorneys for Plaintiff/Counterclaim*
*Defendant AMERICAN NATIONAL*
*PROPERTY AND CASUALTY COMPANY*

**Dated: 1/2/2019**