## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

AMERICAN NATIONAL PROPERTY
AND CASUALTY COMPANY,

               Plaintiff,

vs.

DANIEL J. FELIX,

               Defendant.

Civil Action No. 3:16-cv-147

Hon. Kim R. Gibson

Electronically Filed

JURY TRIAL DEMANDED

### DEFENDANT/COUNTERCLAIMANT'S BRIEF IN OPPOSITION TO PLAINTIFF/COUNTERCLAIM DEFENDANT AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY'S MOTION PURSUANT TO FED.R.CIV.P. 50 AND 59 SEEKING JUDGMENT AS A MATTER OF LAW, AND/OR TO ALTER OR AMEND JUDGMENT AND/OR FOR A NEW TRIAL

Defendant/Counterclaimant Daniel J. Felix ("FELIX"), by and through his undersigned counsel, hereby files this Brief in Opposition to Plaintiff/Counterclaim Defendant American National Property and Casualty Company's ("ANPAC") Motions pursuant to Rules 50 and 59.

## I.    INTRODUCTION

FELIX's premises located at 975 Frankstown Road in Sidman, Cambria County, Pennsylvania, and the contents therein, were insured by a homeowner's policy of insurance, Policy #37H77898P, on January 23, 2016. On that date, the residence, and the contents therein, were destroyed by a fire. During ANPAC's investigation into the loss, ANPAC came to believe that these two (2) items: 1) a Louis Vuitton purse; and 2) a set of 14-carat, 1.5 total weight diamond earrings, had not been destroyed in the fire, but rather, were in the possession of FELIX's former fiancée, Kelly Madison at the time of the fire and continuing thereafter. ANPAC filed the within Declaratory Action [ECF Doc. #1] seeking a declaration that the policy of insurance was void and that ANPAC had no obligation to indemnify FELIX for any losses incurred in connection with the

1

January 23, 2016 fire, and for the recovery of reasonable investigation expenses, costs of suit and attorney's fees pursuant to 18 Pa.C.S.A. §4117 (g).   FELIX filed an Answer containing a Counterclaim for Breach of Contract (Count I) and Bad Faith pursuant to 42 Pa.C.S.A. § 8371 (Count II).  [ECF Doc. #6].[1]

Trial in this matter was scheduled to begin on Monday, November 26, 2018.  Prior to trial both FELIX and ANPAC filed various Motions *in Limine*.  On November 21, 2018, the Court issued its decisions regarding all of the Motions *in Limine*.  Trial began on Monday, November 26, 2018 and continued until Tuesday, December 4, 2018, at which time the jury empaneled in this matter returned a unanimous verdict in favor of FELIX on his counterclaim and against ANPAC. The jury found against ANPAC in connection with both its Declaratory Judgment Action, seeking to void the insurance policy based on alleged material misrepresentations, false swearing and fraud, and also rejected ANPAC's claim that FELIX had engaged in any Insurance Fraud in violation of  18 Pa.C.S. § 4117.   The jury awarded FELIX the total sum of $1,560,716.41 in damages. [ECF Doc. #218].

On January 2, 2019, ANPAC filed a Motion pursuant to Rule 50 and 59 seeking judgment as a matter of law, and/or to alter or amend the judgment, and/or for a new trial.

## II.   APPLICABLE LEGAL STANDARDS OF REVIEW

### A. MOTION FOR JUDGMENT AS A MATTER OF LAW (RULE 50)

The Court can overturn the jury's verdict only if it finds that "a reasonable jury would not have a legally sufficient evidentiary basis for the party on that issue." Fed.R.Civ.P. 50(a)(1). The standard that the party seeking judgment as a matter of law must meet is very high. Judgment as a matter of law should only be granted if the record is deficient of the minimum quantity of

---

[1] By Memorandum Opinion and Order dated April 11, 2018, the Honorable Kim R. Gibson granted ANPAC's Motion for Summary Judgment and dismissed FELIX's counterclaim for "Bad Faith".  [ECF Doc. #72].

evidence from which a jury might reasonably afford relief. *Raiczyk v. Ocean County Veterinary Hosp.*, 377 F.3d 266, 269 (3d Cir. 2004); *see also Davis v. Berk County Philadelphia*, 351 F. App'x 640, 643 (3d Cir. 2009)(*citing Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)("A district court should grant a motion for judgment as a matter of law only if, 'viewing the evidence in the light most favorable to the nonmovant, giving [him] the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.'").

## B.  WAIVER OF RULE 50 MOTIONS

Under Rule 50(b), a party may move for a judgment notwithstanding the verdict only if the party has moved for a directed verdict at the close of all the evidence. Fed.R.Civ.P. 50(b). However, Rule 50(a)(2) specifically requires that any Rule 50(a) motion "must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed.R.Civ.P. 50(a)(2). "A motion for judgment as a matter of law must be preceded by motion sufficiently specific to afford party against whom motion is directed with opportunity to cure possible defects in proof which otherwise might make its case legally insufficient. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1173 (3d Cir. 1993)(*citing Acosta v. Honda Motor Co.*, 717 F.2d 828, 831-32 (3d Cir. 1983)). Normally, "a defendant's failure to raise an issue in a Rule 50(a)(2) motion with sufficient specificity to put the plaintiffs on notice waives the defendant's right to raise the issue in their Rule 50(b) motion." *Wolski v. City of Erie*, 900 F.Supp.2d 553, 562 (W.D. Pa. 2012)(*quoting Williams v. Runyon,* 130 F.3d 568, 571–72 (3d Cir. 1997) (citing authority). *See also Chainey v. Street,* 523 F.3d 200, 218 (3d Cir. 2008); *Noble Biomaterials v. Argentum Medical, LLC,* Civil Action No. 3:08–CV–1305, 2011 WL 4458796 at *3 (M.D. Pa. Sept. 23, 2011); *Reynolds v. University of Pennsylvania,* 747 F.Supp.2d 522, 540–41 (E.D.Pa.2010); *Cipriani v. Lycoming*

*County Housing Authority,* 177 F.Supp.2d 303, 314 (M.D.Pa.2001). Likewise, the Pennsylvania

Supreme Court recently ruled that "an objection to a jury's verdict that is premised on trial error,

correctable before the jury is discharged, must be raised before the jury is discharged." *Stapas v.*

*Giant Eagle, Inc.,* 44 WAP 2017 (PA Supreme Court, Decided Nov. 21, 2018).[2]  A party must

specify the  the grounds for directed verdict in the pre-verdict motion. Fed.R.Civ.P. 50 Advisory

Committee's Note to 1991 Amendment.  "A post-trial motion for judgment can be granted only

on grounds advanced in the pre-verdict motion."  *Id.*

       In the matter presently before the Court, ANPAC's Rule 50 Motion took up less than one

page of the transcript.  ANPAC simply stated during its Rule 50 Motion that, "no one on behalf of

the Plaintiff has testified that there exists a contract[3] that I had with American National, that they

breached this contract, that I have been damaged, here is the damages I sustained, here is my proof

of damages."  [**Exhibit "L"**[4] @ T42:24-T43:19].  As set forth herein, this entire argument misses

the point that the evidence which established the existence of the contract [insurance policy], the

breach of that contract, damages as a result of that breach, and the proof of those damages, were

all established using ANPAC's witnesses and the exhibits admitted into evidence during the course

of this trial, most of which were introduced by ANPAC.[5]

       No matter how many times ANPAC stomps its feet and cries foul, there was no need for

FELIX to have testified in this matter.  ANPAC never specifically identified in its pre-verdict

---

[2] A courtesy copy of the *Stapas* Opinion is attached hereto as **Exhibit 1** for the Court's reference.

[3] Amazingly, ANPAC's counsel conceded that there was a contract during his closing argument [**Exhibit "M"** @ T62:11-16], which he had to do since ANPAC attached a copy of the contract to its Complaint for Declaratory Judgment and was seeking to void that very contract. [ECF Doc. #1 and **Trial Exhibit J46**].

[4] Exhibits referenced by alphabetical letter, from **"A"** through **"N"**, correlate with the Appendix of Exhibits filed herewith and relate to the applicable portions of the Trial Transcript which have been transcribed and cited herein.

[5] Quite the contrary, as set forth in FELIX's Rule 50 Motion, FELIX should have been granted a directed verdict on its counterclaim for breach of contract, and the only issue left for the jury to decide, related to the breach of contract claim, was whether ANPAC had proven is claims of material misrepresentation, false swearing or fraud, which they asserted as a defense to the breach of contract claim.  [**Exhibit "L"** @ T44:2-T46:8].

motion that FELIX failed to introduce or otherwise document his Loss of Use/Additional Living Expenses (ANPAC Brief @ Argument A), Loss of Contents Damages (ANPAC Brief @ Argument B), Loss of Dwelling Damages (ANPAC Brief @ Argument C), or Services from Robert L. Felix (ANPAC Brief @ Argument D).  For these reasons, the Court should not entertain their Rule 50 Motions.[6]

## C.  RULE 59 MOTION TO ALTER OR AMEND JUDGMENT

In order to prevail on a motion to alter or amend a judgment pursuant to Pa.R.Civ.P. 59, the movant must demonstrate one of three major grounds: (1) an intervening change in controlling law; (2) the availability of new evidence [not available previously]; and (3) the need to correct clear error [of law] or prevent manifest injustice. *N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (2d Cir. 1995)(*quoting Natural Res. Def. Council v. US Envt'l Prot. Agency*, 705 F. Supp. 698, 702 (D. D.C. 1989)); *see also Wiest v. Lynch*, 710 F.3d 121, 128 (3d Cir. 2013).

Any arguments advanced by ANPAC are limited, by necessity, to their alleged need to correct a clear error to prevent manifest injustice as there has not been any change in law or newly discovered evidence in this matter.

## D.  RULE 59 MOTION FOR A NEW TRIAL

A court should only grant a new trial under Rule 59 to prevent a miscarriage of justice when the jury's "verdict is contrary to the great weight of the evidence." *Roebuck v. Drexel University*, 852 F.2d 715, 736 (3d Cir. 1988), or when a "court commits an error of law which prejudices a substantial right of a party." *Paul Morelli Design, Inc. v. Tiffany and Co.*, 200

---

[6] FELIX responds to ANPAC's Rule 50 motions anyway, to be on the safe side – and because ANPAC does not make clear when they are seeking Rule 50 vs. Rule 59 relief – but FELIX does not thereby mean to waive ANPAC's waiver on these issues.

*County Housing Authority,* 177 F.Supp.2d 303, 314 (M.D.Pa.2001). Likewise, the Pennsylvania Supreme Court recently ruled that "an objection to a jury's verdict that is premised on trial error, correctable before the jury is discharged, must be raised before the jury is discharged." *Stapas v. Giant Eagle, Inc.,* 44 WAP 2017 (PA Supreme Court, Decided Nov. 21, 2018).[2] A party must specify the the grounds for directed verdict in the pre-verdict motion. Fed.R.Civ.P. 50 Advisory Committee's Note to 1991 Amendment. "A post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion." *Id.*

In the matter presently before the Court, ANPAC's Rule 50 Motion took up less than one page of the transcript. ANPAC simply stated during its Rule 50 Motion that, "no one on behalf of the Plaintiff has testified that there exists a contract[3] that I had with American National, that they breached this contract, that I have been damaged, here is the damages I sustained, here is my proof of damages." [**Exhibit "L"**[4] @ T42:24-T43:19]. As set forth herein, this entire argument misses the point that the evidence which established the existence of the contract [insurance policy], the breach of that contract, damages as a result of that breach, and the proof of those damages, were all established using ANPAC's witnesses and the exhibits admitted into evidence during the course of this trial, most of which were introduced by ANPAC.[5]

No matter how many times ANPAC stomps its feet and cries foul, there was no need for FELIX to have testified in this matter. ANPAC never specifically identified in its pre-verdict

---

[2] A courtesy copy of the *Stapas* Opinion is attached hereto as **Exhibit 1** for the Court's reference.
[3] Amazingly, ANPAC's counsel conceded that there was a contract during his closing argument [**Exhibit "M"** @ T62:11-16], which he had to do since ANPAC attached a copy of the contract to its Complaint for Declaratory Judgment and was seeking to void that very contract. [ECF Doc. #1 and **Trial Exhibit J46**].
[4] Exhibits referenced by alphabetical letter, from **"A"** through **"N"**, correlate with the Appendix of Exhibits filed herewith and relate to the applicable portions of the Trial Transcript which have been transcribed and cited herein.
[5] Quite the contrary, as set forth in FELIX's Rule 50 Motion, FELIX should have been granted a directed verdict on its counterclaim for breach of contract, and the only issue left for the jury to decide, related to the breach of contract claim, was whether ANPAC had proven is claims of material misrepresentation, false swearing or fraud, which they asserted as a defense to the breach of contract claim. [**Exhibit "L"** @ T44:2-T46:8].

4

F.Supp.2d 482, 484 (E.D. Pa. 2002).  A new trial based on the "weight of the evidence" should be closely scrutinized since it invites the Court to substitute its judgment for that of the jury.

> When the district court grants a motion for a new trial based on the weight of the evidence, the court has 'to some extent at least, substituted [its] judgment of the facts and credibility of the witnesses for that of the jury.  Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp the prime function of the jury as a trier of facts.'

*Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir. 1993)(*quoting Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d. Cir.), *cert denied*, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960)).  This is especially true where, as here "the litigation is simple and within a layman's understanding." *Klein.* 992 F.2d @ 1290

A court should only exercise its discretion to grant a new trial "when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991); and *see Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 366 (3d Cir. 1999).

Ultimately, the granting of a new trial is committed to the sound judicial discretion of the trial court. *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980); *Montgomery Ward & Co.*, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940); *American Bearing Co. v. Litton Industries, Inc.*, 729 F.2d 943, 948 (3d Cir. 1983), *cert. denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984).

## III.   LEGAL ARGUMENT

### A. RULE 50 AND 59 MOTION WITH RESPECT TO THE JURY AWARD ON FELIX'S CLAIM FOR LOSS OF USE/ADDITIONAL LIVING EXPENSE DAMAGES

ANPAC's bad faith refusal to agree to an amount for additional living expenses, which met FELIX's "normal standard of living", prior to denying his claim should not now be used against its insured to argue that he failed to "incur" additional living expenses.

The Amended Declarations Page of ANPAC Policy #37H77898P, issued to FELIX and covering the premises located at 975 Franktown Road, Sidman, Pennsylvania, is contained in Joint Trial Exhibit J1 which was admitted into evidence. The Declarations Page evidences that FELIX purchased $146,620 worth of Loss of Use [commonly referred to as "ALE"] coverage from ANPAC. [**Trial Exhibit J1** @ p.0003]. Accordingly, the jury's verdict was within the applicable coverage available for this loss.

The "AGREEMENT" set forth in the ANPAC Special Homeowners Policy states, "[w]e will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy." [**Trial Exhibit J1** @ p.0011]. ANPAC filed its Declaratory Judgment Action [ECF #1] contending that FELIX had made material misrepresentations, false swearing, and committed fraud, therefore claiming he had not complied with the applicable provisions of the policy. The jury simply did not agree with ANPAC's view of the evidence and chose to award FELIX compensation consistent with the evidence and in accordance with the applicable policy limit available for the ALE coverage.

The applicable policy provision Coverage D – Loss of Use, provides in pertinent part:

If a loss covered under this Section makes the residence premises uninhabitable, we cover any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living.

**[Trial Exhibit J1 @ p.0014]**

ANPAC has admitted that the residence and the contents contained therein were destroyed due to the January 23, 2016 fire. **[Trial Exhibit J56]**.    Accordingly, it was proven that the residence was uninhabitable. (*See also* ANPAC's Brief at p.31 "There is no dispute that after the fire, Felix's residence was uninhabitable.").

The jury saw photographs of the house **[Trial Exhibit J54]** as well as the interior of the home **[Trial Exhibit D19]**, which provided the jury with evidence of FELIX's standard of living. This was more than ANPAC Adjuster Cory Campbell knew.  When he was cross-examined about whether any of the "Fair Rental" properties listed on the letter from Assured Relocation **[Trial Exhibit J16]**, ANPAC's vendor, allowed FELIX to maintain his "normal standard of living", as the policy dictates, he couldn't describe any of those properties or whether they meet FELIX's "normal standard of living".[7]  Campbell also could not explain why ANPAC was trying to limit FELIX's recovery to "Fair Rental" properties when there is nothing in the policy language which limits FELIX's ALE coverage to what ANPAC or some third party vendor unilaterally determined was a "Fair Rental".  When Attorney McMonigle argued to the jury that the "Truth Matters" the jury may very well have concluded that ANPAC didn't tell it's insured FELIX the truth when it tried to limit his ALE coverage to $3,310/month when they had contracted to provide up to a monthly maximum of $14,662/month in ALE coverage. [*See also* **Trial Exhibit D14**].

---

[7] It appears that what ANPAC is requesting is that the Court endorse ANPAC's attempts to sell illusory coverage, which is against public policy.  See *Heller v. Pennsylvania League of Cities and Municipalities*, 32 A.3d 1213 (Pa. 2011).  ANPAC is willing to sell a policy which provides $14,662/month, charges and collects a premium for that coverage, and then when an insured makes a claim limits the coverage to "fair rental" coverage, which is thousands of dollars less than the amount of coverage they sold.  Why not just advise the insured right up front that despite paying for such expensive coverage, they are never going to receive that amount because there are no replacement properties in that market which are "fair rentals" which would cost anything close to that amount of coverage.

If the jury believed that FELIX's standard of living warranted the maximum coverage of $14,662/month to maintain his standard of living after the fire, that amount, multiplied by 24 months, equals $351,888. Moreover, the jury heard and saw evidence which FELIX submitted to ANPAC indicating that he could lease another house for around $4,600/month plus an amount for his two dogs [minimum of $108,000 without cost for dogs for 24 months[8]], or to rent an RV and park it on the property for $8,000/month [$192,000 for 24 months]. [**Trial Exhibit D3**]. Even ANPAC has acknowledged that by using the number provided for by its vendor, Assured Relocation, it would have resulted in a loss of $115,810 to FELIX. [**Trial Exhibit J16**].

Judge Gibson instructed the jury as follows, "If you find that ANPAC breached the contract, you should award an amount of money that will fairly and adequately compensate Felix for the harm caused by the breach." [**Exhibit "M"** @ T132:17-19].[9] ANPAC did not object to this instruction.[10] Likewise, ANPAC was aware, before the case was submitted to the jury for deliberation, that the proposed Verdict Form separated out the category of "Loss of Use" as a

---

[8] ANPAC argues that FELIX was somehow responsible for offering Endorsement SH-31410 "Special Protection Package" into evidence and criticizes him for not doing so. The bigger question is why that endorsement wasn't included as part of Joint Trial Exhibit J1 which ANPAC represented was "a full and complete copy of the insured's policy in effect on January 23, 2016." [**Trial Exhibit J1** @ CL 0986-87]. Moreover, if ANPAC thought that introduction into evidence of Endorsement SH-31410 "Special Protection Package" was important and relevant, ANPAC should have entered that document into evidence as an exhibit. [ECF Doc. #223-1, which was not part of the evidence submitted to the jury or a part of the court record]. Had the jury been made aware that FELIX was actually entitled to 36 months of ALE coverage, instead of only 24 months, and awarded him the amount of $4,600/month x 36 months, even without the added costs for the two dogs, that sum would be $165,000, once again above the ALE policy limit of $146,620.

[9] Judge Gibson also provided the jury with a copy of the Final Instruction which had been provided to counsel to bring back to the jury deliberation room for their reference.

[10] ANPAC's own proposed Jury Instruction on contract damages did not require that FELIX prove that the costs incurred had to be submitted to ANPAC. ANPAC's proposed jury instruction states, in relevant part, "[i]t is your responsibility to determine by a preponderance of the credible evidence what was the value of Mr. Felix's dwelling and the personal property at the time of the loss. With respect to **your finding of value of each item of property,** the burden of proof on this issue is upon Mr. Felix." [ECF #184 @ p.33]. Accordingly, prior to the trial, ANPAC recognized that it was up to the jury to determine what it thought was the value of each item of damages. To the extent that ANPAC's current argument seeks to complain about that portion of the verdict which awarded damages for Loss of Use any such argument has been waived.

special interrogatory. [ECF #218].[11]  Accordingly, by failing to object and argue, either at the time of the jury charge or after the return of the verdict before the jury was dismissed, that the basis for the verdict for Loss of Additional Living Expenses was deficient, ANPAC has waived any such argument.

The Court further instructed the jury: "[y]ou should use your common sense in weighing the evidence.  Consider it in light of your everyday experience with people and events and give it whatever weight you believe it deserves.  If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion." **[Exhibit "M"** @ T114:9-14].[12]  This is precisely what the jury apparently did here and arrived at the figure of $146,620 as the amount of damages FELIX was entitled to recover based on his loss.  Accordingly, the verdict amount of $146,620 was both reasonable and supported by the evidence of record.

ANPAC seems to confuse the concept of incurring an expense with the concept of submitting proof that an expense was incurred.  There is nothing in Coverage D – Loss of Use which states that the insured, FELIX, must submit "proof to the insurance carrier of such costs".  **[Trial Exhibit J1** @ CL 0999].  ANPAC's suggestion that FELIX failed to "incur" any additional living expenses is both incredulous and defies common sense.  After someone's house burns down, they have suffered a "Loss of Use" and are going to incur expenses to live somewhere else.

Angela Merrill testified that while continuing to date FELIX after the January 2016 fire up through January 2018, they would sometimes stay in the apartment he built over a garage located at the 975 Franktown Road property.  As one example of FELIX having incurred a loss, the jury could reasonably infer that FELIX spent money to build the apartment over the garage he lived in.

---

[11] Once again, ANPAC's own proposed Jury Verdict Form separated out three (3) categories of damages: (i) Loss of Dwelling; (ii) Loss of Contents; and (iii) Loss of Use.  [ECF #185 @ p.5].
[12] It should be noted that ANPAC's proposed Jury Instruction, Model Jury Instruction 1.5 contains this exact same language. [ECF #184 @ p.7].

The jury may have also reasonably inferred that FELIX did not remain homeless or live in a cardboard box until the apartment was built, therefore he must have incurred expenses to live somewhere and continued to incur those expenses while waiting until he realized the proceeds of his insurance policy so that he could rebuild his home.

ANPAC fails to realize that the reason no such specific proof of those expenses was submitted to ANPAC was because ANPAC denied coverage in June of 2016 [**Trial Exhibit J44**] and filed a Declaratory Judgment Action against FELIX. [**Trial Exhibit J46**]. Moreover, when FELIX had attempted to discuss compensation for alternative living arrangements, prior to ANPAC's denial of his claim, he was rebuffed by ANPAC and told he was only entitled to $3,310/month [*See* **Trial Exhibits D3, J16, and D14**]. However, the above doesn't mean that there wasn't evidence of additional living expenses having been incurred at the time of trial. As the Court instructed the jury, "[t]he evidence from which you are able to find the facts consists of the following: One, the testimony of witnesses; two, documents and other things received as exhibits; and three, any facts that are stipulated. That is, formally agreed to by the parties." [**Exhibit "M"** @ T113:20-24].[13] ANPAC seems to have a difficult time understanding that FELIX was able to prove his claim and his resulting damages through the use of **any and all** evidence admitted at trial and was not constrained or required to prove liability or his damages using only his own affirmative evidence. [Emphasis added].

---

[13] ANPAC submitted a similar proposed jury instruction regarding what is evidence; Model Jury Instruction #1.5. [ECF #184 @ p.7].

## B. RULE 50 AND 59 MOTION WITH RESPECT TO THE JURY AWARD ON FELIX'S CLAIM FOR RULE 50 AND 59 MOTION WITH RESPECT TO THE JURY AWARD ON FELIX'S CLAIM FOR LOSS OF CONTENTS DAMAGES

ANPAC appears to be seeking a remittitur as to the "Loss of Contents" award of damages; remitting the award to $257,390.43. (*See* ANPAC Brief @ p.34). ANPAC, however, fails to cite any controlling case law to support its contention that it is entitled to a remittitur as to the "Loss of Content" damages.

A trial court may properly grant remittitur only if the verdict is clearly against the weight of the evidence as to constitute a miscarriage of justice "or where the verdict, on the record, cries out to be overturned or shocks the conscience." *Thomas Hyll Funeral Home, Inc. v. Bradford*, 233 F.Supp.2d 704, 708 –09 (D.V.I. App. Div. 2002)(*citing Alexander v. Riga*, 208 F.3d 419, 429 (3d Cir. 1993)). "To remit damages, the judge must find that no rational jury, acting on the basis of the full evidentiary record, and without being inflamed by passion or prejudice or other improper consideration, could have awarded such a large sum as damages." *Thomas Hyll*, 233 F.Supp.2d @ 710 (citation omitted).

The assessment of damages is within the province of the jury who, as finders of fact, weigh the veracity and credibility of the witnesses and their testimony. *Dranzo v. Winterhalter,* 577 A.2d 1349, 1352 (Pa. Super. 1990), *appeal denied,* 585 A.2d 468 (Pa. 1991). Moreover, the jury is not limited by an attorney's opening or closing statement as to the amount of money it determines "will fairly and adequately compensate Felix for the harm caused by the breach." [*See* **Exhibit "M"** @ T132:17-19].

The jury heard and saw information regarding FELIX's Sworn Statement in Proof of Loss [**Trial Exhibit J9**], Inventory of Items [**Trial Exhibit J10**], and Supplemental Inventory of Items [**Trial Exhibit J26**]. It is irrelevant that FELIX did not testify about those exhibits himself. Other

witnesses, who are employees of ANPAC, did testify about those exhibits and the content of those exhibits. Furthermore, those exhibits were marked into evidence by counsel for ANPAC. The jury also had the benefit of hearing and seeing the Enservio Select Opinion of Value (POV) Report dated April 12, 2016 [**Trial Exhibit J24**] and Enservio Select Opinion of Value (POV) Report dated April 27, 2016. [**Trial Exhibit J28**]. The Enservio Report dated April 27, 2016 estimated FELIX's loss at $257,390.43. [**Trial Exhibit J28** @ CL 1943].

Enservio reached its estimate of $257,390.43 by valuing several trading cards well below the value claimed. [**Trial Exhibit J28** @ CL1923-1925]. These are some of the same trading cards set forth in FELIX's Supplemental Inventory of Items [**Trial Exhibit J26**] which ANPAC tried to suggest did not even exist and suggested was part of FELIX's alleged fraud. [**Exhibit "C"** @ T56:2-T59:10, **Exhibit "I"** @ T15:1-T17:11]. The Supplemental Inventory of Items specifically states right on it, "Please see pictures I thought these items were still at my child hood Home [sic]. I had more and more sets I just can't remember. These were collected for 6 yrs. old until about 15 Teen (sic)." [**Trial Exhibit J26**].

On cross-examination, using ANPAC's Cause and Origin Report prepared by Pyr-Tech [**Trial Exhibit P9**], the undersigned was able to demonstrate that ANPAC's own expert confirmed the presence of trading cards in rubble in the basement of the residence. [**Exhibit "I"** @ T156:16-157:23; T159:24-T160:7]. Accordingly, contrary to ANPAC's suggestion that these baseball cards were just something FELIX made up to try to pad his claim, the jury heard evidence that these items, along with other items ANPAC suggested didn't exist, were legitimate losses since ANPAC's own hired expert identified these, and other items, in the fire rubble. The jury may have concluded that ANPAC, through its vendor, was undervaluing the trading cards FELIX had listed

on his Inventory of Items, and applying their common sense and experience, chose to award an amount greater than claimed on the Inventory of Items or set forth in Enservio's estimate.

As the Court may recall, ANPAC also expressed disbelief that FELIX could have purchased various items listed on the Inventory of Item for "cash". [**Exhibit "C"** @ T10:9-11, T12:25-T13:16, T13:23-T14:5, T14:24-T15:3, T15:11-16, T55:13-T56:16, T57:21-T58:4, T110:24-T111:5]. Once again, using ANPAC's Cause and Origin Expert's Report, the undersigned was able to demonstrate that all of those "questionable" items were identified by David Brinning of Pyr-Tech. [**Exhibit "C"** @ T101:21-T102:1, **Exhibit "I"** @ T152:2-T:161:14, T167:25-T168:19]. Despite knowing that its own expert had identified those items, ANPAC chose to try to suggest to this jury that FELIX must have been padding his inventory with items that didn't exist or for which he couldn't possibly have paid for with cash.

Enservio similarly tried to suggest that the Reclaimed Wood Library Wall Shelf [**Trial Exhibit D19(k) and (j)**] claimed on FELIX's inventory [**Trial Exhibit J10** @ CL 0470] was only worth $5,949.00. [**Trial Exhibit J24** @ CL 1350, **Exhibit "I"** @ T31:10-T33:12, T128:11-T130:13]. FELIX claimed in his Inventory of Items that this piece of furniture was custom made by an Amish carpenter from reclaimed wood and cost $15,000. [**Trial Exhibit J10** @ CL 0470]. Enservio claimed that they found this item at Walter E. Smithe Furniture and Design for $5,949.00. [**Trial Exhibit J24** @ CL 1350]. The jury may very well have concluded that the mass-produced piece of furniture sold at Walter E. Smithe Furniture and Design was not the same or comparable to a custom piece of furniture made from reclaimed wood by an Amish carpenter. Again, the jury may have concluded that ANPAC, through its vendor, was undervaluing many of the items FELIX had listed on his Inventory of Items and applying their common sense and experience, chose to award an amount greater than claimed on the Inventory of Items or set forth in Enservio's estimate.

The jury may have also reasonably concluded that the cost of the items set forth in the Inventory of Items, prepared in 2016, might cost more to replace in 2018/2019 and adjusted their award accordingly, to take into account the rising cost of most consumer goods.

"[A] jury may not award damages on the basis of speculation and conjecture." *Carroll v. Philadelphia Housing Authority,* 650 A.2d 1097, 1100 (Pa. Cmwlth. 1994). *See also Blanche Road Corp. v. Bensalem Township,* 57 F.3d 253 (3d Cir.1995); *Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 891, 895 (3d Cir.1975); *Ballantine v. Central R. of New Jersey,* 460 F.2d 540, 544 (3d Cir.1972). Under Pennsylvania law, "[d]amages are speculative if the uncertainty concerns the fact of damages not the amount." *Carroll,* 650 A.2d at 1100; *See also Blanche Road Corp. v. Bensalem Township,* 57 F.3d 253, 265 (3d Cir.), *cert. denied,* 516 U.S. 915, 116 S.Ct. 303, 133 L.Ed.2d 208 (1995). On the other hand, Pennsylvania courts have made it clear that when determining the amount of damages, there need not be "'mathematical certainty, but only reasonable certainty, and evidence of damages may consist of probabilities and inferences.'" *Molag, Inc. v. Climax Molybdenum Co.,* 637 A.2d 322, 324 Pa. Super. 1994) (*quoting Delahanty v. First Pennsylvania Bank, N.A.,* 464 A.2d 1243, 1257–58 (Pa. Super. 1983)). "Thus, the law does not demand that the estimation of damages be completely free of all elements of speculation." *Lynch v. Bridges and Company, Inc.,* 678 A.2d 414, 416 (Pa. Super.1996), *app. denied,* 694 A.2d 622 (Pa. 1997); *Pikunse v. Kopchinski,* 631 A.2d 1049, 1052 (Pa. Super. 1993); *Delahanty v. First Pennsylvania Bank, N.A.,* 464 A.2d 1243, 1257 (Pa. Super. 1983).

In the matter presently before the court by claiming that the award for "Loss of Contents" should be permitted, but reduced to $221,642.43, ANPAC has effectively conceded that there is no uncertainty as to the fact of damages having been incurred. (*See* ANPAC's Brief @ p.34-40). Accordingly, pursuant to Pennsylvania law, there can be no argument as to speculation as to the

damages awarded.  Moreover, there was ample evidence from which a reasonable jury could reach the verdict that it returned.  Contrary to ANPAC's contention, there is no rule of law that says a jury must accept the amount ANPAC claims as damages and must deduct therefrom the items ANPAC does not believe FELIX should recover.

ANPAC's statement that there "can be **absolutely no doubt whatsoever that the claim presented by Felix was for the actual Louis Vuitton purse and diamond stud earrings that remained in the possession of Kelly Madison after the fire**" demonstrates ANPAC lack of understanding as to what the role of the jury was.  (*See* ANPAC Brief @ p.37).  As clear as that point seemed to ANPAC, it was equally clear to the unanimous twelve (12) members of the jury that the earrings and purse in Kelly Madison's possession **WERE NOT** the same as the earrings and purse that FELIX was claiming on his Inventory of Items. [**Trial Exhibit J10** @ CL 0466 and CL 0481 respectively].

The jury heard five (5) days of testimony offered by ANPAC on behalf of its argument on this issue.  They also heard Kelly Madison herself say that she was not saying that FELIX couldn't have also lost a pair of earrings and another Louis Vuitton purse.  All she was saying is the purse and earrings lost in the fire weren't the ones in her possession. [**Exhibit "E"** @ T155:5-13, T161:6-14].  Her father, Ron Madison, similarly testified that he had no evidence or proof that FELIX didn't lose a pair of earrings and Louis Vuitton purse in the January 23, 2016 fire.  [**Exhibit "F"** @ T41:2-23].  Jessica Bloom testified that she saw both a pair of diamond hoop earrings and a white Louis Vuitton purse in FELIX's home shortly before the January 23, 2016 fire. [**Exhibit "K"** @ T6:14-T8:3, T10:19-T11:1, T20:11-18, T21:1-4, T21:14-T23:20, **Trial Exhibit D20B**].

In ANPAC's world the scenario of two (2) separate purses and pairs of earrings: (i) one pair of diamond stud earrings and Louis Vuitton purse that Kelly Madison had in her possession,

given to her by FELIX, and (ii) another Louis Vuitton purse and pair of earrings that FELIX had in his house at the time of the fire, simply cannot exist. The text messages between FELIX and Angella Merrill, admitted into evidence by ANPAC [**Trial Exhibit P26** @ p.11], demonstrate this exact scenario. Angela Merrill sent a text message to FELIX as follows: "Well if she has a purse and earrings she's not lying. She's just saying what she has." [**Trial Exhibit P26** @ p.11]. FELIX responds, "I had brought her another 1 tgat (sic) never got given their (sic) were more than 1 pair of earrings." [**Trial Exhibit P26** @ p.11]. These were factual disputes left for the jury to resolve, which they resolved against ANPAC. Simply because ANPAC doesn't like the outcome doesn't mean that there wasn't evidence to support the jury's verdict, or that the jury had to award an amount of damages that ANPAC would have preferred. It should be noted that ANPAC never argued in closing that if in fact they chose to believe FELIX and decided to award him damages, they were limited in the amount that they could award him.

The Parties Stipulation doesn't state what ANPAC apparently thinks it says. The stipulation provides: "The receipt from Littman Jewelers (*see* CL 0504) submitted to American National by Mr. Felix represents that Mr. Felix purchased Item No. 1343433, which is pair of 1½ carat total weight diamond stud earrings, for $1,906.94 (tax included)." [**Trial Exhibit J56**]. All that was being stipulated to was that the receipt submitted to ANPAC was for the diamond stud earrings. The Stipulation does not state that the credit card receipt for Littman's was for the pair of earrings lost in the fire. It was argued at trial that in the course of submitting an inventory of 377 items, FELIX may have submitted the wrong receipt while trying to recreate everything he lost during the fire. [**Exhibit "M"** @ T15:7-T18:8]. The jury obviously believed that Felix must have submitted the wrong documentation to support the pair of earrings lost in the fire.

ANPAC now complains that the jury's award "was **not** based upon Felix's 'showing in detail, the quantity, description, actual cash value, and amount of loss.' And his attaching 'to the inventory all bills, receipts, and related documents that substantiate the figures in the inventory.'" (ANPAC Brief @ p39). The main problem with this argument is that ANPAC, when it had the opportunity, never objected to Inventory as being incomplete [**Trial Exhibit P39, Exhibit "I"** @ T13:2-16, T15:1-12, T37:7-18, T96:11-T99:16] or requested that FELIX submit a more complete inventory[14], and that was not the basis for denying coverage.

## C. RULE 50 AND 59 MOTION WITH RESPECT TO THE JURY AWARD ON FELIX'S CLAIM FOR LOSS OF DWELLING DAMAGES

Defendant ANPAC once again claims that there is insufficient evidence to support the jury's award of loss of dwelling damages in the amount of $908,780.41 as a result of the January 23, 2016 fire and again seems to be asking the court for remittitur.

The jury's award of "Loss of Dwelling" damages is once again within the applicable policy limit. The Declarations Page documents coverage in the amount of $733,100.00. [**Trial Exhibit J1** @ CL 0988]. However, as the jury learned during the course of the trial, ANPAC Policy #37H77898P also contained an SH31410 Special Protection Package Endorsement [**Trial Exhibits D8** and **D17**]. This Endorsement provided up to 125% of the limit of liability shown in the Declarations Page for Coverage A, or the total sum of $916,375, to repair or replace the premises. [ECF Doc. #223-1].

ANPAC argues that FELIX was somehow responsible for offering Endorsement SH-31410 "Special Protection Package" into evidence and criticizes him for not doing so. The bigger question is why that endorsement wasn't included as part of Joint Exhibit **J1** which ANPAC

---

[14] **Trial Exhibit J11** contains all of the receipts that were submitted to ANPAC which counsel had Kip Mathena estimate was thicker than an inch [**Exhibit "C"** @ T21:23-T22:17], belying ANPAC's current argument that there was not sufficient documentation to support the jury's award.

represented was "a full and complete copy of the insured's policy in effect on January 23, 2016."
[**Trial Exhibit J1** @ CL 0986-87]. Moreover, if ANPAC thought that introduction into evidence
of Endorsement SH-31410 "Special Protection Package" was important and relevant, ANPAC
should have entered that document into evidence as an exhibit. [ECF Doc. #223-1, which was not
part of the evidence submitted to the jury or a part of the court record].

Initially, it must be noted that the ANPAC policy admitted into evidence, as **Exhibit J1**,
contains a description of the premises which sets forth the estimated replacement cost, the square
footage (3,400), and the various costs that ANPAC assigned to rebuild the residence. [**Trial
Exhibit J1** @ CL 0990-91]. This is information that ANPAC prepared on its own, without any
input from FELIX. Based on this information alone, the jury had a reasonable basis to award the
sum of $908,780.41.

The jury heard that ANPAC's vendor, Summit Claims Services, LLC's initial estimate
provided to ANPAC as to the Replacement Cost Value for FELIX's property was $727,024.33.
[**Trial Exhibit D15**]. The jury also heard that ANPAC never disclosed that number to FELIX
during the course of handling his claim. It was only after the lawsuit was filed and discovery
conducted that the estimate of $727,024.33 was uncovered.

The jury also heard that Summit Claims Services, LLC issued a second estimate as to the
Replacement Cost Value for FELIX's property. The second estimate was for $712,779.39. [**Trial
Exhibit D17**]. Once again, the jury learned that this revised estimate was not disclosed to FELIX
during the course of adjusting his claim.

Summit Claims Services, LLC prepared a third estimate, this one in the amount of
$595,781.18. [**Trial Exhibit J29**]. This third estimate, which was $131,243.15 less than the
original estimate, was the estimate ANPAC disclosed to FELIX and advised him that ANPAC

believed he was entitled to recover. This third estimate is also $137,260.82 less than the estimated replacement costs contained in the ANPAC Policy Declarations Page. **[Trial Exhibit J1** @ CL 0988, 0990-91].

The jury also viewed FELIX's May 5, 2016 email and heard questioning of ANPAC Adjuster Cory Campbell wherein FELIX specifically asked if the Replacement Cost Value estimate [3rd revision] provided to him was the original estimate, which Mr. Campbell failed and refused to respond to. **[Trial Exhibit J31, Exhibit "I"** @ T143:13-T144:20]. The jury also viewed FELIX's email to Campbell setting forth all of the things that were wrong and inaccurate with the Replacement Cost Value estimate from Summit Claims Services, LLC such as; leaving off 1,200 square footage from the home estimate; pricing 2x4s instead of 2x6s for the structure, leaving off the master bathroom, etc. **[Trial Exhibit J32, Exhibit "I"** @ T145:24-T151:23].

While Mr. Campbell tried to explain that the reason for the revisions was because the estimates had to be approved by ANPAC's Property Quality Unit, he himself really couldn't explain what revisions, if any, they made or why such revisions were made. **[Exhibit "I"** @ T135:24-T151:23]. This is especially curious where the first revision only changed the amount owed to FELIX by $14,244.94, yet the difference between the original estimate and the estimate ANPAC chose to accept was $131,243.15. Was the jury to believe that Summit Claims Services, LLC was simply that incompetent? For whatever reason ANPAC chose not to call someone who could competently explain why the Property Quality Unit felt the need to deduct $131,243.15 from Summit Claims Services, LLC's original estimate. Accordingly, given the fact that Mr. Campbell never answered FELIX's question, as to whether the estimate provided by ANPAC was the original estimate, and the fact that there was a huge discrepancy between the original estimate and the estimate that ANPAC accepted, the jury may have concluded that ANPAC was simply trying

to lowball its insured.  Likewise, since ANPAC either missed, or seemingly ignored, all of the mistakes highlighted by FELIX in his May 5, 2016 email, the jury may have determined that the "plus 25%" was an appropriate sum to add to cover those expenses when rebuilding the home. **[Trial Exhibit J32]**.

ANPAC's argument that the award is deficient because FELIX somehow failed to **"provide[] the specific information requested by Mr. Campbell in his May 5, 2016 e-mail"** (ANPAC Brief @ p.43) as a basis for remitting the amount of damages is preposterous.  As evidenced by ANPAC's own policy, ANPAC obviously possessed sufficient information to issue policy #37H77898P8, which provided for $733,100 in replacement cost coverage.  **[Trial Exhibit J1 @ CL 0988, 0990-91]**. If ANPAC didn't possess sufficient information to underwrite that size policy, shame on them.  Moreover, what information did Summit Claims Services, LLC have to issue any of the three (3) Replacement Cost Value estimates it prepared **[Trial Exhibits D15 and D17]**, including the estimate for $595,784.18 **[Trial Exhibit J29]** which ANPAC now contends the "Dwelling Loss Coverage" award should be remitted to.

### D. RULE 50 AND 59 MOTION WITH RESPECT TO THE JURY AWARD ON FELIX'S CLAIM FOR "SERVICES FROM ROBERT L. FELIX"

It must not go unnoted that ANPAC fails to cite to any policy language, or a single case, in support of its position that FELIX was not entitled to be compensated for the work performed on his property.

The jury heard evidence that ANPAC asked FELIX to arrange for his father, Robert L. Felix, to take down an exterior wall so that it wouldn't collapse into the basement, making ANPAC's investigation more difficult.  **[Trial Exhibit J2 @ p.46, Exhibit "C" @ T122:5-T123:12, T124:23-T126:9, Trial Exhibit J18]**.  Robert L. Felix submitted a bill for the work ANPAC had requested and authorized be performed at FELIX's property.  The invoice submitted

by Robert L. Felix was submitted into evidence as **Exhibit J17**. On its face this invoice indicates that Robert L. Felix performed work on four separate occasions. [**Trial Exhibit J17**].

When asked why Robert L. Felix's invoice remained unpaid, when ANPAC paid all of the other vendors it had contracted with who performed work at the premises, ANPAC employee Kip Mathena testified that the reason for non-payment was because of dissatisfaction with the work performed, and that Robert L. Felix had intentionally tried to destroy or disturb the fire scene and/or evidence. [**Exhibit "C"** @ T127:3-T128:8, T257:16-21]. At other times, Mr. Mathena tried to avoid testifying about the issue stating that he wasn't involved in the hiring of Robert L. Felix. [**Exhibit "C"** @ T126:10-15]. ANPAC employee Cory Campbell also tried to offer similar excuses for why the bill wasn't payed. [**Exhibit "I"** @ T85:1-T87:1]. Unfortunately for ANPAC, the evidence introduced at trial did not support either of their employees' assertions.

During the cross-examination of Cory Campbell, using the report from Pyr-Tech, ANPAC's cause and origin expert, the jury heard the truth regarding the work performed by Robert L. Felix. The evidence demonstrated that Kip Mathena was specifically consulted and approved Robert L. Felix to perform work at the fire scene. [**Exhibit "I"** @ T163:13-T164:21]. The jury further heard Cory Campbell confirm that there is absolutely no documented evidence of any criticism of the work performed by Robert L. Felix. [**Exhibit "I"** @ T164:22-T166:11]. Common sense tells you that if ANPAC was unhappy with Robert L. Felix's work, or if he had improperly disturbed the fire scene or destroyed evidence, ANPAC would not have had him return to the property on multiple occasions. Moreover, if ANPAC's story was true, one would have expected a letter from ANPAC addressed to Robert L. Felix explaining why he wasn't being paid and chastising him for disturbing or destroying the fire scene. The record is devoid of any such documentary evidence being offered by ANPAC to support the testimony of its employees. The

jury heard this ridiculous, unsupported, testimony and presumably believed that this was just another example of ANPAC's overreaching and being less than candid when offering evidence ANPAC believed supported is position. This is especially so where, as here, Cory Campbell ultimately testified that he would have paid the invoice. [**Exhibit "I"** @ p.165-166].

ANPAC argues that there is no legal basis or standing to bring the claim to recover payment of Robert L. Felix's invoice. However, ANPAC Policy #37H77898P8 explicitly states:

**ADDITIONAL COVERAGES**

1.   **Debris Removal.  We will pay** the reasonable expense incurred by you in the removal of debris of covered property provided coverage is afforded for the peril causing the loss.

[**Trial Exhibit J1** @ CL 0999].

ANPAC did not challenge the reasonableness of the expense incurred as it relates to the amount charged. All ANPAC potentially challenged, as to reasonableness, was claiming that he did not perform the work properly as discussed in the preceding paragraph.

Obviously, the need to tear down the one wall and clean the debris was related to the peril causing the loss, in this instance, the January 23, 2016 fire. Accordingly, under the express terms of the policy, coverage was afforded for Robert L. Felix's invoice.

Finally, as argued during trial, the work performed by Robert L. Felix was performed at FELIX's premises and ultimately, for the benefit of FELIX. [**Exhibit "N"** @ T17:24-T18:13]. Accordingly, if this invoice remains unpaid, FELIX faces potential exposure under Pennsylvania's Mechanics' Lien Law, 49 P.S. § 1301, *et seq.*

## E. RULE 59 MOTION SEEKING A NEW TRIAL BASED UPON THE JURY'S PLAIN DISREGARD OF THE EVIDENCE AND INSTRUCTIONS FROM THE COURT

As set forth above, a court should only grant a new trial under Rule 59 to prevent a miscarriage of justice when the jury's "verdict is contrary to the great weight of the evidence." *Roebuck v. Drexel University*, 852 F.2d 715, 736 (3d Cir. 1988), or when a "court commits an error of law which prejudices a substantial right of a party." *Paul Morelli Design, Inc. v. Tiffany and Co.*, 200 F.Supp.2d 482, 484 (E.D. Pa. 2002).

ANPAC's argument on this point is essentially that the verdict was against the weight of the evidence although ANPAC does not phrase its argument in that manner. The reason for ANPAC's phraseology is readily apparent. Defendants are foreclosed from challenging the sufficiency of the evidence by their failure to move for judgment as a matter of law based on the sufficiency of the evidence before the case was submitted to the jury. *See Brown v. Grass*, 544 Fed.Appx. 81, 85 (3d Cir. 2013).

The Third Circuit Court of Appeals has instructed that "the failure to move for a directed verdict at the close of all evidence does more than limit an aggrieved party's remedy to a new trial. In this Circuit, it wholly waives the right to mount any post-trial attack on the sufficiency of the evidence." *Yohannon v. Keene Corp.*, 924 F.2d 1255, 1262 (3d Cir. 1991). Thus, arguments based on sufficiency of the evidence are foreclosed under Rule 59 for the same reason that they are foreclosed under Rule 50(a). *See, Stadtlander Drug Co., Inc. v. Brock Control Systems, Inc.*, 174 F.R.D. 637, 640-41 (W.D. Pa. 1997); *see also United Intern. Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1228 (10th Cir.), *aff'd.*, 532 U.S. 588, 121 S.Ct. 1776, 149 L.Ed. 2d 845 (2001) ("A party may not circumvent Rule 50(a) by raising for the first time in a post-trial motion issues not raised in an earlier motion for directed verdict."). Therefore, it is

respectfully submitted that the Court should find and rule that ANPAC's failure to move for a judgment as a matter of law as to this issue [**Exhibit "L"** @ T42:24-T43:19] forecloses the Court's consideration of this issues in the instant Rule 59 Motion.

To the extent the Court disagrees with FELIX's above argument, and believes that ANPAC has properly preserved this issue for appeal, ANPAC does not set forth any new or different arguments to support its claim that the jury's verdict is against the law, the evidence or the weight of the evidence, other than what it has previously argued in sub-sections A, B, C and D of its Brief. ANPAC does not cite to any specific testimony or exhibits admitted into evidence that the jury ignored or disregarded. It likewise fails to specifically identify what instruction(s) the jury ignored or misapplied. Once again, ANPAC's legal argument is devoid of any reference to the law. In essence, ANPAC's argument boils down to the jury not accepting our argument and awarding more money than we think they should have awarded; therefore, we're entitled to a new trial.

Since ANPAC has failed to specifically identify any evidence, law, or jury instructions which the jury is alleged to have disregarded, there can be no miscarriage of justice. By failing to identify any evidence, law, or jury instructions for the Court to consider, ANPAC has waived this ground for review or appeal.

ANPAC fails to cite to a single case that holds that a jury may not award more damages than an attorney outlines in an opening statement. This is especially so where, as here, the undersigned underestimated the amount of damages ANPAC's various estimates were claiming FELIX was entitled to recover based on the hold back amounts built into ANPAC's vendors' numbers.

There is no evidence cited by ANPAC which supports its contention that the jury "most likely punished the insurance company". (ANPAC's Brief @ p.48). Rather, the evidence admitted

at trial established a basis for each element of damages the jury awarded, and each amount awarded was within the applicable policy coverage.

Likewise, there is no evidence cited, or examples provided, by ANPAC to support its contention that the "jury recklessly disregarded the testimonial and documentary evidence." (ANPAC's Brief @ p.48). An unsubstantiated statement that "the verdict is so egregiously defective" is not the same as proving that a verdict is so egregiously defective. (ANPAC's Brief @ p.49). Other than making bald assertions, ANPAC has failed to offer anything to support its allegation that it is entitled to a new trial under Rule 59 as to all issues raised in its Complaint and FELIX's counterclaim.

### F. RULE 59 MOTION SEEKING A NEW TRIAL BASED UPON THE COURT'S REFUSAL TO ALLOW EVIDENCE CONCERNING FELIX'S FIRST FIRE LOSS AND RELATED CLAIM SUBMITTED TO ANPAC

The issue related to the admissibility of the prior fire was the subject of a Motion *in Limine* filed by FELIX, to preclude its introduction [ECF Doc. #83], to which ANPAC responded. [ECF Doc. #165]. Ultimately, Judge Gibson ruled that evidence of the prior 2013 fire was inadmissible under Rules 401, 403 and 404 of the Federal Rules of Evidence. [ECF Doc. #187].

The trial court has broad discretion in determining the admissibility of evidence. *In re Merritt Logan, Inc. v. Fleming Companies*, 901 F.2d 349, 359 (3d Cir. 1990). When the basis of a request for new trial is that evidence was allegedly improperly admitted, a new trial is only warranted when "a substantial right of a party is affected, which affected the outcome of the case." *Davis v. General Accident Ins. Co.*, 153 F.Supp.2d 598, 601 (E.D. Pa. 2001). Where there is substantial and significant evidence to support a jury's findings, it cannot be said that any alleged errors in the admission of testimony unfairly prejudiced the outcome of the case. *Id.*

Evidence related to the prior March 2013 fire had no relevance to ANPAC's denial of coverage in connection with the January 23, 2016 fire. While the first fire was relevant as to why ANPAC may have initially undertaken its investigation into the January 23, 2016 fire, that initial reason ultimately had nothing to do with ANPAC's denying coverage and charging FELIX with insurance fraud, based on his alleged material misrepresentation regarding a Louis Vuitton purse and a pair of diamond earrings.

ANPAC argues that not allowing the jury to hear about the prior fire "deprived the jury from understanding the full picture regarding the insurance claim." (ANPAC's Brief @ p.49). However, ANPAC doesn't cite to any case law that says a jury must be made aware of prior claims history to understand the full picture regarding an insurance claim. In fact, in negligence actions, the law is that evidence of similar and disconnected acts of negligence is not admissible to prove negligence on a particular occasion. *See Jamison v. Ardes*, 182 A.2d 497, 499 (Pa. 1962). While this matter involves a breach of contract claim, the principle is the same. The mere fact that FELIX had a prior fire claim, which ANPAC voluntarily paid in full, is not relevant as to why it denied the pending claim.

ANPAC's citation to, and reliance on, *U.S. v. Green*, 617 F.3d 233, 250 (3d Cir. 2010) *cert. denied*, __ U.S. ___, 131 S.Ct. 363, 178 L.Ed.2d 234 (2010), as supportive of its argument is misplaced. In *Green*, the Third Circuit held that the "intrinsic" evidence label applies only to "two narrow categories of evidence." *Id.* at 248. The first category is evidence of uncharged acts that "directly proves" the charged offense. *Id.* at 248 (*citing U.S. v. Gibbs,* 190 F.3d 188, 218 (3d Cir. 1999)). The second category is evidence of "'uncharged acts performed contemporaneously with the charged crime'" that "'facilitate the commission of the charged crime.'"  *Id.* at 249 (*quoting United States v. Bowie,* 232 F.3d 923, 929 (D.C.Cir.2000)).

The problem with ANPAC's analogy is that ANPAC never charged or alleged FELIX did anything wrong in connection with the prior fire.[15]  Thus, the March 2013 fire is not evidence of an uncharged act to prove the charged offense, because FELIX was not being charged by ANPAC with arson in connection with the January 23, 2016 fire.  Likewise, ANPAC never made a claim against FELIX for alleged insurance fraud in connection with the prior March 2013 fire. Therefore, the March 2013 fire does not satisfy the first category of "intrinsic" evidence set forth in *Green*.

Similarly, the prior March 2013 fire does not qualify as an uncharged act performed contemporaneously with the pending claim of insurance fraud being made by ANPAC. Accordingly, evidence of the prior fire does not satisfy the second category of "intrinsic" evidence discussed in *Green*.  The alleged prior bad act was simply a prior event which has no significance to the random, yet unfortunate, act of a second fire occurring at the same residence.  The evidence of the prior fire doesn't fit within the framework of either category of "intrinsic" evidence set forth in *Green*.  Accordingly, the holding in *Green* is irrelevant to the matter presently before the court.

ANPAC spends almost an entire page talking about what its witnesses **WOULD HAVE** testified to regarding why evidence of the prior fire is relevant.  However, when the court was ruling on FELIX's Motions *in Limine* Seeking to Exclude Evidence or Reference to the Prior March 29, 2013 Fire [ECF Doc. #83], ANPAC never submitted any deposition testimony from any of the witnesses ANPAC now alleges were going to testify at trial.  Likewise, ANPAC never submitted any affidavits from any of these alleged witnesses setting forth what they **would have** testified to regarding why evidence of the prior fire was relevant.  [ECF Doc. #165].  That was

---

[15] Again, it is important to remember that neither the State Police, the Croyle Township Police or even ANPAC charged FELIX with arson in connection with either the prior March 2013 fire or the January 23, 2016 fire.

ANPAC's opportunity to advance any such arguments, not now, after the Court has ruled on its Motion, the trial has been concluded, and the jury has returned its verdict.

ANPAC's alleged reasons as to why evidence of the prior fire evidence was relevant is not set forth anywhere in ANPAC's letter denying coverage [**Trial Exhibit J44**], its Complaint [**Trial Exhibit J45**], its Answers to Interrogatories [**Trial Exhibit J49**], or ANPAC's Amended Answers to Interrogatories [**Trial Exhibit P11**].

Moreover, ANPAC was able to explain to the jury that ANPAC's SIU initially began investigating this claim due to it being a large loss, and that other issues arose during its investigation that resulted in its ongoing involvement, and fortuitously, during the investigation, it stumbled upon FELIX's alleged fraud without ever needing to reference the March 2013 fire. [**Exhibit "B"** @ T6:6-21, T19:19-T20:16, T34:14-19T38:8-T39:3, T39:24-T40:10]. Changing the narrative to allow ANPAC to tell the jury that the case was referred to the SIU unit because it suspected arson due to the prior fire, adds nothing to ANPAC ultimately stumbling upon the alleged fraud, yet creates extreme prejudice to FELIX. [ECF Doc. #187, **Exhibit "C"** @ T172:3-9].

The only reason to advise the jury of the prior fire was to potentially prejudice the jury against FELIX. If the jury heard evidence of the prior fire, and then that the January 23, 2016 fire, was a second fire, also involving a total loss within three (3) years of the prior fire, the jury might think FELIX was an arsonist. ANPAC would therefore get the benefit of the negative inference without having to meet the burden of actually proving arson. This is especially significant, given that ANPAC did not deny the present claim based on arson, nor did it contend that the prior March 2013 fire was the result of arson.

With respect to ANPAC's argument that the jury needed to know about the prior fire to fully understand "Felix's financial motive to commit fraud with respect to the second fire" (ANPAC's Brief @ p.51), ANPAC was and did get to make this argument over FELIX's objection.[16] The only thing the jury didn't hear was that FELIX had a prior fire at the same premises. However, the lack of discussion of the prior fire also hampered FELIX's ability to explain how he had so much cash on hand or why so many purchases claimed in the January 2016 fire had been purchased within the last two (2) years. ANPAC repeatedly called into question how FELIX was able to make so many cash purchases within the last two (2) years, despite knowing full well why that was. [**Exhibit "C"** @ T10:9-11, T12:25-T13:16, T13:23-T14:5, T14:24-T15:3, T15:11-16, T55:13-T56:16, T57:21-T58:4, T110:24-T111:5]. ANPAC's expert, Douglas King, likewise offered testimony calling into question how FELIX could pay for so many items with cash, when his earnings didn't support him having enough cash to pay for the items listed on his inventory. [**Exhibit "H"** @ T8:5-9, T12:15-23, T16:2-10, T16:15-T21:16, T23:18-T24:9, T24:25-T26:7]. This testimony was extremely misleading given that Mr. King, as well as ANPAC, knew exactly where a large portion of the cash came from and that there was a valid reason for FELIX having sufficient cash to pay for the items contained on his Inventory of Items. If anything, the lack of evidence of the prior fire worked to FELIX's disadvantage and created a false impression adverse to FELIX.

The jury presumably didn't believe Mr. King's testimony and likely found that his testimony, like much of the irrelevant testimony offered by ANPAC, was far reaching [**Exhibit "H"** @ T31:2-19, T32:10-T33:20, T35:2-T36:7] and had nothing to do with whether or not

---

[16] FELIX's Motion *in Limine* to Preclude Testimony of Douglas King. [ECF Doc. #88].

ANPAC could prove that the purse and pair of earrings listed on FELIX's inventory were the same purse and pair of earrings in Kelly Madison's possession.

ANPAC was able to pursue its contention that FELIX was "over-extended" and continuously argued that FELIX was motivated to allegedly commit insurance fraud because of his alleged dire financial circumstances. [**Exhibit "A"** @ T46:22-T47:8, **Exhibit "M"** @ T65:3-T69:14]. As such, ANPAC was able to advance its financial distress argument despite not mentioning the prior fire.   Accordingly, ANPAC has failed to demonstrate any evidence of prejudice, let alone "substantial prejudice", related to the Court's refusing to allow evidence of the prior fire.

Finally, ANPAC argues that the failure to allow ANPAC to discuss the prior fire deprived it of the ability to demonstrate FELIX's intent or motive to defraud ANPAC.  It must initially be noted that based on the above economic arguments advanced by ANPAC, it did offer evidence it believed demonstrated FELIX's economic motive to defraud ANPAC.  Assuming *arguendo* that evidence of the prior fire would have somehow demonstrated intent or motive, any such error, was harmless.  Over FELIX's objection ANPAC was allowed to introduce evidence of his text messages with Kelly Madison[17], his text messages with Angela Merrill[18], and Felix's breaking into Angela Merrill's residence and stealing $1,700 worth of Victoria Secret lingerie[19] all in an effort to demonstrate FELIX's motive and intent to defraud ANPAC.  Despite all of those misguided efforts, the jury obviously rejected each and every one of those arguments advanced by ANPAC.

---

[17] FELIX Motion *in Limine*. [ECF Doc. #96].
[18] FELIX Motion *in Limine*. [ECF Doc. #120].
[19] FELIX Motion *in Limine*. [ECF Doc. #118].

### G. RULE 59 MOTION SEEKING A NEW TRIAL BASED UPON THE COURT'S REFUSAL TO ALLOW EVIDENCE OF THE EXTENT AND RESULT OF THE CAUSE AND ORIGIN INVESTIGATION INTO THE SUBJECT FIRE

The issue related to the admissibility of Underlying Arson Investigation or Basis for Investigating Arson was the subject of a Motion *in Limine* filed by FELIX, to preclude its introduction [ECF Doc. #86], to which ANPAC responded. [ECF Doc. #169]. Ultimately, Judge Gibson ruled that evidence of the prior 2013 fire was not relevant to the issues in this case. In addition, even if it were relevant, it fails the balancing test required under Rule 403 of the Federal Rules of Evidence. [ECF Doc. #194]. Thereafter, ANPAC filed a Motion for Clarification seeking to be able to offer evidence that ANPAC **conducted a cause and origin investigation**. [ECF Doc. #198]. Neither ANPAC's Motion for Clarification nor Proposed Order [ECF Doc. #198-1] sought permission to offer the results or conclusion of the cause and origin investigation at trial.

As Judge Gibson previously ruled [ECF Doc. #194], the results and conclusion as to the cause of the January 23, 2016 fire, had absolutely nothing to do with ANPAC's decision to deny coverage for FELIX's claim. [**Trial Exhibits J44 and J45**]. Accordingly, the results and conclusion as to the cause of the fire are irrelevant to ANPAC's decision to deny coverage. Moreover, as ANPAC has acknowledged, the investigation by both the Croyle Township Police and ANPAC determined that the cause of the fire was "undetermined". As such, the cause of the fire would not assist the jury in determining whether a material fact was more probable or not related to whether FELIX made a material misrepresentation when he submitted his claim as to the Louis Vuitton purse or a pair of diamond earrings.

Moreover, when ANPAC raised this issue during the course of Kip Mathena's testimony, counsel merely argued that the jury needed to hear about the results of the cause and origin investigation because "it's sort of hanging out there" and he didn't want "the jury speculating on

something when **they really should be focusing on the issues in this case.**" [Emphasis added][ **Exhibit "C"** @ T169:16-T170:14], This is precisely the issue: why introduce this irrelevant information [the outcome of the investigation] when the jury **really should be focusing on the issues in this case?** The Trail Court agreed with counsel's assessment stating:

> I don't believe it's relevant either, not based on the issues that are in this case. In a different case where the origin of the fire would have relevance, that would be different; but I don't think in this case it's relevant. The only possible impact that could have would be to prejudice the Defendant, to raise the issue that this fire is unexplained. So I'll deny the request to get into that area.

**[Exhibit "C"** @ T172:3-9].

FELIX's criticism of ANPAC's handling of the claim was not directed to the finding that the cause of the fire was "undetermined", but rather the fact that ANPAC relied upon the statements of Kelly Madison and Ron Madison as the sole support for its denial of coverage. **[Exhibit "C"** @ T233:18-T234:19, T167:15-168:6, T186:1-25]. Kelly Madison refused to give a sworn statement, prior to ANPAC's denial **[Exhibit "C"** @ T60:15-T61:3, T61:21-T62:9, **Trial Exhibit J2** @ p11, T166:21-25]. Moreover, when initially asked about the contents of FELIX's home, Kelly Madison advised them she didn't recall a lot of information and didn't have specific information on the contents. **[Exhibit "C"** @ T61:21-T62:9, **Trial Exhibit J2** @ p11]. Ron Madison, who had no firsthand knowledge of the contents of FELIX's home, but certainly had an ax to grind with FELIX, injected himself into this claim yet wanted to remain anonymous **[Exhibit "C"** @ T63:11-19, T67:9-T68:6, T70:6-TT71:14, T71:22-T72:6, T73:1-6, T228:18-T229:10, T230:18-T231:12, **Exhibit "D"** @ T3:7-T5:24, T10:6-T11:10,] something that ANPAC honored, despite that being contrary to ANPAC's corporate policy and Pennsylvania law.[20]

---

[20] 31 Pa. Code § 146.3.

FELIX further criticized the fact that Attorney Hudock only ever asked one (1) question about the Louis Vuitton purse and three (3) questions, over the course of two (2) Statements Under Oath, yet ANPAC somehow twisted those minimal questions into "material misrepresentations and false swearing" as the basis for denying coverage. ANPAC made several logical leaps of faith yet never actually connected the dots to get from the purse and earrings listed in FELIX's Inventory of Items to the purse and earrings in Kelly Madison's possession.

The criticism of ANPAC was that it sought to deny this claim, thinking that FELIX intentionally burned down his home, and once it realized it couldn't prove that, was looking for any reason to deny this claim. Once ANPAC uncovered that FELIX spent the night before the fire with his former fiancée, Kelly Madison, and was heading to his girlfriend, Angela Merrill's house on the night of the fire, it adopted it strategy to exploit FELIX's unfaithfulness to these women and play them against each other and FELIX. [**Exhibit "J"** @ T51:15-24, T52:2-7, T61:3-6, T130:10-15]. This strategy is evidenced by the fact that ANPAC didn't contact one single witness, other than these two women and then relied on the information from the father of the former fiancée who was ticked off that FELIX had cheated on his daughter and sought to borrow $16,000 dollars from her while not putting her name on the home being built. ANPAC never contacted Jess Bloom [**Trial Exhibits D23** and **D24**], any member of FELIX's family who might have been able to provide information regarding items inside FELIX's home at the time of the fire, or Dustin Wyrick, the person who was with FELIX on the day of the fire and who first texted FELIX to tell him that his house was on fire. [**Exhibit "K"** @ T10:6-11, T12:10-20].

As argued by the undersigned during FELIX's Motion for Reconsideration regarding the Granting of Summary Judgment as to the Bad Faith Claim [**Exhibit "L"** @ T48:5-T50:21], ANPAC adopted a singular strategy and essentially stopped its investigation once it believed it

had proof of a misrepresentation and thereafter used that as a pretext to deny his claim.  (*See Zell v Federal Ins. Co.*, 2007 WL 1875803 (W.D. Pa. 2007).

ANPAC sets forth a laundry list of reasons as to why it needed to explain the extent and results of the underlying cause and origin investigation (ANPAC's Brief @ p.56), however, it never explains how it was prejudiced by the failure to explain any of the things listed.

(a) **Why Felix's claim was initially assigned to American National's SIU Department and why the claim remained with the SIU through the conclusion of the claims-handling;**

ANPAC was in fact able to explain why the SIU Department was involved in the handling of FELIX's claim as set forth above. **[Exhibit "A" @ T35:14-16].**  More importantly, who cares? ANPAC has failed to explain how telling the jury that the outcome of the cause and origin investigation was "undetermined" would have somehow affected the outcome in its favor.

(b) **Why Attorney Hudock was retained;**

As discussed above, ANPAC was in fact able to explain why Attorney Hudock was retained in connection with the handling of FELIX's claim.  **[Exhibit "A" @ T38:7-24, T39:7-T40:10, Exhibit "G" @ T6:6-17].**  Again, what does it matter as to why Attorney Hudock was retained? The fact is that he was retained: he conducted two EUOs, wrote an opinion letter, and prepared the Complaint in Declaratory Judgment. **[Trial Exhibits J20, J34, J43 and J45].**  ANPAC fails to demonstrate how advising the jury of the outcome of the cause and origin investigation would have changed the work Attorney Hudock performed in connection with this case.  Attorney Hudock was obviously aware of the outcome of the cause and origin investigation.  Moreover, the evidence demonstrated that Attorney Hudock was retained before ANPAC itself knew of the outcome of the cause and origin investigation. **[Exhibit "B" @ T38:2-T39:23, T43:23-T44:11].**

(c) **Why two Examinations Under Oath ("EUO") were taken from Felix, and why these two EUOs were so lengthy;**

ANPAC did explain to the jury why two (2) EUOs were conducted of FELIX. [**Exhibit "B" @** T43:23-T44:11, **Exhibit "C" @** T27:20-T28:12, T74:2-6]. FELIX's issue with the EUOs was not the length of time it took to conduct the two (2) EUOs. The issue argued before the jury was that during the course of the two (2) EUO's, counsel for ANPAC only asked four (4) questions on the topic which formed the basis for ANPAC's denial of FELIX's claim. [**Trial Exhibits J20, J34, J40** and **J43, Exhibit "G" @** T6:6-17, T20:17-20, T21:3-9].

(d) **Why, during the EUO's, American National's counsel inquired as to who Felix was with before the fire (Kelly Madison) and where he was headed during the fire (to be with Angela Merrill);**

ANPAC was in fact able to explain why ANPAC inquired into Ms. Madison and Ms. Merrill during FELIX's EUO. [**Exhibit "B" @** T39:20-T40:10, **Exhibit "G" @** T14:3-T16:6]. Certainly, where FELIX was before, during, and immediately following the fire were legitimate areas of concern. ANPAC fails to demonstrate how telling the jury that the cause of the fire was "undetermined" changes anything. Ms. Merrill didn't even know FELIX at the time of the March 2015 fire. [**Exhibit "J" @** T16:21-T17:5].

(e) **Why Kelly Madison and Angela Merrill were contacted as witnesses after the first EUO;**

As previously set forth above, ANPAC did explain why these two (2) witnesses were contacted. The fact that these two (2) witnesses were contacted or questioned was not the issue. The issue was, how ANPAC tried to manipulate these two (2) witnesses and their testimony to try to create a scenario that simply did not exist. Once again, other than complain that it couldn't tell the jury of the outcome, ANPAC fails to demonstrate how this allegedly relevant evidence would have affected the outcome of the case.

(f) **Why Ms. Madison's father, Ron Madison, contacted American National (he would have testified that he was aware that the authorities and the insurance company were investigating the cause and origin of the subject fire, and he did not want his daughter somehow implicated in any fraudulent scheme of Felix); and**

ANPAC did explain why Ron Madison contacted them. [**Exhibit "A"** @ T41:12-T42:4, **Exhibit "F"** @ T5:17-T6:2, T6:11-19, **Exhibit "M"** @ T81:18-T83:7]. ANPAC also attempted to explain why it violated the law regarding documentation of its claims file as well as its own corporate policy. [**Exhibit "C"** @ T63:11-19, T227:18-20, T228:21-T229:10, **Exhibit "D"** @ T4:24-T5-23, T6:18-23, T8:19-T9:3, T10:6-12, T10:19-T11:12]. When Ron Madison was cross-examined about why he injected himself into this claim, he tried his best to implicate the prior fire, stating: "the things that happened prior to this, before, and I didn't contact the insurance company, which led me to believe what he was doing would lead her into an investigation of fraud." [**Exhibit "F"** @ T21:2-16]. Despite ANPAC trying to portray Mr. Madison as a concerned father, innocently injecting himself into FELIX's insurance claim, the jury obviously saw through Mr. Madison and ANPAC, and rejected this theory.

(g) **Why Felix's claim was subject to heightened scrutiny by SIU, which ultimately revealed the post-loss fraudulent misrepresentations by Felix.**

ANPAC fails to explain how this is even relevant. ANPAC explained it was conducting its investigation and how, during the course of its investigation, it came to believe that FELIX made material misrepresentations in his claim. The jury spent the afternoon of Monday November 26th Tuesday November 27th, Wednesday November 28th, Thursday November 29th, Friday November 30th, first thing Monday December 3rd and the December 4th closing of counsel listening to ANPAC explain how ANPAC's SIU investigation revealed what it believed to be FELIX's post-loss fraudulent misrepresentation and obviously was not persuaded by ANPAC's argument.

ANPAC also contends that "Felix's counsel 'opened the door' to the evidence regarding the cause and origin investigation" (ANPAC's Brief @ p.57), however, it fails to cite to where in the record that occurred.  Not only does ANPAC not cite to evidence of this contention in the record, it doesn't even offer an example of any such alleged "opening of the door".

Finally, assuming *arguendo* that ANPAC is correct about all the arguments it has made as to why it should have been allowed to inform the jury that the cause of the fire was "undetermined", ANPAC fails to explain how that information would have changed the outcome of the trial.  All ANPAC was precluded for saying was that its investigation began as a possible arson investigation, which it could not prove, and that it ultimately concluded that the cause and origin of the fire was "undetermined".  ANPAC has not demonstrated how the failure to inform the jury that the cause of the fire was "undetermined" resulted in the verdict being contrary to the great weight of the evidence or resulted in a miscarriage of justice, which is its burden to prove.

## H. RULE 59 MOTION SEEKING A NEW TRIAL BASED UPON THE COURT'S RULE 59 MOTION SEEKING A NEW TRIAL BASED UPON THE PERMITTING FELIX TO QUESTION WITNESSES CONCERNING THE "PLUS 25% ENDORSEMENT" WITHOUT OFFERING SAME INTO EVIDENCE

The first person to be questioned about the "plus 25% endorsement" was ANPAC SIU Adjuster, Kip Mathena. [**Exhibit "C"** @ T138:17-T139:10].  Mr. Mathena was questioned about the "plus 25% endorsement" as a way of demonstrating that during the course of adjusting this claim ANPAC made several mistakes.  ANPAC's mistake was advising FELIX on multiple occasions that he was not entitled to the "plus 25% endorsement" coverage, when in fact he was entitled to this additional coverage. [**Trial Exhibit D7**].  The jury also heard about the "plus 25% endorsement" from ANPAC Claims Adjuster Cory Coleman.  FELIX's strategy was to show that when ANPAC made mistakes they were called mistakes but when FELIX made a mistake, he was

accused of committing insurance fraud.[21] [**Exhibit "C"** @ T139:11-15, T139:23-T140:4, **Exhibit "M"** @ T17:1-14].

In order to prevail on his counterclaim for breach of contract, all FELIX had to show was (i) the existence of a contract; and (ii) that ANPAC breached a duty created by the contract. [**Exhibit "M"** @ T130:24-T131:18]. As argued in FELIX's Rule 50 Motion for a Directed Verdict on the Counterclaim [**Exhibit "L"** @ T44:2-T46:5] and then later during closing [**Exhibit "M"** @ T5:23-T10:5], both of those elements were proven during ANPAC's case in chief.   As previously argued, before ANPAC could seek to rescind the policy of insurance a policy of insurance (contract) first had to exist.  ANPAC attached a copy of the insurance (contract) to its Complaint in Declaratory Judgment [**Trial Exhibit J46**], therefore establishing the first prong: the existence of a contract.  ANPAC readily admitted that it had not paid on FELIX's claim, therefore establishing ANPAC's breach of duty under the contract.  ANPAC, not FELIX, had the burden to prove ANPAC's affirmative defense of material misrepresentation, a contention the jury obviously rejected.

To the extent ANPAC believed that portions of the "plus 25% endorsement", Endorsement SH31410 [ECF Doc. #223-1], was relevant to explain any conditions or limitations applicable to FELIX's claim, ANPAC should have introduced the Endorsement into evidence.  There is no obligation that FELIX introduce that Endorsement into evidence, and ANPAC does not cite to any legal authority to support this contention.

More importantly, ANPAC has not offered any evidence to indicate that FELIX was ever in possession of Endorsement SH31410.  As the jury learned, during trial, it was during ANPAC's investigation into this loss when it was determined to add the Endorsement.  [**Trial Exhibit D7**].

---

[21] ANPAC's argument that inclusion of the Endorsement SH-31410 was not disputed and included within FELIX's policy is a false statement and misrepresentation of the evidence in this case.

There was no evidence offered that FELIX, or his counsel, was ever provided with a copy of this document.  To the contrary, ANPAC provided what was supposed to be a full and complete certified copy of the applicable policy.  [**Trial Exhibit J1**].  Notably absent from ANPAC's Brief is an explanation as to why the full and complete, certified policy, which ANPAC presented to both the court and counsel, DID NOT contain this Endorsement.  Nor does ANPAC attempt to explain how FELIX was supposed to offer into evidence a piece of evidence that ANPAC never provided to FELIX and in fact spent most of the time denying applied to FELIX's claim.

ANPAC CANNOT now be heard to complain that the "plus 25% endorsement" was not introduced into evidence when it was the party in possession of the Endorsement and failed, on its own, to introduce that document into evidence.  How can ANPAC be heard to argue that its own failure to offer a document, it had in its possession, into evidence at the time of trial, somehow has resulted in the verdict being contrary to the great weight of the evidence or resulted in a miscarriage of justice?

The fact that the estimate that ANPAC chose to share with FELIX as to what it claimed were his "Loss of Dwelling" damages, $595,784.14 [**Trial Exhibit J29**], was below the policy limit of $733,100 is irrelevant.  The jury obviously did not accept ANPAC's argument that the estimate that it chose to provide to FELIX reflected what it would cost to replace FELIX's residence.  Instead the jury apparently believed that FELIX's damages were more accurately reflected in one of the other two (2) estimates prepared on behalf of ANPAC, which ANPAC failed to disclose to FELIX, which were substantially higher. [**Trial Exhibits D15** and **D17**].  The jury obviously believed that since even the highest estimate prepared by ANPAC's vendor, Summit Claim Services, LLC, missed an entire page of relevant information [*see* **Trial Exhibit J32**] when preparing that estimate, FELIX was entitled to an additional 25%, which total amount would take

FELIX over the policy threshold of $733,100 in damages. The difference between the policy limit of $733,100, and the original estimate from Summit Claim Services, LLC, in the amount of $727,024.33 [**Trial Exhibit D15**] is only $6,075.67. At the end of the day the amount the jury awarded, $908,780.41 does in fact exceed the policy limit of $733,100, thereby triggering the "plus 25% endorsement". More importantly, the jury's award of $908,780.41 was within the amount of total coverage available applying the "plus 25% endorsement" ($916,375).

## I. RULE 59 MOTION SEEKING A NEW TRIAL BASED UPON THE COURT'S IMPROPER JURY INSTRUCTION AS TO THE STANDARD APPLICABLE TO THE DECLARATORY JUDGMENT CLAIM ON FRAUD

In the matter presently before the Court, ANPAC seeks a new trial based on the Court not charging the jury that it could have found fraud, under the terms of the insurance policy, by a preponderance of the evidence, and that it failed to give its Proposed Jury Instruction #7. [ECF Doc. #184 @ p.25].

Under Rule 59, a court should only exercise its discretion to grant a new trial "when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991); *Roebuck v. Drexel University*, 852 F.2d 715, 736 (3d Cir. 1988); and *see Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 366 (3d Cir. 1999). Neither of those conditions exists in the matter presently before the Court.

Under the policy of insurance there are three types of conduct by which ANPAC could void coverage under the "Concealment or Fraud" provision of the policy: if the insured (i) willfully and deliberately engaged in concealment or misrepresentation regarding a material fact; (ii) engaged in false swearing; or (iii) committed fraud. [**Trial Exhibit J1** @ CL1011]. ANPAC argued throughout the course of this litigation that FELIX engaged in all three types of conduct.

Rather than use ANPAC's Proposed Jury Instruction #7, Judge Gibson instructed the jury as follows:

> The insurance policy at issue in this case provides that "the entire policy shall be void if, whether before or after a loss, any insured has willfully concealed or misrepresented any material fact or circumstances concerning this insurance of the subject thereof, or the interest of any insured therein, or in the case of any fraud or false swearing, by any insured related thereto.

> Therefore, ANPAC is entitled to void the entire insurance policy if it proves, by a preponderance of the evidence, that Felix willfully and deliberately engaged in concealment or misrepresentation concerning his insurance claim.

> * * *

> * * *

> Further, ANPAC is entitled to void the entire insurance policy if it determines that Felix engaged in "false swearing." False swearing is when an insured submits a knowingly false statement to the insurance company when the insured is required to certify that his responses are true and correct to the best of his knowledge.

> Therefore, if you find by a preponderance of the evidence that Felix willfully misrepresented or concealed a material fact, or engaged in false swearing, then you must find in favor of ANPAC on its declaratory judgment claim.

[Exhibit "M" @ T128:1-12, T134:12-15 @ Jury Instructions @ p.13-14]. The above instruction, given by Judge Gibson, does initially mention that the ANPAC policy may be rendered void due to fraud when discussing the preponderance of evidence standard. However, the issue of fraud is more thoroughly discussed when charging the jury as to the burden of proof required to prove Civil Insurance Fraud. [Exhibit "M" @ T129:7-T130:9, T134:12-15 @ Jury Instructions @ p.14-15]. Moreover, the Jury was instructed that if it found that FELIX had committed fraud, by a preponderance of the evidence, that ANPAC would not be liable on FELIX's breach of contract claim. [Exhibit "M" @ T131:19-T132:13, T134:12-15 @ Jury Instructions @ p.16].

Assuming arguendo that the jury should have been more specifically instructed, that as to ANPAC's Declaratory Judgment Action ANPAC only had to prove fraud, under the terms of the

policy of insurance, by a preponderance of the evidence, with regard to any alleged errors in jury instructions, in order to mandate a new trial, the error must be so substantial that, viewed in light of the charge as a whole, "the instruction was capable of confusing and thereby misleading the jury." *Link v. Mercedes-Benz*, 788 F.2d 918, 922 (3d Cir. 1986). Accordingly, what ANPAC is asking for is a new trial because the jury wasn't more clearly instructed that it could have found that FELIX committed fraud under the insurance policy by applying the clear and convincing evidence standard.

In the matter presently before the Court the jury clearly rejected ANPAC's theories in this case and unequivocally found as follows:

(i)   FELIX **DID NOT** engage in willful and deliberate concealment or misrepresentation regarding any material fact (preponderance of the evidence standard);

(ii)  FELIX **DID NOT** engage in false swearing (preponderance of evidence standard);

(iii) FELIX **DID NOT** commit insurance fraud (clear and convincing evidence standard); and

(iv)  ANPAC breached the contract of insurance and did not prove its affirmative defense of fraud (preponderance of the evidence).

[ECF Doc. #218].

Fed.R.Civ.P. 61 "Harmless Error"[22] provides that "[u]nless justice requires otherwise, no error in admitting or excluding evidence – or any other error by the court or a party - is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."

---

[22] Likewise, on appeal, 28 U.S.C.A. § 2111 "Harmless Error" provides that "[o]n the hearing of any appeal * * * in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."

In the criminal content, harmless error is defined as "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Fed.R.Crim.P. 52. In the criminal setting, an erroneous jury instruction that omits an element of an offense may be subject to harmless-error analysis. *Neder v. U.S.*, 527 U.S. 1, 9-10, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)(where trial court failed to charge jury on an element of materiality in a tax fraud prosecution).

In the matter presently before the Court it strains credibility to think that the jury would have returned a different verdict had it been made clearer to the jury that it could have found fraud, under the insurance policy, applying the preponderance of evidence standard. The fact is, the jury was charged with that standard when defending the breach of contract claim and rejected ANPAC's argument.

Moreover, the fraud alleged by ANPAC consisted of Felix allegedly including a Louis Vuitton purse and pair of earrings on his Inventory of Items and during the testimony he provided to Attorney Hudock during his two (2) EOUs. This alleged "fraud" by FELIX was encompassed in the claims of "false swearing" and/or "making material misrepresentations" when submitting his claim. ANPAC doesn't cite to or otherwise refer to any other allegedly "fraudulent conduct" that does not involve one of those other two (2) basis for denying coverage. Since the jury expressly rejected those other two (2) basis for denying coverage, applying the preponderance of evidence standard, it is likely that even if "properly" charged with being able to find fraud applying the "preponderance of evidence" standard the jury's verdict **WOULD NOT** have been different. This is the very essence of the harmless error rule.

## J.   RULE 59 MOTION SEEKING A NEW TRIAL BASED UPON THE COURT'S REFUSAL TO ALLOW VOIR DIRE QUESTIONING AND A JURY CHARGE REFLECTING THE LAW THAT IF FELIX WILLFULLY CONCEALED OR MISREPRESENTED A SINGLE

MATERIAL FACT OR CIRCUMSTANCE CONCERNING HIS INSURANCE CLAIM, THE SUBJECT INSURANCE POLICY WOULD BE VOID

**(i)     Voir Dire Questioning**

Without citing to a single case to support its legal argument, ANPAC argues that the Trial Court committed an abuse of discretion by failing to give its proposed *voir dire* question #15 to the venire.

The Federal Courts have consistently held that a district court possesses wide latitude over the determination of the particular questions to be asked, and the scope of the inquiry at *voir dire. Butler v. City of Camden, City Hall*, 352 F.3d 811, 819 (3d Cir. 2003)(citations omitted). *See, e.g., U.S. v Dansker,* 537 F.2d 40, 56 (3d Cir. 1976), *abrogated on other grounds by N.L.R.B. v. New Vista Nursing and Rehab.*, 870 F.3d 113 (3d Cir. 2017); *United States v. Madrigal,* 43 F.3d 1367, 1372 (10th Cir.1994) (no abuse of discretion "when the court inquiries into the proposed subject matter in its own questions").   "It is the trial court's province to determine the questions to be asked, their phrasing and the scope of the inquiry into any subject matter, subject only to the requirements of fundamental fairness." *Butler v. Camden, City Hall*, 352 F.3d 811, 819 (3d Cir. 2003)(citations omitted).

While the Trial Court did not give the *voir dire* instruction requested by ANPAC, it did instruct the jury as follows during its "Preliminary Jury Instructions"[23]:

> ANPAC seeks to void the policy of insurance under a provision in the insurance policy that prevents an insured like Felix from concealing or misrepresenting material information.  This type of claim is called a declaratory judgment.  The insurance policy at issue in this case provides that the entire policy shall be void if, whether before or after a loss, any insured has willfully concealed or misrepresented any material fact or circumstance concerning his insurance or the subject thereof or the interest of the insured therein * * * .

---

[23] The Trial Court provided similar instructions as the close of the case [**Exhibit "M"** @ T127:22-T128:7].

[**Exhibit "A"** @ T16:21-T17:4].  ANPAC did not voice any exception to this "Preliminary Jury Instruction."

Accordingly, although the Trial Court did not give ANPAC's proposed *voir dire* question #15, the Court correctly instructed the jury that was empaneled, before it heard opening statements or any evidence, that if it found that FELIX had concealed or made any misrepresentation, so long as it involved a "material" fact, the entire policy would be voided.  Much to ANPAC's dismay, the jury simply didn't find that FELIX make any misrepresentations or conceal and information which it deemed "material".  [ECF Doc. #218].

ANPAC's proposed *voir dire* question #15 does not correctly state the law.  ANPAC tries to focus the jury on a number; "a single material fact".  However, the word "single" is not part of the legal definition of "materiality".[24]  It is the "materiality" of any alleged concealment or misrepresentation that determines whether the policy may be voided, not the number of facts concealed or misrepresented.  Accordingly, the Court provided the jury with a correct statement of the law to guide them throughout the trial.

As such, there is no abuse of discretion which would warrant the awarding of a new trial on this basis.

### (ii)    *Jury Instruction*

ANPAC next argues for a new trial because the Trial Court didn't grant its Proposed Jury Instruction #4 which provides that "[t]he Concealment or Fraud provision 'does not differentiate between big and small lies." [ECF Doc. # 184 @ p.22].  As set forth above, the law requires proof that concealment or misrepresentation is "material".  Materiality is not defined in terms of "big or

---

[24] ANPAC's Proposed Jury Instruction #9 defines the concept of "materiality", thereby demonstrating its knowledge and understanding that it is materiality of any alleged concealment or misrepresentation that determines whether a policy may be voided, not the number of any such misrepresentations or concealments. [ECF Doc. # 184 @ p.27].

small lies".  A District Court's refusal to use a proposed jury instruction is reviewed for an abuse of discretion.  *U.S. v. Khorozian*, 333 F.3d 498, 507–08 (3d Cir.2003).

ANPAC fails to cite to any binding precedent that defines "materiality" in terms of "big or small lies".  The case of *Rizk v. State Farm Fire & Cas. Co.*, 2015 WL 4929725, 2015 U.S. Dist. LEXIS 108988 (M.D. Pa. 2015), cited by ANPAC simply sets forth a three (3) prong test for voiding an insurance policy for misrepresentation: The insurer must establish that (1) the representation was false, (2) the insured knew it to be false when made or acted in bad faith, and (3) the representation was material to the risk being insured. [*Citing Matinchek v. John Alden Life Ins. Co.*, 93 F.3d 96, 102 (3d Cir. 1996)(*citing New York Life Ins. Co. v. Johnson*, 923 F.2d 279, 281 (3d Cir. 1991)).  This is essentially what the Trial Court instructed the jury on in the matter presently before the Court.  [**Exhibit "M"** @ T128:8-T129:6].

ANPAC references the undersigned's closing argument [**Exhibit "M"** @ T7] as support for its alleged need for the jury to have been instructed that either a "single willful violation" or a "small lie" was enough to void the policy.  However, ANPAC once again seems to misunderstand that it is the "**materiality**" of any potential representation that governs whether there has been a breach of the policy.  [Emphasis added].  Similarly, ANPAC does not seem to understand, or is unwilling to accept that, a "mistake" is not a "lie" no matter whether the mistake is big or small, and that a "mistake" is different than a "willful misrepresentation".  [**Exhibit "C"** @ T151:8-10].  Simply because ANPAC believed that FELIX "lied" or made one or more "material misrepresentations" does not mean that the jury had to agree with its view of the evidence.  That is precisely why we have jury trials, to resolve disputed issues of fact.  In this case the jury, performing its duty as the finder of facts, undoubtedly disagreed with ANPAC's view of the facts and evidence.

That the Court exercised its discretion and refused to charge the jury in the precise fashion that ANPAC requested, is not error, where the charge given by the court "as a whole, stated the correct legal standard." *Ryder v. Westinghouse Elec. Corp.,* 128 F.3d 128, 135 (3d Cir. 1997). Accordingly, there is no reason to award a New Trial where the Court's instructions are entirely consistent with the law cited by ANPAC in its Proposed Jury Instruction #4.

Finally, ANPAC contends it is entitled to a new trial because the Court didn't charge the jury with its Proposed Jury Instruction #8, "False in One, False in All". [ECF Doc. #184 @ p26]. It should be noted that ANPAC never objected to this lack of charge during the charge conference. ANPAC's counsel merely inquired as follows:

> **Mr. McMonigle**: "I don't think I saw it in the first one – the false in unum or false in one charge --- did Your honor include that?  Or is it in there and I missed it?  I didn't see it.
>
> **The Court**: You mean you can accept all, some or none of the testimony is that what you're –
>
> **Mr. McMonigle**: Yes.  I mean it's the – trying to envision it, I know there's a specific charge in state court, and I'm sure I gave it – yeah, it the – there's actually a Third Circuit model, which I'm more criminal, you tend to see there in more criminal cases; but the Third Circuit Model Criminal jury Instruction No. 4.26. And then I cited the two cases there – this is page 25 of our proposed jury charges.
>
> * * *
>
> **The Court**: I have the language in there about evaluating the credibility of witnesses, and I think its sufficient and fair to all of the parties if the jurors apply that credibility analysis.  I know we have in here that you can find that you accept some, none or all of each witness's testimony.  That's in there.  But false in one, false in all, I did not include that.
>
> **Mr. McMonigle**: Thank you, Your Honor.

**[Exhibit "L"** @ T12:23-T15:15].

As the Advisory Committee Note to Rule 51 explains, challenges to the failure to give a proposed jury instruction "must be renewed by objection." *Franklin Prescriptions, Inc. v. New*

*York Times Co.*, 424 F.3d 336, 339 (3d Cir. 2005).  "Merely proposing a jury instruction that differs from the charge given is insufficient to preserve an objection." *Franklin Prescriptions, Inc. v. N.Y. Times Co.*, 424 F.3d 336, 339 (3d Cir.2005).  Any unpreserved challenge to an instruction is reviewed for plain error that affects substantial rights. Fed.R.Civ.P. 51(d)(2);  *Collins v. Alco Parking Corp.*, 448 F.3d 652, 655 (3d Cir.2006). Under that discretionary standard, "we will reverse the trial court only where a plain error was fundamental and highly prejudicial, such that the instructions failed to provide the jury with adequate guidance and our refusal to consider the issue would result in a miscarriage of justice." *Franklin Prescriptions*, 424 F.3d at 339 (quotation marks and citation omitted); *accord Alexander v. Riga*, 208 F.3d 419, 426 (3d Cir.2000). Based on the above colloquy, ANPAC did not object and properly preserve this issue for review.

The Trial Court instructed the jury regarding the credibility of witnesses by using Model Jury Instruction No. 1.7 "Credibility of Witnesses".   **[Exhibit "M"** @ T117:9-T118:5]. Accordingly, there was no plain error.  Moreover, there was no abuse of discretion and the jury instruction given, regarding credibility, read as a whole, correctly states the applicable law.

## IV   <u>CONCLUSION</u>

For the reasons set forth herein, Defendant/Counterclaimant Daniel J. Felix respectfully requests that this Honorable Court DENY Plaintiff/Counterclaim Defendant American National Property and Casualty Company's Rule 50 and 59 Motions in full, and let the verdict reached by the jury stand.

Respectfully submitted,

BORDAS & BORDAS, PLLC

*s/ Douglas J. Olcott, Esq.*
CHRISTOPHER J. REGAN
(PA ID #88771)
DOUGLAS J. OLCOTT
(PA ID #204851)
One Gateway Center, 18th Floor
420 Fort Duquesne Blvd.
Pittsburgh, PA 15222
T: 412-502-5000
F: 412-709-6343
dolcott@bordaslaw.com
*Counsel for Defendant/*
*Counterclaim Plaintiff Daniel J. Felix*