## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **AMERICAN NATIONAL PROPERTY** ) | **Case No. 3:16-cv-147** |
| **AND CASUALTY COMPANY,** ) | |
| ) | **JUDGE KIM R. GIBSON** |
| **Plaintiff and Counterclaim-Defendant,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **DANIEL J. FELIX,** ) | |
| ) | |
| **Defendant and Counterclaimant.** ) | |

## MEMORANDUM OPINION

Before the Court are post-trial motions that the parties filed following a jury verdict in this case rendered on December 4, 2018. (ECF No. 218.) Defendant-Counterclaimant Daniel J. Felix filed two post-trial motions—a Motion to Alter Judgment to Include Prejudgment and Post-Judgment Interest (ECF No. 219) and a Motion to Alter Judgment to Add Costs Pursuant to Rule 54(d) (ECF No. 220). Plaintiff and Counterclaim-Defendant American National Property and Casualty Company ("ANPAC") filed a Motion to Alter Judgment, Motion for Judgment as a Matter of Law, and Motion for New Trial (ECF No. 223). The Court held oral argument on these Motions on May 2, 2019. (*See* ECF No. 260.) These Motions are fully briefed (*see* ECF Nos. 224-29, 232-33, 255) and are ripe for disposition.

## I. Background

### A. Factual Background[1]

This case arises from ANPAC's denial of Felix's claim under his ANPAC homeowner's insurance policy (the "Policy") after a fire destroyed his home in 2016.

#### 1. The Policy

At the time of the January 23, 2016 fire, Felix's home and its contents were insured under ANPAC homeowner's insurance policy number 37-H-778-98P. (ECF No. 169 ¶¶ 2-3.) All premiums were paid and the Policy was in effect on January 23, 2016. (*Id.* ¶ 3.) The Policy's major provisions provided coverage for loss of dwelling, loss of personal property, and loss of use. (ECF No. 51-1 at 8.)

The Policy also contained a "Fraud" provision, providing:

Section I and Section II – Conditions

. . .

2. Concealment or Fraud. This entire policy shall be void if, whether before or after any loss, any insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of any insured therein, or in case of any fraud or false swearing by any insured relating thereto.

(ECF No. 51-1; ECF No. 47 ¶ 3; ECF No. 57 ¶ 3.) At trial, ANPAC's counsel referred to this provision as the "honesty provision." (ECF No. 239 at 16:20.)

---

[1] The Court derives these facts mostly from the evidence introduced at trial and transcripts of the trial testimony. (ECF Nos. 236-253.) For some facts, particularly those introduced through exhibits at trial, the Court cites to the appendices that the parties filed at summary judgment. This Section is merely intended to provide a general background. In Section IV, the Court includes additional facts and citations where necessary. For a thorough background on the facts of this case, see the Court's Memorandum Opinion and Order on the parties' Motions for Summary Judgment. (ECF No. 72 at 2-9.)

## 2. The Fire at Felix's Home and Subsequent Insurance Claim

Felix owned a property located at 975 Frankstown Road in Sidman, Pennsylvania. (ECF No. 169 ¶ 1.) In 2013, a fire entirely destroyed Felix's home located at that property.[2] (ECF No. 52 ¶¶ 27, 46, 49; ECF No. 54 ¶¶ 27, 46, 49.) The 2013 fire was caused by an electrical failure. (ECF No. 52 ¶ 24.) Felix's home was insured by an ANPAC homeowner's insurance policy, and ANPAC paid Felix $426,000 to cover his losses. (*Id.* ¶ 27.) Using the insurance proceeds from the 2013 fire, Felix built a new home on the property in 2014, which was eventually destroyed in the 2016 fire. (*Id.* ¶¶ 28-33.)

After the 2013 fire, Felix built a one-family home on the property. (ECF No. 51-1 at 8.) On January 23, 2016, Felix's home and its contents were destroyed by another fire. (ECF No. 149 ¶ 1.) On January 25, 2016, Felix notified ANPAC of the fire at his home. (ECF No. 239 at 29:22-30:20.) Felix submitted a claim for about $1,074,000 in losses comprising of $744,000.00 in dwelling replacement costs, $60,000.00 in loss of use, and $270,000.00 in loss of contents. (ECF No. 51-3 at 32.) ANPAC requested that Felix submit a Sworn Statement in Proof of Loss ("Proof of Loss") detailing the possessions destroyed in the fire. (ECF No. 52 ¶ 35; ECF No. 54 ¶ 35.)

## 3. ANPAC's Investigation After the 2016 Fire

ANPAC initially assigned the investigation into the 2016 fire to Martin Van Dyke, a large-loss specialist in ANPAC's claims department. (ECF No. 239 at 30:12-18, 33:20-22.) Eventually, ANPAC's claims department referred Felix's claim to the special investigations unit ("SIU"), where it was assigned to SIU investigator Kip Mathena. At trial, Mathena and Cory

---

[2] As discussed further in the following subsection, the Court did not permit evidence of the 2013 fire at trial per its ruling on a motion *in limine*. (*See* ECF No. 187.)

Campbell—a claims adjustor in ANPAC's property department—testified extensively about ANPAC's post-fire investigation.[3]  (*See* ECF Nos. 239-41, 244.)

Initially, ANPAC investigated the cause of the fire.[4]  (*See* ECF No. 52 ¶¶ 41-43.)  ANPAC hired outside investigators and corresponded with the Pennsylvania State Police during its cause-and-origin investigation.  (*Id.* ¶¶ 40-44, 52-59.)  No criminal charges were filed against Felix.  (*See* ECF No. 188.)  In April of 2016, ANPAC's outside investigator submitted a cause-and-origin report which indicated that the cause of the fire was "undetermined."  (ECF No. 52 ¶ 74; ECF No. 54 ¶ 74.)

During the investigation into the fire's cause, Felix submitted a Proof-of-Loss form detailing the contents of his home which were destroyed in the fire.  (*Id.*)  The Proof-of-Loss form requires the insured to provide a quantity, description, and actual cash value of the items.  (*Id.* at 13:11-12.)  It also requests evidence to "support ownership" of the items through documentation like receipts, invoices, and credit-card statements.  (*Id.* at 13:18-22.)

In February of 2016, Mathena requested that Felix submit to an examination under oath with Pittsburgh-based attorney Joseph Hudock.  (*Id.* at 43:15-19, 44:1-10.)  ANPAC hired Hudock as local counsel to assist in the handling of Felix's claim.  (ECF No. 52 ¶ 50; ECF No. 54 ¶ 50.)  Felix attended the examination under oath on March 30, 2016.  (ECF No. 240 at 30:1-3.)

---

[3] ANPAC's counsel introduced several documents related to ANPAC's investigation into evidence through Mathena and Campbell.  In this opinion, the Court sometimes cites to the portion of the trial transcript where the exhibits were introduced.  When the exhibits were not included in the parties' appendices in support of their motions for summary judgment, the parties cite to the trial exhibits themselves.  The trial exhibits are not docketed on CM/ECF.

[4] Per the Court's ruling on one of Felix's motions *in limine*, the Court held that evidence of suspicions of arson and the cause-and-origin investigation related to the 2016 fire were inadmissible.  (ECF Nos. 194, 200.)

During the statement under oath, Hudock questioned Felix about various items on his Proof-of-Loss form. (ECF No. 246 at 6:21-7:10.) Felix confirmed that the fire destroyed a Louis Vuitton purse. (ECF No. 52 ¶ 68; ECF No. 54 ¶ 68.) Felix stated that he purchased the Louis Vuitton purse for Kelly Madison, his ex-fiancée, but that she had returned it to Felix after their relationship ended. (ECF No. 52 ¶ 68; ECF No. 52 ¶ 68.) Felix also confirmed that he lost a pair of 1.5 carat earrings in the fire.[5] (ECF No. 52 ¶ 63(a); ECF No. 54 ¶ 63(a).)

As ANPAC investigated Felix's claim, it was contacted by Ron Madison, the father of Felix's former fiancé. (ECF No. 240 at 63:15-19.) Ron Madison contacted Mathena several times. (*Id.* at 67:16-17.) After multiple conversations between Ron Madison and Mathena, Ron Madison informed ANPAC (through Mathena and Hudock) that two items on Felix's Proof-of-Loss form—a Louis Vuitton purse and a pair of diamond stud earrings—were not actually destroyed. (*Id.* at 70:11-24.) Ron Madison informed Hudock that his daughter, Kelly, still had a Louis Vuitton purse and diamond earrings that Felix had given her for Christmas. (ECF No. 243 at 10:5-12:2.)

On his Proof-of-Loss form, Felix stated that he purchased the earrings from Littman Jewelers for $1,906.94, that he used a credit card to purchase the earrings, and that he had a receipt from the purchase. (ECF No. 51-3 at 40.) Felix stated that he purchased the purse from

---

[5] Unlike the purse, Felix did not state that he gave the earrings to Ms. Madison nor that she returned them to him prior to the fire. (ECF No. 47 ¶ 14; ECF No. 57 ¶ 14.)

a Louis Vuitton store for $1,358, that he used a credit card to purchase the purse, but that he did not have a receipt. (*Id.* at 53.)

ANPAC then investigated whether Felix misrepresented that the Louis Vuitton purse and diamond earrings were destroyed in the fire. On May 31, 2016, Ron Madison sent pictures of the Louis Vuitton purse and earrings to ANPAC. (ECF No. 240 at 73:3-9.) Attorney Hudock spoke with Kelly Madison and verified that the Louis Vuitton purse and diamond earrings were in her possession. (*Id.* at 74:20-24.) Around that time, ANPAC arranged for Hudock to conduct a second examination under oath. (*Id.* at 73:20-23.) Mathena obtained text messages between Felix and Kelly Madison where Felix inquired about the whereabouts of the Louis Vuitton purse.[6] (*Id.* at 80:21-25.) Finally, Mathena requested that Hudock review case law to see whether ANPAC could deny Felix's insurance claim based on misrepresentations about the Louis Vuitton purse and diamond earrings. (*Id.* at 75:4-12; 78:15-20.)

During the investigation, Felix submitted a supplemental Proof-of-Loss form claiming that an additional $66,000 worth of property was destroyed in the fire.[7] (ECF No. 240 at 55:5-9; ECF No. 244 at 15:1-16.) ANPAC hired a vendor, Enservio, to value the contents of Felix's home

---

[6] ANPAC introduced the text-message exchanges between Felix and Kelly Madison at trial. (*See* ECF No. 240 at 82:21-23, 83:3-4, 6-7.) Felix texted Kelly Madison asking, "And where my pic of this purse, [that] is not at your house?" (*Id.* at 82:21-23.) He also asked her, "You going to take that pic of your purse for me right now? Is that right?" (*Id.* at 83:3-5.) Finally, Felix asked Kelly Madison, "it's the purse, where's my pic?" Kip Mathena testified that "[b]ased on these text messages, it was apparent that Mr. Felix's testimony was not as accurate as it may have intended to be; that he did not, in fact, take these items back from Ms. Madison at the point at which they broke up, but rather left them in her possession and still attempted to collect X amount of dollars from the insurance company for their existence." (*Id.* at 83:21-84:3.)

[7] Both Mathena and Campbell testified about the supplemental Proof-of-Loss form that Felix submitted to ANPAC. (ECF No. 240 at 55:5-57:3; ECF No. 244 at 15:4-17:17.) The supplemental Proof-of-Loss form claimed that expensive sports memorabilia was destroyed in the fire. (ECF No. 240 at 56:2-8.) All the items on Felix's supplemental Proof-of-Loss form were purchased using cash. (*Id.* at 58:3-4.)

that were destroyed in the fire.[8] (ECF No. 244 at 17:19-25.) ANPAC hired another vendor called Summit Claims Services LLC to inspect the damage to Felix's home and estimate the cost to replace his home.[9] (*Id.* at 64:20-67:1.)

Cory Campbell also testified about "loss of use" after the fire. (ECF No. 244 at 9:8-13.) "Loss of use" is the term for the living expenses that an insured incurs after a property is destroyed. (*Id.*) ANPAC paid Felix $30,000 as an advance for living expenses while ANPAC processed his fire-loss claim. (*Id.* at 54:18-55:22.) ANPAC also offered Felix $3,310 per month, which was based on the fair market value for a rental dwelling and furnishings near Sidman, Pennsylvania.[10] (*Id.* at 109:18-23.) Felix did not accept ANPAC's offer. (*Id.* at 57:18-58:10.)

### 4. ANPAC Denies Felix's Claim

By May 31, 2016, ANPAC had determined that Felix engaged in misrepresentation and false swearing by falsely claiming that certain property was destroyed in the fire. (*Id.* at 79:17-19.) Then, on June 10, 2016, Attorney Hudock sent a letter to ANPAC summarizing Felix's

---

[8] Enservio submitted two reports. The first report detailed the value of items on Felix's first Proof-of-Loss form. (ECF No. 244 at 16:1-20.) The second report detailed the value of items on Felix's supplemental Proof-of-Loss form. (*Id.* at 33:21-34:4.) Campbell testified that, generally, Enservio reported that Felix's possessions were worth less than the cash values that he included on his Proof-of-Loss forms. (*Id.* at 34:4-7.) On cross-examination, Felix's counsel attempted to show that Enservio priced Felix's possessions at much less than they were worth. (ECF No. 244 at 119-134.) For instance, Felix's counsel argued that Enservio improperly valued Felix's handmade Amish bookshelf at $5,000 based on a store-bought replacement. (*Id.* at 129:18-130:8.) Felix allegedly paid $15,000 for the bookshelf. (*Id.* at 129:21-25.)

[9] Felix's counsel also argued that Summit "shorted" Felix when it estimated the replacement cost of his home. Felix's counsel pointed out that Summit used an improper square footage to determine the cost to rebuild Felix's home. (*Id.* at 149:1-18.) Felix's counsel also argued that Summit calculated the replacement value using two-by-fours when Felix actually built his home using two-by-sixes. (ECF No. 244 at 149:12-150:14.)

[10] On cross-examination, Felix's counsel argued that ANPAC did not make Felix a fair and reasonable offer for loss of use. (ECF No. 244 at 112:1-5.) Felix requested $4,400 per month to maintain his standard of living. (*Id.* at 112:2-3.) Felix's counsel argued that ANPAC breached the terms of the Policy by failing to adequately compensate Felix for loss of use. (*Id.* at 112:2-114:21.) Felix's counsel argued that "you're going to offer my client only $3,310 when he's paid for $14,000 of additional living expenses." (*Id.* at 113:14-22.)

second examination under oath. (*Id.* at 84:13-19.) In that letter, Hudock stated that "[b]ased on Pennsylvania law, which follows the majority view that a single fraudulent material misrepresentation can void the entire policy, I believe ANPAC . . . is within its rights to deny this entire claim."[11] (*Id.* at 85:9-13.)

About a week after receiving Hudock's June 10 opinion letter, ANPAC's Claims Committee "decided that the misrepresentations presented in Mr. Felix's claims resulted in a denial of the claim in its entirety." (*Id.* at 90:22-24; *see also* ECF No. 244 at 11:2-10.) ANPAC sent Felix a letter on June 23, 2016 to advise him that it denied coverage for his claim due to material misrepresentations. (ECF No. 240 at 91:11-14.)

### 5. Other Evidence Presented at Trial

#### a. Items Other Than Louis Vuitton Purse and Diamond Earrings

ANPAC attempted to prove that Felix misrepresented that items were destroyed in the fire. First, ANPAC introduced evidence that the Louis Vuitton purse and diamond earrings were destroyed in the fire. Both Kelly and Ron Madison testified that Felix gave Kelly Madison a Louis Vuitton purse and a pair of diamond earrings. (ECF No. 242 at 6:6-9:4; ECF No. 243 at 10:2-15.) Kelly Madison brought the Louis Vuitton purse and diamond earrings to the courtroom with her. (ECF No. 242 at 9:6-17.)

Felix rebutted the testimony of Kelly and Ron Madison by suggesting that Felix had two

---

[11] Attorney Hudock inadvertently included incorrect details in his opinion letter. He stated that Kelly Madison asked to be off the record, when in fact her father Ron Madison had asked for anonymity. Further, Hudock stated that Kelly Madison sent ANPAC photos of the purse and earrings, when Ron Madison provided those photos. Mathena asked Hudock to correct these issues in a supplemental letter. (ECF No. 240 at 88:22-89:22.)

Louis Vuitton purses and two pairs of diamond earrings—and that only one Louis Vuitton purse and one pair of diamond earrings were destroyed in the fire.[12] (*See id.* at 132:1-15; ECF No. 243 at 40:19-41:8.) Felix presented one witness at trial, his friend Jessica Bloom, who testified that she saw a second Louis Vuitton purse and a second pair of diamond earrings in Felix's home before the fire.[13] (ECF No. 250 at 7:4-11:1, 20:14-20.)

Second, ANPAC tried to prove that various other items on Felix's Proof-of-Loss form— 300 pounds of meat, golf clubs, cameras, a Movado watch, clothing from the store Buckle, and Christmas presents from Toys-R-Us—were not actually destroyed in the fire.

Mathena testified that Felix claimed that roughly 300 pounds of meat was destroyed in the fire. (ECF No. 240 at 18:2-24.) Mathena also testified that Felix did not claim that an external freezer was destroyed in the fire, which suggests that Felix did not possess adequate freezer space to store 300 pounds of meat. (*Id.*)

Angela Merrill testified that Felix claimed several items on his Proof-of-Loss form that were not destroyed in the fire. Felix's golf clubs were in her garage when the fire occurred. (ECF No. 248 at 94:3-11.) Felix claimed that those same golf clubs were destroyed in the fire. (*See* ECF No. 51-3 at 49.) Merrill testified that Felix claimed a GoPro camera on his Proof-of-Loss form but

---

[12] Specifically, Felix's counsel showed that Kelly and Ron Madison were not sure that Felix did not own a second Louis Vuitton purse and pair of diamond earrings. Felix's counsel asked Kelly Madison, "The last time you were in Mr. Felix's house in November of 2010, do you know if there was a Louis Vuitton purse at that time?" (ECF No. 242 at 155:1-3.) She replied, "No, sir; I do not." (*Id.* at 155:4.) Similarly, Ron Madison testified that "I wasn't in the house [at the time of the fire], so I couldn't tell you what was in it the date of the fire; yes, sir." (ECF No. 243 at 41:2-6.)

[13] Bloom testified that the Louis Vuitton purse that she saw in Felix's house before the fire was white. (ECF No. 250 at 8:5-13.) The purse in Kelly Madison's possession after the fire, on the other hand, was brown. (*See* ECF No. 240 at 204:8-13.) Further, Bloom testified that the earrings in Felix's jewelry box before the fire were hoop earrings. (ECF No. 250 at 20:14-18.) Meanwhile, the earrings in Kelly Madison's possession (that Felix purchased for $1,906.94 at Littman Jewelers) were stud earrings. (*See* ECF No. 240 at 250:9-14.)

that she saw him take the GoPro on a ski trip after the fire. (ECF No. 248 at 90:13-92:14.) Merrill also testified that Felix possessed a Nikon camera after the fire, despite his claiming that a Nikon camera was destroyed in the fire. (*Id.* at 92:15-93:15.) And Merrill testified that Felix left a Movado watch at her house sometime after the fire, which she suspected that Felix claimed was destroyed in the fire. (*Id.* at 75:2-6.)

Further, Merrill testified that Felix misrepresented that certain items of Buckle clothing and children's toys were destroyed in the fire. Felix claimed $816.16 of Buckle clothing and $136.11 in toys from Toys-R-Us on his Proof-of-Loss form. (ECF No. 51-4 at 17.) At trial, ANPAC's counsel introduced receipts for Felix's purchases at Buckle and Toys-R-Us. (ECF No. 248 at 151:15-18.) Merrill testified that she and her children were in possession of the items that Felix purchased at Buckle and Toys-R-Us, and therefore that those items were not destroyed in the fire. (*Id.* at 151:1-153:14.)

### b. Felix's Arrest for Breaking Into Merrill's Home

At trial, ANPAC's counsel read a stipulation of facts about Felix breaking into Merrill's home. (*See* ECF No. 249 at 52-58.) On January 16, 2018, Felix broke into Merrill's home in Allegany County, Maryland, and stole approximately $1,700 of Merrill's property. (ECF No. 197 at 2.) Felix eventually admitted to breaking into Merrill's home and was convicted of burglary. (*Id.* at 2-3; ECF No. 249 at 52:21-57:2.) The District Court of Maryland for Allegany County found Felix guilty of felony theft of property valued between $1,500 and $2,500. (ECF No. 197 at 2-3.)

The stipulation of facts at trial stated, in short, that Felix broke into Merrill's home and stole lingerie and a gift card. (ECF No. 249 at 53:21-56:7.)

### c.    Evidence of Felix's Financial Condition

ANPAC retained Douglas S. King, a certified public accountant, to conduct a "lifestyle analysis" of Felix's financial situation. (*See* ECF No. 161-3; ECF No. 245.) A lifestyle analysis is a forensic accounting technique where an accountant analyzes an individual's income and spending habits over time. (ECF No. 245 at 5:1-4.) Here, ANPAC asked King "to review [Felix's] records and documents that were submitted by Mr. Felix to ANPAC in support of his fire loss claim and spending contents of his proof of loss statement." (*Id.* at 7:12-15.)

King conducted in-depth analyses of Felix's finances. King testified that Felix spent almost all his income—which totaled roughly $300,000—in the three years leading up to the fire. (*Id.* at 12:22-23.) The upshot of his testimony was that Felix "was basically overspending his income, so he was in an overextended situation and was really living off debt." (*Id.* at 23:22-24:2.) King also noted that Felix did not submit bank statements and other financial data that King requested. (*Id.* at 9:18-10:19.)

### B.    Procedural Background

On June 24, 2016, one day after making its decision to deny coverage, ANPAC filed its Complaint against Felix. (*See* ECF No. 1.) ANPAC's Complaint contained two counts: (1) a claim for a declaratory judgment that the Policy is void and that ANPAC had no obligation to

indemnify Felix for the fire loss because Felix made material misrepresentations in his claim after the fire; and (2) a civil insurance fraud claim under Pennsylvania law. (*Id.*)

In his Answer, Felix asserted several affirmative defenses and brought two counterclaims against ANPAC: (1) a breach-of-contract counterclaim alleging that ANPAC violated the Policy by failing to indemnify Felix for the fire loss; and (2) a counterclaim under Pennsylvania's bad-faith statute. (ECF No. 6.)

After conducting discovery, both parties filed motions for summary judgment.[14] (*See* ECF Nos. 45-47, 50-54, 58-59, 64-68, 71.) The Court issued a Memorandum Opinion and Order on the parties' motions for summary judgment on April 11, 2018. (ECF No. 72.) The Court denied Felix's Motion for Summary Judgment in full. (*Id.* at 19-23.) The Court granted ANPAC's partial motion for summary judgment and dismissed Felix's bad-faith counterclaim. (*Id.* at 11-16.) ANPAC's claims and Felix's breach-of-contract counterclaim survived summary judgment. (*Id.*) The Court scheduled the case for a jury trial beginning on November 26, 2019. (ECF No. 73.)

Before trial, the parties filed motions *in limine.* (ECF Nos. 83-135, 138-170.) The Court issued eleven orders on the motions *in limine* on November 21, 2018. (ECF Nos. 187-97.) The Court's rulings are summarized as follows:

(1)    evidence of the prior March 29, 2013 fire at Felix's property was inadmissible because it was not relevant and, even if relevant, was inadmissible because the probative value of evidence of the prior fire was substantially outweighed by potential prejudice (ECF No. 187);

---

[14] ANPAC's Partial Motion for Summary Judgment (ECF No. 50) sought dismissal of Felix's bad-faith claims. (*See* ECF No. 53.)

(2)     Felix was not permitted to introduce evidence that the Pennsylvania Attorney
        General's Office chose not to prosecute Felix for insurance fraud (ECF No. 188);

(3)     ANPAC was permitted to introduce evidence that Felix misrepresented that
        items other than the Louis Vuitton purse and diamond earrings were destroyed
        in the 2016 fire (ECF No. 189);

(4)     Ron Madison was permitted to testify without limitation at trial (ECF No. 190);

(5)     accounting expert Douglas S. King was permitted to testify at trial and his expert
        report was admissible (ECF No. 191);

(6)     text messages between Felix and Merrill were generally admissible, subject to
        objection at trial (ECF No. 192);

(7)     Merrill was permitted to testify at trial (ECF No. 193);

(8)     evidence of suspicions of arson and the cause-and-origin investigation related to
        the 2016 fire were inadmissible (ECF Nos. 194, 200);

(9)     evidence of Felix's emotional distress was inadmissible except to rebut and
        explain evidence that Felix threatened Kelly Madison (ECF No. 195);

(10)    text messages between Felix and Kelly Madison were admissible and Kelly
        Madison was permitted to testify at trial that she thought Felix wanted her to lie
        to ANPAC's investigators (ECF No. 196); and

(11)    evidence that Felix's broke into Merrill's home was admissible (ECF No. 197).

The jury trial in this matter began on November 26, 2018. (*See* ECF No. 201.) The trial

lasted for seven days. (*See* ECF No. 216 at 2.)

On December 4, 2018, the jury returned its verdict. (ECF No. 218.) The jury found against

ANPAC on both its declaratory judgment claim and its civil insurance fraud claim. (*Id.*) The

jury found in Felix's favor on his breach-of-contract counterclaim. (*Id.*) The jury awarded Felix

compensatory damages in the following amounts: $727,024.33 for loss of dwelling, $501,516 for

loss of contents, $146,620 for loss of use, and $3,800 for excavation services from Robert L. Felix.

(*Id.*) The jury also wrote "plus 25% endorsement" beside its award for loss of dwelling, so the

Court added $181,756.08 to the jury's loss-of-dwelling award. (*Id.*) Accordingly, the Court

entered judgment in Felix's favor for a total of $1,560,716.41. (ECF No. 257.)

After trial, the parties filed in the instant post-trial motions.

## II. Jurisdiction

The Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the parties are

completely diverse and the amount in controversy exceeds $75,000. Venue is proper under 28

U.S.C. § 1391(b) because a substantial portion of the events giving rise to the claims occurred in

the Western District of Pennsylvania.

## III. Legal Standard

### A. Motion for Judgment as a Matter of Law

Rule 50 of the Federal Rules of Civil Procedure provides that:

> If a party has been fully heard on an issue during a jury trial and the court finds
> that a reasonable jury would not have a legally sufficient evidentiary basis to find
> for the party on that issue, the court may: (A) resolve the issue against the party;
> and (B) grant a motion for judgment as a matter of law against the party on a
> claim or defense that, under the controlling law, can be maintained or defeated
> only with a favorable finding on that issue.

FED. R. CIV. P. 50.

A court should grant a motion for judgment as a matter of law only if "'there is no legally

sufficient basis for a reasonable jury' to find in favor of the non-moving party. In making this

determination, the District Court 'must draw all reasonable inferences in favor of the non-

moving party, and it may not make credibility determinations or waive evidence.'" *Sullivan v.

Cty. of Allegheny*, 112 F. App'x 176, 178 (3d Cir. 2004) (quoting *Reeves v. Sanderson Plumbing Prods.*,

*Inc.*, 530 U.S. 133, 149 (2000)); *see Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001) (internal quotation marks omitted) (quoting *Powell v. J.T. Posey Co.*, 766 F.2d 131, 133-34 (3d Cir. 1985)) (stating that a court should grant a motion for judgment as a matter of law "only if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief"). When deciding a motion for judgment as a matter of law, a district court "must refrain from weighing the evidence, determining the credibility of witnesses, or substituting [its] own version of the facts for that of the jury." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)).

Still, "[f]ederal courts do not follow the rule that a scintilla of evidence is enough" to defeat a motion for judgment as a matter of law. *Sullivan*, 112 F. App'x at 178 (citing *Walter v. Holiday Inns, Inc.*, 985 F.2d 1232, 1238 (3d Cir. 1993)). As the Third Circuit has repeatedly held, "[t]he question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Id.* at 178 (quoting *Walter*, 985 F.2d at 1238); *Foster v. Nat'l Fuel Gas Co.*, 316 F.3d 424, 428 (3d Cir. 2003) (quoting *Walter*, 985 F.2d at 1238); *Vincler & Knoll v. Paul*, 54 F. App'x 66, 68 (3d Cir. 2002) (quoting *Walter*, 985 F.2d at 1238); *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002) (quoting *Patzig v. O'Neil*, 577 F.2d 841, 846 (3d Cir. 1978)).

### B.    Motion to Alter or Amend Judgment

Federal Rule of Civil Procedure 59(e) provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." FED. R. CIV. P. 59(e). A motion filed under Rule 59(e) primarily serves to correct analytical errors in a prior

decision of the court. *See United States v. Fiorelli*, 337 F.3d 282, 288 (3d Cir. 2003). Under Rule 59(e), "a judgment may be altered or amended if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). Motions to amend or alter judgments under Rule 59(e) are the proper vehicle to correct a jury verdict that is manifest error or shocks the judicial conscience. *Delamor Enter., L.P. v. Fire-X Sales & Serv.*, No. 4:07-cv-878, 2010 WL 11556562, at *3 (M.D. Pa. May 17, 2010).

"Because federal courts have a strong interest in finality of judgments, motions for reconsideration should be granted sparingly." *Bolick v. DFS Servs., LLC*, No. 10-5211, 2012 WL 13018253, at *1 (E.D. Pa. Jan. 25, 2012) (citing *United States v. Babalola*, 248 F. App'x 409, 411 (3d Cir. 2007)); *see also Mack v. Yost*, No. 3:10-264, 2014 WL 14710689, at *1 (W.D. Pa. Apr. 3, 2014) (Gibson, J.).

Post-judgment motions for interest can also be raised under Rule 59(e). *See, e.g., Delamor*, 2010 WL 11556562, at *1 (citing *Schacke v. Colt Indus. Operating Corp. Severance Plan for Salaried Emp.*, 960 F.2d 1187, 1192 (3d Cir. 1992)).

## C.     Motion for New Trial

The decision to grant a new trial is committed to the sound discretion of the district court. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *United States v. Schiffer*, 836 F. Supp. 1164, 1169 (E.D. Pa. 1993), *aff'd*, 31 F.3d 1175 (3d Cir. 1994). Under Federal Rule of Civil Procedure 59, a motion for a new trial may be granted "for any reason for which a new trial has heretofore

been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1). "Such reasons include prejudicial erroneous judicial rulings or misconduct by opposing counsel." *Houser v. Folino*, No. 2:1-CV-416, 2016 U.S. Dist. LEXIS 25165, at *4 (W.D. Pa. Mar. 1, 2016) (citing *Olefins Trading, Inc. v. Han Yang Chem. Corp.*, 9 F.3d 282, 289-90 (3d Cir. 1993); *Schiffer*, 836 F. Supp. at 1169). "[T]he court must assess whether an error was, in fact, committed, and whether the error was so prejudicial that denying a new trial would be inconsistent with substantial justice." *Houser*, 2016 U.S. Dist. LEXIS 25165, at *4-5 (citing *Bhaya v. Westinghouse Elec. Corp.*, 709 F. Supp. 600, 601 (E.D. Pa. 1989), *aff'd*, 922 F.2d 184 (3d Cir. 1990)).

A motion for a new trial may also be granted "when the verdict is contrary to the great weight of the evidence; that is, 'where a miscarriage of justice would result if the verdict were to stand,'" *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 453 (3d Cir. 2001) (quoting *Olefins Trading*, 9 F.3d at 289), or "when the court believes the verdict results from jury confusion." *Brown v. Nutrition Mgmt. Servs. Co.*, 370 F. App'x 267, 269-70 (3d Cir. 2010). When reviewing a jury's verdict, the District Court has an "obligation . . . to uphold the jury's award if there exists a reasonable basis to do so." *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989). In determining whether a new trial should be granted, the court must draw all reasonable inferences in favor of the party who prevailed at trial. *See Moyer v. United Dominion Indus.*, 473 F.3d 532, 545 n.8 (3d Cir. 2007).

## IV. Discussion

**A.  ANPAC Is Entitled to Judgment as a Matter of Law on Certain Issues; The Court Will Therefore Amend the Jury's Verdict to Comport with the Evidence at Trial By Remitting the Jury's Award for Loss of Use, Loss of Contents, and Loss of Dwelling**

**1.  ANPAC Is Entitled to Judgment as a Matter of Law on Felix's Loss of Use/Additional Living Expenses Claim; The Court Will Therefore Remit the Jury's Award to $0**

The Policy provided up to $146,620 in coverage for "loss of use," subject to a monthly

maximum of $14,662. (ECF No. 51-1 at 4.) The Policy provides:

Coverage D – Loss of Use

. . .

1. Additional Living Expense. If a loss covered under this Section makes the residence premises uninhabitable, we cover any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living for up to 24 months. Payment shall be for the shortest time required to repair or replace the premises; or, if you permanently relocate, the shortest time required for your household to settle elsewhere. This period of time is not limited by expiration of this policy.

(*Id.* at 15.)

The jury awarded Felix the Policy maximum of $146,620 for loss of use and additional

living expenses after the 2016 fire. (ECF No. 218.) ANPAC argues that the jury's verdict must

be molded to zero because Felix did not prove that he incurred any additional living expenses

after the 2016 fire. (ECF No. 229 at 35-38.) ANPAC argues that "[t]he burden was on Felix to

prove this aspect of his claim by the fair preponderance of the evidence and, simply put, he failed

to do so." (*Id.* at 38.)

In response, Felix argues that he proved his pre-fire standard of living through evidence

about his home and lifestyle. (ECF No. 233 at 9.) Felix argues that based on this evidence, the

-18-

jury reasonably found that Felix's standard of living warranted an award of the Policy maximum. (*Id.* at 9-11.) Felix also argues that the jury properly used common sense to infer that Felix incurred some additional living expenses after the fire. (*Id.* at 11.) Felix points out that Angela Merrill testified that Felix built an apartment above his garage to live in. (*Id.*)

The Court is mindful that "[t]he duty of assessing damages is within the province of the jury and should not be interfered with by the court, unless it clearly appears that the amount awarded resulted from caprice, prejudice, partiality, corruption, or some other improper influence." *Ferrer v. Trs. of Univ. of Pa.*, 825 A.2d 591, 611 (Pa. 2002) (citing *Tonik v. Apex Garages, Inc.*, 275 A.2d 296, 299 (Pa. 1971)); *accord Morris v. Phoenix Installation & Mgmt. Co.*, No. 11-951, 2013 WL 6858299, at *3 (W.D. Pa. Dec. 30, 2013).

> Under Pennsylvania law:

> Where one party . . . breaches the contract, the other party is entitled to recover . . . . whatever damages he suffered, provided (1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty.

*Ferrer*, 825 A.2d at 610 (citing *Taylor v. Kaufhold*, 84 A.2d 347, 351 (Pa. 1951)).[15]

---

[15] The Court's jury instructions on Felix's breach-of-contract counterclaim were in line with Pennsylvania law. The Court instructed the jury that "[i]f you find that ANPAC breached the contract, you should award an amount of money that will fairly and adequately compensate Felix for the harm caused by the breach. Generally, damages include the amount of money that will put Felix in the position he would have been in if ANPAC had not breached the contract. This includes damages that result directly from the breach and also those damages that were foreseeable when ANPAC and Felix entered into the insurance contract. Any damages award should be based on . . . [the] loss of use of [Felix's] dwelling as his primary residence." (ECF No. 253 at 132:17-133:6.) *See also Cerciello v. Cerciello*, No. 415 EDA 2014, 2014 WL 10750745, at *4 (Pa. Super. Ct. Dec. 2, 2014) (holding that "Wife was not entitled to insurance proceeds . . . for living expenses [because] Wife did not incur any additional living expenses as a result of the fire").

In breach-of-contract actions, the plaintiff has the burden of establishing damages to a reasonable certainty. *See Spang & Co. v. U.S. Steel Corp.*, 545 A.2d 861, 866 (Pa. 1988); *Gordon v. Trovato*, 338 A.2d 653, 657 (Pa. 1975). "As a general rule, damages are not recoverable if they are too speculative, vague, or contingent and are not recoverable beyond an amount that the evidence permits to be established with reasonable certainty." *Printed Image of York, Inc. v. Mifflin Press, Ltd.*, 133 A.3d 55, 59-60 (Pa. Super. Ct. 2016) (citing *Spang*, 545 A.2d at 866). "The question of whether damages are speculative has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages." *Id.* at 60 (citing *Newman Dev. Grp. of Pottstown, LLC v. Genuardi's Family Mkt., Inc.*, 98 A.3d 645, 661 (Pa. Super. Ct. 2014)).

As a preliminary matter, there is no indication that the jury's verdict on loss of use was motivated by caprice, prejudice, partiality, corruption, or some other improper influence. *Ferrer*, 825 A.2d at 611.

The Court finds that the evidence at trial established Felix's standard of living before the fire. At trial, the jury heard extensive testimony about Felix's standard of living before the fire. Both Kip Mathena and Cory Campbell testified extensively about Felix's home. (*See* ECF Nos. 239-241, 244.) For instance, Campbell testified about the square footage of Felix's home. (ECF No. 244 at 110:3-10.) Both Campbell and Mathena testified about how Felix's home was constructed. (*Id.* at 63:19-64:4; ECF No. 240 at 33:11-34:5.) They testified extensively about the interior finishes and furnishings. (*See, e.g.,* ECF No. 244 at 14:19-23, 131:4-16; ECF No. 240 at 12:12-23, 14:1-5.) Further, Kelly Madison and Angela Merrill testified about the layout of the home and the furnishings throughout. (ECF No. 242 at 99:18-101:1; ECF No. 248 at 100:6-101:8.)

-20-

The jury also saw photos of Felix's home. (ECF No. 244 at 28:14-29:17, 130:17-133:22.) These photos, which showed the exterior and interior of Felix's home, provided the jury with evidence of Felix's standard of living before the fire. (*Id.*) After Felix's counsel showed Cory Campbell several pictures of the inside of Felix's home, he asked Campbell, "And so I think I'm not going to show the jury every one, but do you now think we have a pretty good idea of the standard of living that my client was in before the fire?" (*Id.* at 133:17-19.) Campbell replied, "Yes." (*Id.* at 133:20.)

Other witnesses provided additional insight into Felix's standard of living before the fire. Douglas King, Jessica Bloom, and Ronald Madison each testified that Felix's house was nice. (ECF No. 245 at 50:16-18; ECF No. 250 at 6:9; ECF No. 243 at 28:10-11.) Angela Merrill testified that the master suite in the house was nice. (ECF No. 248 at 101:3.) This testimony gave the jury additional insight into the Felix's home before it was destroyed by the 2016 fire. Therefore, the Court finds that the jury had sufficient evidence to assess Felix's standard of living before the fire.

However, despite the evidence of Felix's standard of living before the fire, the Court finds that the jury did not have a reasonable basis to conclude that Felix was entitled to damages for loss of use and additional living expenses. At trial, Felix did not introduce any evidence that he actually incurred any additional living expenses after the fire. The Policy provides that "[ANPAC will] cover any necessary increase in living expenses *incurred* by you." (ECF No. 51-1 at 15.) The plain language of the Policy clearly states that the insured must actually incur costs

to be eligible for additional living expenses and loss-of-use coverage.[16]  In other words, to be

eligible for additional living expenses, the insured must expend money on or otherwise become

liable for additional living expenses.  For example, an insured might rent an apartment after a

fire loss.

Here, there is no evidence that Felix actually incurred additional living expenses after the

2016 fire.  Felix communicated with ANPAC about alternative living arrangements while his

claim was pending.  (ECF No. 244 at 54:9-21.)  They discussed Felix renting a house or living in

an RV on his property while his home was rebuilt.  (*Id.* at 112:24-120:4.)  However, as Cory

Campbell testified, ANPAC and Felix never reached an agreement on a substitute living

arrangement.[17]  (*Id.* at 54:22-55:7.)

Felix did not present evidence at trial indicating that he incurred additional living

expenses.  Felix argues that the jury used its common sense to infer that Felix incurred $146,620

in additional living expenses after the fire.  (ECF No. 233 at 11.)  Felix argues that the jury relied

on evidence of other houses in the area that Felix *could have* rented, or that Felix *could have* lived

in an RV on his property for $8,000 per month.  (*Id.* at 10.)  However, there is no evidence that

---

[16] The Court agrees with ANPAC's arguments about the definition of "incur." (ECF No. 229 at 36-37.) The dictionary definition of "incur" is "to become liable to subject to: bring down upon oneself" or "to suffer or to bring on oneself (a liability or defense)." (*Id.* at 36 (citing *Incur*, MIRIAM-WEBSTER ONLINE DICTIONARY, www.merriam-webster.com/dictionary/incur; *Incur*, BLACK'S LAW DICTIONARY (9th ed. 2009).) To incur an expense, an individual must take on a liability.

[17] Campbell testified, "There were conversations throughout the claim handling of where Mr. Felix might stay, what he might have used to be his temporary residence until his house was rebuilt or replaced. I don't believe we ever got to a point where we knew actually what his plan was going to be, where he was going to stay." (ECF No. 244 at 55:1-6.)

Felix actually incurred these costs.[18] Rather, the evidence at trial suggests that Felix lived with Kelly Madison and relatives after the fire. (ECF No. 242 at 29:24-30:11, 63:9-16.) There was no evidence that Felix paid rent to stay with them after the fire. And there is no evidence that he otherwise incurred liabilities for his post-fire lodging. Accordingly, from this evidence, there was no basis for the jury to award Felix damages for loss of use and additional living expenses.

There was evidence Felix lived in an apartment above his garage at the Frankstown Road property after the 2016 fire. (ECF No. 248 at 139:19-140:5.) The only evidence of that living arrangement was Angela Merrill's testimony. (*Id.*) Felix did not introduce evidence showing that he built an apartment above his garage. And even if the jury could have reasonably inferred that Felix expended money to construct a living space above his garage after the fire, Felix is not entitled to additional living expenses because he did not prove damages with reasonable certainty. *Ferrer*, 825 A.2d at 610. There was no testimony about the size of this apartment or the amenities it contained. More importantly, there was no testimony that Felix expended money to construct it or whether the apartment existed before the fire. Angela Merrill's brief testimony did not give the jury a reasonable basis to award the Policy's maximum for additional living expenses. The Court therefore finds that the jury's award for loss of use and additional living expenses is vague, speculative, and unsupported by the evidence at trial.

In conclusion, the Court finds that the evidence at trial did not support the jury awarding Felix damages for loss of use and additional living expenses. Accordingly, the Court finds that

---

[18] Moreover, the jury's verdict is vague, speculative, and unsupported by the evidence because its award of the Policy maximum does not align with 24 months of living in an RV for $8,000 per month (a total of $192,000) or renting a home for $3,310 per month (a total of $79,440).

ANPAC is entitled to judgment as a matter of law on this point and will amend the jury's verdict

on loss of use from $146,620 to $0.

### 2. ANPAC Is Entitled to Judgment as a Matter of Law on Felix's Loss of Contents Claim; The Court Will Therefore Remit the Jury's Verdict to $292,139.80 for Loss of Contents

The Policy provides that "[ANPAC] cover[s] personal property owned or used by any

insured while it is anywhere in the world." (ECF No. 51-1 at 14.) An endorsement to the Policy

provides that:

> liability for loss on any one item or items covered hereunder shall not exceed the smallest of the following amounts: (1) replacement cost at the time of loss; (2) the full cost of repair; (3) the Coverage C Limit of Liability [of $504,000]; (4) any special limits of liability described in the policy; (5) the interest of the insured; or (6) the amount it would cost us to replace the item with a similar item of like kind and quality, using our replacement facilities, within a reasonable time after the loss.

(*Id.* at 32.) The Policy also contains certain limitations on personal-property coverage that are

not relevant here. (*Id.* at 14.)

The jury awarded Felix $501,516 for loss of contents. (ECF No. 218 at 3.)  ANPAC

requests that the Court must reduce the jury's verdict on loss of contents because Felix did not

introduce evidence of the replacement value of his possessions. (ECF No. 229 at 38-39; ECF No.

255 at 17-19.)  ANPAC therefore argues that the jury had no basis to award Felix $501,516. (ECF

No. 229 at 38-39; ECF No. 255 at 17-19.)  ANPAC argues that Felix is entitled to either the

replacement-cost estimate of $257,390.43 by ANPAC's vendor Enservio or, at most, the

$324,623.80 that Felix claimed on his Proof-of-Loss form. (ECF No. 229 at 40-43; ECF No. 255 at

17.)

-24-

ANPAC contends that any loss-of-contents award must be further reduced by the following amounts: (1) $1,886 for golf clubs that Felix admits were not destroyed in the fire; (2) $598 for a GoPro camera that Felix admits was not destroyed in the fire; (3) $1358 for a Louis Vuitton purse that ANPAC alleges was not actually destroyed in the fire; (4) $1906 for diamond stud earrings that ANPAC alleges were not actually destroyed in the fire; and (5) $30,000 for advance payments that ANPAC made to Felix.[19] (ECF No. 229 at 43-44.)

In response, Felix argues that the jury properly awarded him $501,516 for loss of contents for three reasons. (ECF No. 233 at 13-19.) First, Felix suggests that the jury rejected Enservio's estimates, which undervalued the replacement costs of Felix's possessions. (*Id.* at 15.) Second, Felix argues that "[t]he jury may have also reasonably concluded that the cost of the items set forth in the [Proof of Loss], prepared in 2016, might cost more to replace in 2018/2019 and adjusted their award accordingly." (*Id.* at 16.) Finally, Felix argues that the jury's loss-of-contents award should not be reduced for the Louis Vuitton purse and diamond earrings because the jury reasonably found that those items were not destroyed in the fire. (*Id.* at 17-19.)

### a.   The Court Will Initially Remit the Jury's Award to Reflect Felix's Estimates of the Cash Value of the Items on His Inventory

The jury did not have a reasonable basis to award Felix $501,516 for the contents destroyed by the fire at his home.[20] At trial, the jury was presented with two pieces of evidence that detailed the value of the contents of Felix's home:

---

[19] Before Felix's deposition, his counsel sent a letter to ANPAC stating that a set of golf clubs and a GoPro camera were not actually destroyed in the fire, despite his including those items on the Proof-of-Loss form. (*See* Trial Ex. J52.)

[20] While the Court does not factor this argument into its remittitur analysis, ANPAC convincingly reconstructs the jury's verdict on loss of contents. (ECF No. 229 at 39.) ANPAC points out that "[i]t is clear that the verdict for Loss of Contents ($501,516) rendered by the jury represents the Personal Property

(1)   Felix's initial Proof of Loss and supplemental Proof of Loss, which claimed that the total cash value of the possessions destroyed in the fire was $324,623.80 (ECF Nos. 51-3, 51-4, 51-5; Trial Exs. J10, J26); and

(2)   the report by Enservio, which stated that the total replacement value of Felix's destroyed possessions was $257,390.43 and that the actual cash value of those items was $220,218.23.[21] (ECF No. 244 at 49:22-51:12; Trial Exs. J24, J28.)

The Court finds that the jury did not have a reasonable basis to award Felix more than $324,623.80. First, any damages beyond the amount Felix claimed in his Proof-of-Loss forms are impermissible under Pennsylvania law because they are speculative and vague. *Ferrer*, 825 A.2d at 610. Felix did not present evidence indicating that the value of his possessions exceeded the cash value that he listed on his Proof-of-Loss forms. Therefore, the jury did not have a reasonable basis to award Felix more than he claimed his own possessions were worth.

Second, the Court rejects Felix's argument that the jury awarded Felix more than $324,623.80 to reflect the rising replacement value of his possessions over time. (ECF No. 233 at 16.) Felix did not present evidence that his possessions appreciated in value between the fire and trial. While common sense and experience reasonably indicate that an item may cost more to replace in 2019 than in 2016, there was no basis for the jury to add more than $175,000 to the value that Felix provided on his Proof-of-Loss forms.[22] Any additional damages based on appreciation or differences in replacement costs are unreasonably speculative and vague.

---

Policy limit of $504,000 less the amount of the GoPro camera and accessories ($598) and golf clubs ($1,886) that Felix had conceded, by letter from his counsel prior to his deposition, were not actually destroyed in the fire." (*Id.*)

[21] Enservio produced two reports—one after Felix submitted his initial Proof of Loss (Trial Ex. J24) and another after Felix submitted a supplemental Proof of Loss. (Trial Ex. J28.) The second Enservio report (Trial Ex. J28) reflects Felix's entire claim. It incorporates items from both Proof-of-Loss forms to provide a total replacement value for his possessions destroyed in the fire.

[22] This amount reflects the difference between the jury's award for loss of contents ($501,516) and the total cash value that Felix listed for his possessions on his Proof-of-Loss forms—$324,623.80.

Moreover, Felix is entitled to prejudgment interest on the loss-of-contents award, which will compensate him for "the loss of use of money" between the fire loss and the jury's verdict.[23] *Benefit Tr. Life Ins. Co. v. Union Nat'l Bank of Pittsburgh*, 776 F.2d 1174, 1178 (3d Cir. 1985) ("[T]he award of interest in contract disputes is not based on punitive considerations but on compensation for the loss of use of the money.").

While Felix is not entitled to more than $324,623.80, the Court finds that the jury had a reasonable basis to award him the total cash value of the items listed on his Proof-of-Loss forms, subject to the reductions discussed below. Based on the testimony at trial, the jury could have reasonably determined that Felix accurately represented the value of his possessions on his Proof-of-Loss forms. And contrary to ANPAC's characterization of the evidence, the jury could have reasonably determined that Felix's cash purchases were not "dubious." (ECF No. 229 at 40.) Accordingly, the Court will utilize $324,623.80 as a baseline to calculate Felix's damages for loss of contents. As described in the following subsections, that figure must be reduced to reflect other evidence introduced at trial.

The Court rejects ANPAC's argument that the jury verdict must be amended to reflect the Enservio report. The jury could have reasonably rejected Enservio's determinations of replacement costs for Felix's possessions. Felix's counsel called Enservio's replacement-value calculations into question through his cross-examination of Cory Campbell. (*See* ECF No. 244.) For example, Felix claimed that the fire destroyed a custom, hand-built Amish built-in wooden

---

[23] According to Merriam-Webster, prejudgment interest is "interest awarded to the prevailing party in a lawsuit as compensation for the loss of use of money from the time it is determined at trial to be due to the time final judgment is entered." *Prejudgment Interest*, MIRIAM-WEBSTER ONLINE DICTIONARY, www.merriam-webster.com/dictionary/incur; *see also Interest*, BLACK'S LAW DICTIONARY (11th ed. 2019).

bookshelf for which he paid $15,000. (*Id.* at 14:19-23.) Enservio valued Felix's built-in wooden

bookshelf at $5,949 based on a replacement from an online furniture retailer. (*Id.* at 32:20-24.)

Felix's counsel pointed out that Enservio's replacement bookshelf was not a reasonable

replacement or an item of like kind and quality—it was not a handmade Amish piece built out

of reclaimed wood.[24] (*Id.* at 129:11-130:8.) Therefore, based on this testimony, it was reasonable

for the jury's loss-of-contents award to exceed Enservio's replacement-cost estimate.

> b. **The Court Will Deduct for Golf Clubs ($1,886) and a GoPro Camera ($598) That Were Not Destroyed in the Fire, But Will Not Deduct for the Louis Vuitton Purse and Diamond Earrings**

Felix's Proof-of-Loss forms included two items that he admitted were not destroyed in

the 2016 fire. Before his deposition, Felix's counsel sent a letter to ANPAC stating that a set of

golf clubs (worth $1,886) and a GoPro camera and accessories (worth $598) were not actually

destroyed in the fire. However, because these items were originally included in Felix's Proof of

Loss, the Court will subtract the total value of these items ($2,484) from the baseline loss-of-

contents award of $324,623.80. Since Felix admitted that the golf clubs and GoPro camera were

not destroyed in the fire, the jury clearly had no basis to award damages for these items. (ECF

No. 229 at 39; Trial Ex. J52.)

ANPAC also argues that the jury's loss-of-contents award must be reduced because the

Louis Vuitton purse and diamond earrings that Felix claimed on his Proof of Loss were not

---

[24] The Policy provides that "liability for loss on any one item or items covered hereunder shall not exceed the smallest of the following amounts: (1) replacement cost at the time of loss; (2) the full cost of repair; (3) the Coverage C Limit of Liability [of $504,000]; (4) any special limits of liability described in the policy; (5) the interest of the insured; or (6) the amount it would cost us to replace the item with a similar item of like kind and quality, using our replacement facilities, within a reasonable time after the loss." (ECF No. 51-1 at 32.)

actually destroyed in the fire. (ECF No. 229 at 41.) As evidenced by the jury's verdict on ANPAC's declaratory judgment and fraud claims, the jury did not agree with ANPAC's theory of the case—that Felix misrepresented that a Louis Vuitton purse and diamond earrings were destroyed in the fire. The Court finds that there was a reasonable basis for the jury to reach this conclusion.

ANPAC maintained that Felix misrepresented that a brown Louis Vuitton purse was destroyed in the fire, when in reality it was in Kelly Madison's possession.[25] (*See, e.g.,* ECF No. 240 at 204:8-12.) Jessica Bloom—the only witness that Felix presented—testified that she saw a white Louis Vuitton purse in Felix's home before the 2016 fire. (ECF No. 250 at 7:22-8:13.) Both Kelly Madison and her father testified that they did not know if Felix had another Louis Vuitton purse that could have been destroyed in the fire. (ECF No. 242 at 155:1-12; ECF No. 243 at 40:19-41:10.) Therefore, there was a reasonable basis for the jury to conclude that a Louis Vuitton purse was destroyed in the 2016 fire at Felix's home.

Similarly, the jury had a reasonable basis to conclude that a pair of diamond earrings was destroyed in the 2016 fire. Bloom testified that she saw a set of diamond hoop earrings in Felix's home before the fire. (ECF No. 250 at 10:21-11:1.) And both Kelly Madison and her father testified that a pair of diamond earrings—other than the diamond stud earrings in Kelly Madison's possession—could have been destroyed in the fire. (ECF No. 242 at 155:9-12; ECF No. 243 at 41:12-19.) Therefore, there was a reasonable basis for the jury to conclude that a pair of

___

[25] Trial Exhibit J37 is a photograph of a brown Louis Vuitton purse that was in Kelly Madison's possession. Trial Exhibit D20, on the other hand, is a photograph of a white Louis Vuitton purse—the type which Felix claims was destroyed in the fire.

diamond earrings was destroyed in the fire. Accordingly, the Court will not reduce Felix's loss-of-contents award to reflect the value of the Louis Vuitton purse and diamond earrings.

### c. The Court Will Deduct $30,000 to Reflect ANPAC's Cash Advances to Felix

Finally, the Court will deduct $30,000 from Felix's loss-of-contents award to reflect cash advances that ANPAC provided to Felix. At trial, the parties stipulated that ANPAC made $30,000 in cash advances to Felix. (ECF No. 179 ¶ 8.) Cory Campbell testified that ANPAC deducts cash advances from any subsequent payment to its insured for losses of personal property. (ECF No. 244 at 134:24-135:17.) Felix does not contest that ANPAC is entitled to reduce Felix's loss-of-contents award by $30,000 to reflect these cash advances. Accordingly, the Court will remit Felix's loss-of-contents award by $30,000.

In conclusion, the Court will remit the jury's award of loss of contents to $292,139.80. This amount represents the cash value of the items that Felix claimed were destroyed in the fire ($324,623.80), less the $30,000 cash advance and the value of the golf clubs ($1,886) and GoPro camera ($598) that Felix admitted were not destroyed in the fire.

### 3. ANPAC Is Entitled to Judgment as a Matter of Law on Felix's Loss of Dwelling Claim; The Court Will Therefore Remit the Jury's Verdict to $727,024.33 for Loss of Dwelling

The jury awarded Felix a total of $908,780.41 for loss of dwelling. (ECF No. 218 at 3.) On the verdict form, the jury wrote $727,024.33 for loss of dwelling and beside that wrote "plus 25% endorsement." (*Id.*) The Court therefore multiplied $727,024.33 by 1.25 before entering the loss-of-dwelling award, rendering a total of $908,780.41. (*Id.*)

The Policy provides that:

[ANPAC] cover[s]: (a) the dwelling on the residence premises . . . used principally as a private residence, including structures attached to the dwelling; (b) materials and supplies located on or adjacent to the residence premises for use in the construction, alteration, or repair of the dwelling or other structures on the residence premises; and (c) wall-to-wall carpeting attached to the dwelling on the residence premises.

(ECF No. 51-1 at 13.)

The 25% endorsement refers to an enhancement to Felix's loss-of-dwelling coverage that would provide an additional 25% of loss-of-dwelling coverage in the event of a loss. (ECF No. 244 at 76:19-77:10.) Cory Campbell testified that "the endorsement is a special protection package" that "enhances the coverage that's provided by the general policy. What an endorsement does is it actually changes the language to the extent that it says the following paragraph is deleted and replaced with." (*Id.* at 77:3-10.) Here, the endorsement "would allow for up to 125 percent of what the dwelling limit is, so an extra 25 percent." (*Id.* at 77:19-24.)

ANPAC argues that the jury's loss-of-dwelling award was improper for two reasons. First, ANPAC argues that the jury had no reasonable basis to add the 25% endorsement to its verdict. (ECF No. 229 at 44-47.) Second, ANPAC argues that the Court must amend the verdict because the evidence at trial supported, at most, a $588,453.18 award for loss of dwelling. (*Id.* at 43-45.) The Court will address these arguments in turn.

> a. **The Court Will Reduce the Jury's Loss-of-Dwelling Award By $181,756.08 Because the Evidence Does Not Support the Addition of the 25% Endorsement**

ANPAC contends that the jury improperly awarded Felix the 25% endorsement for two reasons. First, ANPAC argues that the jury improperly considered the 25% endorsement because the endorsement itself was never offered into evidence. (*Id.* at 44.) Second, ANPAC

-31-

argues that the evidence presented at trial does not justify the jury's application of the 25%
endorsement. *(Id.)*

In response, Felix argues that the jury had a basis to award $908,780.41 based on the
description of Felix's residence in the Policy. (ECF No. 233 at 20.) Felix also argues that the jury
reasonably determined that ANPAC and its vendor—Summit Claims Services LLC—"was
trying to lowball [Felix]" through its estimates on the cost to replace Felix's home. *(Id.* at 21.)
Felix points out that Summit's replacement estimates were inaccurate because they did not
account for the full square footage of Felix's home and priced the replacement using two-by-
fours, when the house was constructed using more expensive two-by-sixes. *(Id.)*

The Court will not fully analyze ANPAC's first argument because the Court finds that
Felix is not entitled to the 25% endorsement based on the evidence introduced at trial. Therefore,
the Court's ruling on loss of dwelling is not affected by whether the 25% endorsement was
properly introduced into evidence.

The evidence at trial did not justify an award greater than $727,024.33, and therefore did
not implicate the endorsement. At trial, the jury saw the following evidence on the replacement
cost of Felix's dwelling:

- (1) the Estimated Replacement Cost of $733,042 in the "Description of Your House"
  section of the Policy (ECF No. 51-1 at 7; Trial Ex. J1);

- (2) a first report from Summit (dated March 22, 2016) stating that the replacement
  cost of Felix's home was $727,024.33 (Trial Ex. D15 at 43);

- (3) a rough draft report from Summit (dated April 7, 2016) stating that the
  replacement cost of Felix's home was $712,779.39 (Trial Ex. D17 at 45); and

- (4) a second report from Summit (dated May 2, 2016) stating that the replacement
  cost of Felix's home was $588,453.18 (Trial Ex. J29 at 11).

The largest replacement-cost figure presented to the jury was the estimated replacement cost of $733,042 in the Policy itself. The second largest was the March 22 Summit report stating that the replacement cost of Felix's home was $727,024.33. Felix did not present any evidence showing that the replacement cost of his home was more than $733,042 or the policy maximum of $733,100. (*See* ECF No. 51-1 at 8.) While Felix tried to show that Summit "lowballed" him on lumber costs by pricing two-by-fours instead of two-by-sixes, Felix never presented evidence on the difference in cost between these types of lumber. Similarly, Felix claimed that Summit miscalculated the square footage of Felix's home by 1,200 square feet, but never introduced evidence of the actual size of Felix's home or how the miscalculation affected replacement cost.

Further, the photographs of Felix's home (Trial Exs. J53, J54) did not provide the jury with a reasonable basis to award more than the Policy's loss-of-dwelling limit. These photos generally showed the quality of Felix's home but did not provide any concrete insight into the cost of replacing it. Therefore, the jury did not have a reasonable evidentiary basis to award Felix the 25% endorsement for his loss of dwelling. Any jury award for loss of dwelling beyond the $733,042 replacement cost in the Policy is unreasonably speculative and vague. *Ferrer*, 825 A.2d at 610.

In sum, the evidence on replacement cost presented at trial did not implicate the 25% endorsement. Accordingly, ANPAC is entitled to judgment as a matter of law on this point and the Court will remit the jury's loss-of-dwelling award by $181,756.08.

> **b.    The Jury Had a Reasonable Basis to Award Felix $727,024.33 For the Loss of His Dwelling**

As the preceding subsection indicates, the jury had a reasonable basis to award Felix

$727,024.33—the replacement cost estimate in the March 22 Summit report (Trial Ex. D15)—for the loss of his dwelling.

Contrary to ANPAC's suggestion, the jury was not required to accept the May 2 Summit report (Trial Ex. J29) as the actual replacement cost for Felix's home. Felix's counsel may have led the jury to question how ANPAC determined the replacement cost of Felix's home by introducing the March 22 and April 7 Summit reports, where the estimated replacement costs were significantly lower. (Trial Exs. D15, D17.) Felix's counsel also cross-examined Cory Campbell on how Summit reached its replacement-cost figures. (ECF No. 244 at 134:2-143:9.) The jury could have reasonably accepted that the March 22 Summit report most accurately captured the replacement value Felix's home. Accordingly, the Court will affirm the jury's loss-of-dwelling award to $727,024.33, without the addition of the 25% endorsement.

## 4. ANPAC Is Not Entitled to Judgment as a Matter of Law or Remittitur Regarding the Services of Robert L. Felix

The Policy provides that "[ANPAC] will pay the reasonable expense incurred by you in the removal of debris of covered property provided coverage is afforded for the peril causing the loss." (ECF No. 51-1 at 15.) The jury awarded Felix $3,800 for his father's excavation work. (ECF No. 218.)

ANPAC argues that the jury improperly awarded Felix $3,800 for his father's excavation services. (ECF No. 229 at 50-51.) ANPAC argues, without citation, that Felix "did not have standing" to collect damages for his father's excavation services. (*Id.* at 51.) ANPAC argues that there was no evidence that Felix was responsible for payment of the invoice for his father's excavation services because (1) Felix's father was not a party to this action, (2) Felix did not testify

-34-

about the invoice for his father's excavation services, and (3) the invoice was not addressed from Robert Felix to Daniel Felix.[26] (*Id.*)

Felix argues that the jury heard ANPAC representatives admit that they should have paid Robert Felix for his excavation services. (ECF No. 233 at 22-24.) Felix points out that Robert Felix was hired to perform excavation work at ANPAC's request, which clearly implicates coverage under the Policy's plain language. (*Id.* at 23.) Finally, Felix argues that he would face personal exposure under Pennsylvania's mechanics' lien laws if the invoice remains unpaid. (*Id.* at 24.)

The Court finds that the jury properly awarded damages to Felix for his father's excavation work. The Court firstly rejects ANPAC's claim that Felix does not have standing to collect damages for his father's excavation services. ANPAC does not cite any authority for its claim. Rather, the Court finds that under Pennsylvania law, Robert Felix's excavation services are recoverable contract damages. *Ferrer*, 825 A.2d at 610. When ANPAC denied Felix's claim, it was foreseeable that Felix would be stuck with the bill for his father's excavation services, especially given that Felix hired his father at ANPAC's request.[27] *Id.* Given the Policy's express language on excavation costs, the parties contemplated this type of expense when the Policy was

---

[26] In its reply brief, ANPAC argues that Felix waived the argument that he is entitled to recover for the excavation services of his father because he never raised that argument at trial. (ECF No. 255 at 22.) ANPAC claims that Felix "had not thought of" this argument until post-trial motions. (*Id.*) However, during his closing argument, Felix's counsel stated that "if you agree with me, ladies and gentlemen, there's several areas that we're entitled to recovery. There is the bill from Mr. Robert Felix, and you're going to get this on your verdict sheet." (ECF No. 253 at 43:2-14.) Accordingly, the Court rejects ANPAC's waiver argument.

[27] Cory Campbell testified that ANPAC's former claims professional, Mr. Van Dyke, arranged for Robert Felix to perform excavation work at Felix's house. (ECF No. 244 at 162:8-15.) Cory Campbell also testified that the invoice for the excavation services "should have been paid" by ANPAC. (*Id.* at 165:17-23.)

entered into. *Id.*; (ECF No. 51-1 at 15). And finally, by introducing the invoice into evidence, Felix proved these damages with reasonable particularity.[28] *Ferrer*, 825 A.2d at 610.

The jury had a reasonable basis to conclude that Felix "incurred" these excavation costs, even though there was no evidence that Felix actually paid $3,800 to his father. At trial, ANPAC representatives testified that Robert Felix's invoice for excavation services was unpaid at the time of trial. (ECF No. 244 at 85:15-87:12.) The invoice plainly shows that excavation costs were incurred by someone. In other words, someone became liable for these costs after the work was performed. Because Felix hired his father to perform the excavation work, it is common sense that Felix would become liable for the excavation bill if ANPAC did not pay it. It is not material that the invoice was not addressed to Felix because ANPAC should have paid the excavation bill under the Policy. (ECF No. 244 at 165:17-23.) Therefore, the jury's award of $3,800 would enable Felix to pay the excavation bill and put Felix in the position he would have been in had ANPAC honored the terms of the Policy.

Accordingly, the Court finds that ANPAC is not entitled to judgment as a matter of law regarding the services of Robert L. Felix, and the Court will not amend the jury's verdict on that point.

---

[28] The invoice for Robert L. Felix's excavation services was introduced at trial and marked as Exhibit J17. (*See* ECF No. 233 at 23.)

### 5. Conclusion

After ruling on ANPAC's Motion for Judgment as a Matter of Law and to Alter Judgment, the Court has remitted the jury verdict as follows:

| Loss of dwelling | $ | 727,024.33 |
|---|---|---|
| Loss of contents | $ | 292,139.80 |
| Loss of use | $ | 0 |
| Services from Robert L. Felix | $ | 3,800 |
| TOTAL | $ | 1,022,964.13 |

## B. Felix is Entitled to Interest and Costs

### 1. Felix is Entitled to Prejudgment and Post-Judgment Interest

Felix moves to add prejudgment and post-judgment interest from January 23, 2016—the date of the fire loss at Felix's home—until the date of payment. (ECF No. 219.) ANPAC does not dispute that Felix is entitled to interest, but merely states that the Court must apply the interest rate to an amended judgment, not the jury's verdict. (*See* ECF No. 228.)

Felix is entitled to prejudgment interest. In diversity cases, prejudgment interest is governed by state law. *See Yohannan v. Keene Corp.*, 924 F.2d 1255, 1265 (3d Cir. 1991) (citing *Jarvis v. Johnson*, 668 F.2d 740, 746-47 (3d Cir. 1982)). Pennsylvania law provides that prejudgment interest on damages for breach of contract is recoverable as a matter of right when damages are ascertainable with mathematical precision. *Camplese v. Consol. Rail Corp.*, 594 F. Supp. 44, 45 (M.D. Pa. 1984). Here, Felix's damages are ascertainable with mathematical precision.

In breach-of-contract cases involving fire insurance, Pennsylvania courts hold that insureds are entitled to interest from the date of the fire until the date of judgment. *Samuels v. Cal. Ins. Co.*, 162 A.2d 48, 51 (Pa. Super. Ct. 1960) (citing *J. Purdy Cope Hotels Co. v. Fidelity-Phenix Fire Ins. Co.*, 191 A. 636, 639-40 (Pa. Super. Ct. 1937)).

A prevailing party in a breach-of-contract action is entitled to prejudgment interest at a 6% rate. 41 Pa. Cons. Stat. § 202. Accordingly, Felix is entitled to prejudgment interest at a 6% rate from January 23, 2016 until the date upon which the Court enters an amended judgment consistent with this Memorandum Opinion and Order.

Felix is also entitled to post-judgment interest. Under federal law, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court . . . from the date of the entry of judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield." 28 U.S.C. § 1961(a); *see also Eaves v. Cty. of Cape May*, 239 F.3d 527, 529-30 (3d Cir. 2001). The weekly average 1-year constant maturity Treasury yield for the week preceding the date of the judgment applies. 28 U.S.C. § 1961(a). Accordingly, Felix is entitled to post-judgment interest from the date of the amended judgment corresponding with this Memorandum Opinion and Order until the date upon which he is paid.

### 2. Felix is Generally Entitled to Costs

Felix also filed a Motion for Costs Pursuant to Fed. R. Civ. P. 54(d). (ECF No. 220.) Rule 54(d) provides that "costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). Therefore, as the prevailing party in this matter, Felix is entitled to costs.

However, the Court will defer ruling on Felix's Motion for Costs until his counsel files a bill of costs. Under 28 U.S.C. § 1924, an attorney must file a bill of costs with an affidavit that states the costs to be taxed and represents that they were necessarily incurred. Similarly, the Local Rules of this Court provide that "a bill of costs must be filed within a reasonable period of time" after a judgment is entered. LCvR 54(B)(2).

Accordingly, the Court will defer ruling on Felix's Motion for Costs until he files a bill of costs. ANPAC shall file any objections to Felix's bill of costs within 21 days of its filing.

### C. ANPAC Is Not Entitled to a New Trial

#### 1. ANPAC Is Not Entitled to a New Trial Because the Jury Did Not Plainly Disregard Evidence and Instructions from the Court

ANPAC argues that the Court must grant a new trial because the "jury's verdict is against the law, the evidence, and the weight of the evidence, and is wholly unsupported by the evidence presented over the course of the trial." (ECF No. 229 at 51-52.) ANPAC argues that the jury recklessly disregarded the evidence presented at trial and instead awarded the Policy's limits to punish ANPAC. (*Id.* at 52-53.)

In response, Felix argues that ANPAC is foreclosed from challenging the sufficiency of the evidence because it did not raise that argument in its motion for judgment as a matter of law at trial. (ECF No. 233 at 24-25.) In the alternative, Felix argues that the evidence introduced at trial properly supported the jury's verdict. (*Id.* at 25-26.)

The Court finds that the jury's verdict was not so contrary to the evidence to justify a new trial. A miscarriage of justice will not result here if ANPAC is not granted a new trial. *See Pryer*, 251 F.3d at 453 (holding that a new trial is not warranted unless the verdict is so contrary

-39-

to the weight of the evidence that a miscarriage of justice would result if the verdict stands). ANPAC does not cite specific evidence indicating that the jury's verdict was motivated by animosity or that it was intended to punish ANPAC. The Court finds that its alteration of the judgment, as discussed in the previous subsection, adequately adjusts the jury's award so that a new trial is not warranted. Accordingly, the Court will not reach Felix's waiver argument.

Moreover, the Court presumes that the jury followed the jury instructions. *See Citizens Fin. Group v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 133 (3d Cir. 2004) (citing *United States v. Givan*, 320 F.3d 452, 462 (3d Cir. 2003)) (holding that courts must presume that juries follow courts' instructions); *United States v. Syme*, 276 F.3d 131, 155 (3d Cir. 2002). The Court instructed the jury that it must "base [its] verdict on the evidence as presented in this case." (ECF No. 253 at 113:4-7.) The Court also stated that "[n]either sympathy nor prejudice should influence you in any way in your deliberations. Our system of law does not permit jurors to be governed by sympathy, prejudice, or public opinion." (*Id.* at 113:13-19.) The Court therefore presumes that the jury did not disregard the evidence and that its verdict was not motivated by an improper purpose.

### 2. ANPAC Is Not Entitled to a New Trial Based on the Court's Excluding Evidence Related to Felix's 2013 Fire Loss and Insurance Claim

In its Memorandum Order excluding any evidence related to the 2013 fire, the Court stated that:

> Evidence of the 2013 fire at Felix's home is not relevant to any fact of consequence to ANPAC's claims. The crucial issue in this case is whether Felix misrepresented that certain items—namely a Louis Vuitton purse and diamond earrings—were destroyed in the 2016 fire. The 2013 fire is wholly unrelated to the content of Felix's insurance claim after the 2016 fire. ANPAC does not allege any connection between the purse or earrings and the 2013 fire. Accordingly, the Court finds

evidence of the 2013 fire at Felix's home fails to meet the low threshold for relevance under Rule 401.

(ECF No. 187 at 3.) The Court also held that evidence of the first fire was inadmissible under Rules 403 and 404(b). (*Id.* at 4-5.)

ANPAC argues that it is entitled to a new trial because the Court improperly excluded evidence of the 2013 fire at Felix's property and the insurance claim he submitted after it. (ECF No. 229 at 53-58.) ANPAC argues that "evidence of the first fire and related claim was necessary and relevant in presenting to the jury a full picture as to all the events related to the subject claim." (*Id.* at 53.) It argues that evidence of the first fire shows Felix's motivation to commit insurance fraud after the second fire because ANPAC overpaid him after the first fire. (*Id.* at 54.) ANPAC also argues that Kip Mathena's testimony opened the door to evidence of the 2013 fire. (*Id.*)

In response, Felix argues that "[e]vidence related to the March 2013 fire had no relevance to ANPAC's denial of coverage in connection with the January 23, 2016 fire." (ECF No. 233 at 28.) Felix argues that the jury may have inferred that Felix was an arsonist if they learned that he had another fire roughly three years earlier, which would cause undue prejudice given that ANPAC did not prove that either fire was the result of arson. (*Id.* at 29.) Felix also argues that the 2013 fire does not show that Felix had a financial motive to defraud ANPAC. (*Id.* at 30.) Felix points out that ANPAC was still able to introduce evidence of Felix's financial condition without introducing evidence of the prior fire. (*Id.* at 31-32.)

Felix is not entitled to a new trial based on the Court's excluding evidence of the 2013 fire. The Court reiterates all the conclusions from its prior Memorandum Order on this issue.

(ECF No. 187.) The 2013 fire is not relevant to the issues in this case because this case does not involve arson—the primary issue at trial was whether Felix misrepresented that certain items were destroyed *after* the 2016 fire. Therefore, any evidence related to the 2013 fire does not meet the low bar for relevance under Rule 401.

And as the Court held before trial, evidence related to the 2013 fire is inadmissible under Rule 403 because it is plainly and obviously prejudicial. Had evidence of the 2013 fire come in, the jury may have inferred that foul play was involved in the ignition of the fires or that Felix was trying to take advantage of ANPAC after the second fire. This potential prejudice clearly outweighs its probative value.

Furthermore, the jury properly considered a substantial amount of evidence related to Felix's conduct after the 2016 fire. And despite the Court's ruling, ANPAC presented significant evidence about Felix's financial state before the 2016 fire.[29] The jury was able to adequately assess Felix's financial state before the 2016 fire without evidence of the 2013 fire and subsequent insurance payout. Evidence related to the 2013 fire would not have added to the jury's understanding of Felix's behavior after the 2016 fire or his financial state beforehand. If anything, this evidence would have confused the issues. Accordingly, the Court rejects ANPAC's argument that evidence of the first fire was necessary to "give the jury a full picture."

---

[29] Here, ANPAC presented extensive evidence on Felix's financial state through the testimony of its accounting expert, Douglas King. (*See* ECF No. 245.) Although ANPAC was not able to discuss the proceeds from Felix's insurance claim after the 2013 fire, the Court finds that ANPAC was able to provide the jury with a detailed account of Felix's financial state. *See Old Chief v. United States*, 519 U.S. 172, 184 (1997) (holding that the "Rule 403 'probative value' of an item of evidence . . . may be calculated by comparing evidentiary alternatives").

The jury was given a full picture through extensive testimony and evidence regarding Felix's financial condition before the 2016 fire and his behavior after it.

The Court also rejects ANPAC's argument that evidence of the 2013 fire was necessary to show that Felix had filled out proof-of-loss forms in the past. ANPAC argues that this indicates that Felix had a motivation to defraud ANPAC or that he did not make a mistake when he filled out the Proof-of-Loss form after the 2016 fire because "his experience in preparing a Proof of Loss for this prior claim provides evidence that refutes any claim of mistake." (ECF No. 229 at 56-57.) The fact that Felix completed a proof-of-loss form in the past does not make it more or less likely that he misrepresented items destroyed in the fire on his 2016 Proof-of-Loss form.[30] Felix's experience with proof-of-loss forms does not have any relationship to his motivation to defraud ANPAC. In other words, ANPAC was not substantially prejudiced by the Court's precluding it from introducing evidence that Felix had completed a proof-of-loss form in the past.

Finally, the Court also rejects ANPAC's argument that Felix offered testimony and evidence that "opened the door" to evidence related to the 2013 fire.[31] The portion of the

---

[30] The Third Circuit "has found that prior similar activities [are] admissible to show intent to defraud, motive, or knowledge of the criminal nature of activity, as well as relevant to proving a crime of fraud." *United States v. Shelow*, No. 10-0037, 2011 WL 6130974, at *4 (E.D. Pa. Dec. 9, 2011) (citing *United States v. Saada*, 212 F.3d 210 (3d Cir. 2000)). ANPAC argues that Felix's insurance claim after the 2013 fire is admissible based on this general rule. However, courts in those cases have admitted evidence of a defendant's prior insurance *fraud*; they did not admit evidence that the defendant had made an insurance claim in the past. *See, e.g., United States v. Jemal*, 26 F.3d 1267, 1272 (3d Cir. 1994). Here, there is no evidence that Felix engaged in insurance fraud before his alleged misrepresentations after the 2016 fire.

[31] ANPAC does not cite case law on this point, but is clearly referring to the common-law evidentiary rule that otherwise inadmissible evidence may be referred to if a party "opens the door" by introducing testimony or argument about that evidence. *See, e.g., United States v. Brown*, No. 2:12-cr-224, 2014 WL 183077, at *4 (W.D. Pa. Jan. 14, 2014) (holding that "if Defendant opens the door by introducing argument

-43-

transcript that ANPAC cites dealt with testimony about the cause-and-origin investigation into the 2016 fire. (ECF No. 229 at 53; ECF No. 240 at 128-130.) ANPAC does not point to specific portions of the transcript where Felix offered evidence or testimony that referred to the 2013 fire. Accordingly, the Court finds that Felix did not open the door to evidence related to the 2013 fire.

In sum, ANPAC is not entitled to a new trial based on the Court's exclusion of evidence related to the 2013 fire at Felix's home.

### 3. ANPAC Is Not Entitled to a New Trial Based on the Court's Excluding Evidence Related to the Cause-and-Origin Investigation into the 2016 Fire

ANPAC contends that it is entitled to a new trial based on the Court's excluding evidence related to the investigation into the cause and origin of the 2016 fire. Before trial, Felix filed a Motion *in Limine* to exclude evidence related to the cause-and-origin investigation. (*See* ECF Nos. 86-87, 111-12.) The Court granted that Motion. (ECF No. 194.) The Court later clarified that ANPAC was not permitted "to introduce evidence of arson or suspicion of arson as the cause of the 2016 fire at Mr. Felix's home." (ECF No. 200.)

ANPAC argues that the Court erred by precluding evidence about the cause-and-origin investigation into the 2016 fire at Felix's home. (ECF No. 229 at 58-62.) ANPAC argues that the Court's ruling "prevented the jury from getting a complete picture regarding the circumstances of the loss and ANPAC's handling of the claim." (*Id.* at 59.) ANPAC also states that without evidence of the cause-and-origin investigation—and its outcome that the cause of the fire was "undetermined"—the jury was unable to comprehend its handling of Felix's claim, including its

---

or evidence about the other gun, the Government will be permitted to introduce evidence related to the other gun, as well").

assigning Felix's claim to the SIU and conducting an examination under oath with Attorney Hudock.[32] (*Id.* at 60.) Finally, ANPAC argues that Felix opened the door to evidence of the cause-and-origin investigation at trial. (*Id.* at 61.)

In response, Felix argues that the cause-and-origin investigation and its outcome are irrelevant to whether Felix misrepresented afterwards that certain items were destroyed in the fire. (ECF No. 233 at 33-34.) Felix also argues that the evidence of the cause-and-origin investigation and its outcome does not provide useful insight into how ANPAC handled Felix's claim. (*Id.* at 36-39.) Felix specifically discusses each step of ANPAC's investigation and argues that the jury had a sufficient basis to follow how ANPAC chose to investigate Felix's claim. (*Id.*)

The Court finds that it properly excluded evidence regarding the outcome of the cause-and-origin investigation and any reference to arson. The Court reiterates its findings in its Memorandum Opinion on Felix's Motion *in Limine.* (ECF No. 194.) There, the Court held that the "central issue in this case is whether Felix knowingly misrepresented that certain items were destroyed in the 2016 fire" and therefore that "[n]either of ANPAC's claims . . . involve the cause or origin of the 2016 fire." (*Id.* at 3.) The Court also held that evidence of the cause-and-origin investigation—specifically that ANPAC investigated whether Felix had committed arson—fails the Rule 403 balancing test because juror speculation about the cause of the 2016 fire could substantially prejudice Felix. (*Id.* at 4.)

---

[32] ANPAC argues that it was unable to explain why ANPAC made seven specific decisions when investigating Felix's claim: (1) why Felix's claim was initially assigned to the SIU; (2) why Attorney Hudock was retained; (3) why ANPAC took two examinations under oath; (4) why ANPAC contacted Kelly Madison and Angela Merrill; (5) why ANPAC inquired into where Felix was before the fire; (6) why Ron Madison contacted ANPAC; and (7) why Felix's claim was subject to heightened scrutiny by ANPAC. (ECF No. 229 at 60.)

ANPAC's post-trial motion illustrates why evidence of the cause-and-origin investigation was irrelevant and prejudicial. ANPAC argues that "[s]imply put, the subject fire loss was suspicious, and ANPAC conducted a full and proper investigation into the cause and origin of the loss; indeed, there is nothing prejudicial about the mere fact that an investigation occurred." (ECF No. 229 at 61.) This argument reinforces the Court's prior ruling. ANPAC is correct that there is nothing prejudicial about it investigating the cause of the 2016 fire—that is why the Court allowed it to mention that it undertook an investigation. (ECF No. 200.) Suggesting that the subject fire loss was suspicious, on the other hand, plainly prejudices Felix and unnecessarily draws the jury's attention to the cause of the fire, thereby distracting from the alleged misrepresentations after the fire. As the Court stated at sidebar during trial:

> I don't believe [evidence of the outcome of the cause-and-origin investigation] is relevant either, not based on the issues that are in this case. In a different case where the origin of the fire would have relevance, that would be different; but I don't think in this case it's relevant. The only possible impact that could have would be to prejudice the Defendant, to raise the issue that this fire is unexplained. So I'll deny the request to get into that area.

(ECF No. 240 at 172:3-9.)

Similarly, the Court does not find that precluding ANPAC "from offering evidence that its investigation was completed prevented ANPAC from providing the jury with a full picture of the process that led to ANPAC's determination that Felix engaged in insurance fraud." (ECF No. 229 at 60.) During his opening statement, ANPAC's counsel stated that "because of the substantial size and nature of this fire . . . it also got referred to what's known at the Special Investigation Unit, or the SIU." (ECF No. 237 at 35:3-13.) The jury was certainly able to understand this straightforward explanation. Moreover, Mathena explained the general process

for how claims are assigned to ANPAC's SIU. (ECF No. 239 at 19:19-20:1.) Mathena testified that the SIU was notified of all fire claims (*id.* at 19:24-20:1), which discredits ANPAC's argument that the jury was unable to understand why ANPAC assigned Felix's claim to the SIU. Mathena also explained that ANPAC sometimes conducts examinations under oath to investigate claims. (*Id.* at 14:20-15:2.) Therefore, the jury had an adequate basis to understand ANPAC's process in investigating Felix's claim without additional testimony about the cause-and-origin investigation.

Finally, the Court does not find that Felix opened the door to testimony about the cause-and-origin investigation. ANPAC cites to a line of questioning by Felix's counsel about the bill for the excavation services of Felix's father, Robert Felix. (ECF No. 240 at 127-130.) Felix's counsel asked Mathena why ANPAC did not pay Robert Felix for his excavation services. (*Id.* at 127:7-22.) At sidebar, ANPAC's counsel stated that this question opened the door to testimony about the cause and origin of the fire. (*Id.* at 128:13-129:18.) The Court stated that "I don't find the door's been opened to the areas you want to get into as long as you limit it to the fact that these bills were submitted and not paid." (*Id.* at 130:6-8.) ANPAC alleges that Felix's father hampered its cause-and-origin investigation by improperly removing debris from the scene. However, the outcome of the cause-and-origin investigation is still irrelevant to whether Felix misrepresented that personal property was destroyed in the fire. This line of questioning by Felix's counsel did not justify ANPAC introducing evidence that the cause of the 2016 fire was suspicious, especially given the potential prejudice this evidence could cause Felix. Accordingly, the Court finds that Felix did not open the door to any further testimony or argument about the cause-and-origin investigation into the 2016 fire.

### 4.    ANPAC Is Not Entitled to a New Trial Because the Court Allowed Questioning About the 25% Endorsement

ANPAC argues that it is entitled to a new trial because the Court allowed questioning

about the 25% endorsement without the endorsement itself having been introduced into

evidence. (ECF No. 229 at 62-65.) Given the Court's holding in the preceding subsection—that

Felix is not entitled to the 25% endorsement as a matter of law—the Court will not reach this

argument.

### 5.    ANPAC Is Not Entitled to a New Trial Based on the Court's Instruction on the Standard Applicable to ANPAC's Declaratory Judgment Claim

ANPAC argues that it is entitled to a new trial because the Court improperly instructed

the jury on the standard applicable to its declaratory judgment claim. (ECF No. 229 at 65-68.)

At trial, the Court instructed the jury on ANPAC's declaratory judgment claim as

follows:

> The first standard that applies is the preponderance of the evidence. ANPAC has the burden of proving its declaratory judgment claim by what is called the preponderance of the evidence
>
> . . .
>
> ANPAC seeks to void the policy for insurance under a provision in the insurance policy that prevents an insured from concealing or misrepresenting material information. This type of claim is called a declaratory judgment. The insurance policy at issue in this case provides that the entire policy shall be void if, whether before or after a loss, any insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof or the interests of any insured therein or, in the case of a fraud or false swearing, by any insurance related thereto.
>
> Therefore, ANPAC is entitled to void the entire insurance policy if it proves by a preponderance of the evidence that Felix willfully and deliberately engaged in concealment or misrepresentation concerning his insurance claim.
>
> A fact is material whenever a reasonable insurance company would attach importance to the fact in determining its course of action. A misrepresentation is

also material if it may be said to have been calculated to either discourage, mislead, or deflect an insurance company's investigation into any area that may seem to the company at that time to be a relevant and productive area to investigate.

A misrepresentation is any assertion by words or conduct that is not in accordance with the facts.

Further, ANPAC is entitled to void the entire insurance policy if it determines that Felix engaged in false swearing. False swearing is where an insured knowingly submits a false statement to the insurance company when the insured is required to certify that his responses are true and correct to the best of his knowledge.

Therefore, if you find by a preponderance of the evidence that Felix willfully misrepresented or concealed a material fact or engaged in false swearing, then you must find in favor of ANPAC upon its declaratory judgment claim.

(ECF No. 253 at 122:3-8, 127:22-129:6.)

"Where a motion for a new trial is based on an alleged legal error in the jury instructions, the court must determine whether the error was in fact committed, and whether that error was so prejudicial that the denial of a new trial would be inconsistent with substantial justice." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 585 F. Supp. 2d 583, 586 (D. Del. 2008). "In making these determinations, the court should examine the jury instructions as a whole and should not scrutinize specific instructions in a vacuum. Overall, the jury instructions must fairly and adequately apprise the jury of the issues and the applicable law." *Id.* (citing *Tigg Corp. v. Dow Corning, Corp.*, 962 F.2d 1119, 1123 (3d Cir. 1992)).

ANPAC argues that the Court's instructions were improper because "the Court elected to treat fraud under the Policy differently from misrepresentation and false swearing." (ECF No. 229 at 66.) ANPAC incorrectly argues that "[t]he Court charged the jury that in the declaratory judgment action, the company was entitled to prove intentional misrepresentation

and false swearing by the preponderance of the evidence standard, but that it was required to prove fraud by the more stringent clear and convincing evidence standard." (*Id.*)

The Court did not instruct the jury that ANPAC was required to prove fraud by clear and convincing evidence in its declaratory judgment claim. The Court more thoroughly instructed the jury on misrepresentation and false swearing to prevent confusion between fraud in the declaratory judgment context—where a preponderance of the evidence standard applies—and ANPAC's civil insurance fraud claim—where a clear and convincing evidence standard applies. The Court did not instruct the jury to apply an improper standard. The Court did not mention clear and convincing evidence when instructing the jury on ANPAC's declaratory judgment claim. If anything, the Court could have instructed the jury more thoroughly on applying the preponderance of the evidence standard to fraud in ANPAC's declaratory judgment claim. But the instructions clearly informed the jury that a preponderance of the evidence standard applied to Felix's declaratory judgment claim.

The Court did make one unclear remark at the end of its jury instructions, but it was not prejudicial to ANPAC or confusing to the jury. After thoroughly instructing the jury on substantive matters, the Court stated that "[y]ou will take this verdict form to the jury room and answer the questions, and when they're complete, sign the form. Of course with regard to the fraud allegations, the burden of proof will be clear and convincing evidence and not preponderance of the evidence." (ECF No. 253 at 136:20-24.) While this remark did not distinguish between the fraud component of ANPAC's declaratory judgment claim and ANPAC's insurance fraud claim, it was clearly made as an aside at the end of the Court's instructions. Any confusion caused by this remark is mitigated by the fact that the jury took a

copy of the Court's instructions—which did not include the above-quoted remark—into deliberations.

Therefore, taken as a whole, the Court's instructions fairly apprised the jury of the issues in the case. Accordingly, ANPAC is not entitled to a new trial based on its objection to the Court's jury instructions.

### 6. ANPAC Is Not Entitled to a New Trial Based on the Court's Refusal to Allow Voir Dire Questioning and a Jury Charge Regarding Misrepresentations

ANPAC argues that the Court erred by not including its requested voir dire questions and jury instructions on misrepresentations. (ECF No. 229 at 68-72.) The Court will address ANPAC's proposed voir dire and jury instructions separately.

First, ANPAC argues that the Court should have asked jurors during voir dire: "if Mr. Felix willfully concealed or misrepresented a single material fact or circumstance concerning his insurance claim, the policy is voided and he would not be entitled to recover anything under the insurance policy." (*Id.* at 64.) The Court did not ask potential jurors the exact "question" that ANPAC requested.

The Court has significant discretion over the voir dire process. *See Butler v. City of Camden*, 352 F.3d 811, 819 (3d Cir. 2003) (holding that "the district court possesses wide latitude over the determination of the particular questions to be asked, and the scope of the inquiry at voir dire"). Courts have ordered new trials where "voir dire examination omitted inquiries relevant to the discovery of actual bias." *United States v. Wooten*, 518 F.2d 943, 946 (3d Cir. 1975) (citing *United States v. Poole*, 450 F.2d 1082 (3d Cir. 1971)). Here, ANPAC is not concerned with

discovering bias, but with strategically "underscor[ing] a very important aspect of the law relevant to [ANPAC's] case." (ECF No. 229 at 69.)

The Court inquired into potential bias by describing the case to prospective jurors and asking if any jurors would not be able to fairly decide the case. (*See* ECF No. 236.) Further, the Court gave a preliminary charge on material misrepresentations that was substantially similar to ANPAC's requested voir dire question. Before trial, the Court instructed the jury that:

ANPAC seeks to void the policy for insurance under a provision in the insurance policy that prevents an insured like Felix from concealing or misrepresenting material information. This type of claim is called declaratory judgment. The insurance policy at issue in this case provides that the entire policy shall be void if, whether before or after a loss, any insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof or the interest of any insured therein or in the case of a fraud or false swearing by any insured related thereto. Therefore, ANPAC is entitled to void the entire insurance policy if it proves that Felix engaged in willful concealment or misrepresentation relating to any material facts or circumstances concerning his insurance claim.

(ECF No. 237 at 16:21-17:9.) Although the Court has no obligation to underscore important aspects of a party's claims during voir dire, this preliminary instruction adequately apprised the jury of the law on Felix's declaratory judgment claim before trial. Accordingly, ANPAC is not entitled to a new trial based on the Court's voir dire questioning.

Second, ANPAC argues that it is entitled to a new trial because the Court did not include a "false in one, false in all" instruction in the final jury charge. (ECF No. 229 at 69-70.) ANPAC requested the following instruction:

[ANPAC] has claimed that Mr. Felix made at least one false statement in his sworn Statement in Proof of Loss and/or in his Statement Under Oath given to [ANPAC]. Under the law, if you believe that Mr. Felix knowingly made a false statement to [ANPAC] concerning any matter that was important to his claim, you may distrust Mr. Felix's statements and representations concerning other matters. You may

-52-

reject all of Mr. Felix's statements or you may accept such parts of his statements that you believe are true and give them such weight as you think it deserves.

(ECF No. 184 at 26.)

While the Court did not give the exact instruction that ANPAC requested, the Court gave a substantially similar instruction. The Court instructed the jury that "ANPAC is entitled to void the entire insurance policy if it proves that Felix engaged in willful concealment or misrepresentation relating to *any* material facts or circumstances concerning his insurance claim." (ECF No. 237 at 17:6-9 (emphasis added).) The Court further instructed the jury that "[a] misrepresentation is *any* assertion by words or conduct that is not in accordance with the facts." (*Id.* at 17:12-14.)

The Court's instructions were similar to ANPAC's proposed instructions and adequately apprised the jury of the law. *Power Integrations*, 585 F. Supp. 2d at 586. Therefore, ANPAC is not entitled to a new trial based the Court's jury instructions.

## V.   Conclusion

For the reasons stated above, ANPAC's Motion to Alter Judgment, Motion for Judgment as a Matter of Law, and Motion for New Trial (ECF No. 223) is **GRANTED IN PART** and **DENIED IN PART**. ANPAC is entitled to judgment as a matter of law and remittitur on certain issues, but it is not entitled to a new trial. Felix's Motion to Alter Judgment to Include Pre-Judgment and Post-Judgment Interest (ECF No. 219) is **GRANTED**. Finally, the Court will defer ruling on Felix's Motion to Alter Judgment to Add Costs Pursuant to Rule 54(d). (ECF No. 220.)

A corresponding order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY, | ) ) ) | Case No. 3:16-cv-147 |
| | ) | JUDGE KIM R. GIBSON |
| Plaintiff and Counterclaim-Defendant, | ) ) | |
| v. | ) ) | |
| DANIEL J. FELIX, | ) ) | |
| Defendant and Counterclaimant. | ) | |

## ORDER

**AND NOW**, this __9th__ day of July, 2019, upon consideration of the post-trial motions

the parties filed after the jury verdict rendered in this case on December 4, 2018, **IT IS HEREBY**

**ORDERED** as follows:

(1)     ANPAC's Motion to Alter Judgment, Motion for Judgment as a Matter of Law, and Motion for New Trial (ECF No. 223) is **GRANTED IN PART** and **DENIED IN PART**. ANPAC is entitled to judgment as a matter of law and remittitur on the jury's award for loss of contents, loss of dwelling, and loss of use. ANPAC's Motion is denied in all other respects. The jury verdict is amended as follows:

| | |
|---|---|
| Loss of dwelling | $    727,024.33 |
| Loss of contents | $    292,139.80 |
| Loss of use | $    0 |
| Services from Robert L. Felix | $    3,800 |
| TOTAL | $    1,022,964.13 |

(2)     Felix's Motion to Alter Judgment to Include Prejudgment and Post-Judgment Interest (ECF No. 219) is **GRANTED**. Felix is entitled to prejudgment interest at a rate of 6% from January 23, 2016 until the date of the entry of the amended judgment.

(3)   The Court will defer ruling on Felix's Motion to Alter Judgment to Add Costs
       Pursuant to Rule 54(d). (ECF No. 220.) Felix shall submit a bill of costs in
       accordance with LCvR 54. ANPAC shall file objections to Felix's bill of costs
       no later than 14 days from the date of its filing.

The Clerk of Court is directed to enter a corresponding amended judgment.

The amended judgment should award Felix $1,023,018.13 plus prejudgment interest at a

6% rate for the period from January 23, 2016 until date upon which the Court enters the amended

judgment, and post-judgment interest from the date upon which the Court enters the amended

judgment until payment.

**BY THE COURT:**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**